1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2      Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  STEVEN B. SACKS, Cal. Bar No. 98875
   JEFFREY K. REHFELD, Cal. Bar No. 188128
4  ORI KATZ, Cal. Bar No. 209561
   Four Embarcadero Center, 17th Floor
5  San Francisco, California  94111-4106
   Telephone:    415-434-9100
6  Facsimile:    415-434-3947

7  Proposed Attorneys for The Billing Resource, dba
   Integretel
8
                    UNITED STATES BANKRUPTCY COURT
9
                   NORTHERN DISTRICT OF CALIFORNIA
10
                          [SAN JOSE DIVISION]
11

12  In re                                      Case No. 07-52890

13  THE BILLING RESOURCE, dba                  Chapter 11
    INTEGRETEL, a California corporation,
14
                  Debtor.
15
    Tax ID: 33-0289863
16

17  THE BILLING RESOURCE, dba                  Adv. Proc. No. 07-05156
    INTEGRETEL, a California corporation,
18                                             **MEMORANDUM OF POINTS AND**
                  Plaintiff,                   **AUTHORITIES IN SUPPORT OF**
19                                             **EMERGENCY MOTION FOR**
         v.                                    **TEMPORARY RESTRAINING ORDER**
20                                             **AND ORDER TO SHOW CAUSE RE:**
    FEDERAL TRADE COMMISSION, and              **PRELIMINARY INJUNCTION AND**
21  DAVID R. CHASE, not individually, but      **DECLARATORY RELIEF**
    solely in his capacity as receiver for
22  Nationwide Connections, Inc., Access One   Date:        September 26, 2007
    Communications, Inc., Network One Services, Time:        2:15 p.m.
23  Inc., 411TXT, Inc., CELL-INFO-USA, INC.,   Place:       United States Bankruptcy Court
    Enhanced Billing Services, Inc., Toll Free              280 South First Street
24  Connect, Inc., Cripple Creek Holdings, LLC,             San Jose, California
    Built to Last, LLC, Not Fade Away, LLC, He's Judge:     Hon. Arthur S. Weissbrodt
25  Gone, LLC, The Other One, LLC, Turn on     Courtroom:  3020
    Your Love Light, LLC, China Cat Sunflower,
26  LLC, Lazy River Road Holdings, LLC,

27                Defendants.

28

W02-WEST:5SS1\400436007.4                      MEMORANDUM OF P&A'S RE EMERGENCY
                                                          MOTION FOR TRO . . .

1

## TABLE OF CONTENTS

2

Page

3   I.     INTRODUCTION ........................................................................................... 1

4   II.    FACTUAL STATEMENT .............................................................................. 4

5       A.     The Debtor's Business. ...................................................................... 4

6       B.     The Florida Action and the Debtor's Bankruptcy Filing. ............................. 5

7       C.     Irreparable Injury Will Occur Absent A Stay Of The Payment Order And The Florida Action............................................................................... 8

9       D.     The Debtor Has a Reasonable Likelihood of a Successful Reorganization. .................................................................................... 10

11   III.   RELIEF REQUESTED .............................................................................. 10

12   IV.   ARGUMENT............................................................................................. 11

13       A.     The Court Has Authority Under Section 105 to Stay the Florida Action. ...................................................................................... 11

15       B.     The Debtor Has Shown Entitlement to a Stay Under the Preliminary Injunction Standard in this Circuit. ............................................. 11

16

17           1.     The Debtor Has a Reasonable Likelihood of a Successful Reorganization.......................................................... 12

18

19           2.     The Debtor Will Suffer Irreparable and Severe Hardship if Required to Defend the Florida Action or Comply with the Payment Order.................................................... 13

20

21           3.     No Serious Hardship will Befall the FTC or the Receiver if the Florida Action is Stayed. .................................................... 14

22

23           4.     Serious Questions Are Raised And The Balance Of Hardships Tips Strongly In Favor Of Granting A TRO And Preliminary Injunction.................................................................... 15

24

25           5.     Granting a Stay is not Inconsistent with the Public Interest. ............. 16

26   V.    NOTICE................................................................................................... 17

27   VI.   CONCLUSION ......................................................................................... 17

28

-i-

1

## TABLE OF AUTHORITIES

2

### FEDERAL CASES

3

In re Bonner Mall Partnership,
   2 F.3d 899, 915 (9th Cir. 1993), dismissed as moot, 513 U.S. 18 (1994)............................... 16

Canter v. Canter (In re Canter),
   299 F.3d 1150 (9th Cir. 2002).............................................................................................. 1

Caribbean Marine Services Co. v. Baldrige,
   844 F.2d 668 (9th Cir. 1988)............................................................................................. 13

FTC v. First Alliance Mortgage Co. (In re First Alliance Mortgage Co.),
   264 B.R. 634 (C.D. Calif. 2001) ........................................................................................ 13

Gruntz v. County of Los Angeles (In re Gruntz),
   202 F.3d 1074 (9th Cir. 2000)........................................................................................... 11

Homestead Holdings, Inc. v. Broome & Wellington (In re PTI Holding Corp.),
   346 B.R. 820 (Bankr. D. Nev. 2006).......................................................................... 12, 14

NLRB v. Bildisco & Bildisco,
   465 U.S. 513 (1984) .......................................................................................................... 16

NLRB v. Superior Forwarding, Inc.,
   762 F.2d 695 (8th Cir. 1985)............................................................................................. 13

Save Our Sonoran, Inc. v. Flowers,
   408 F.3d 1113 (9th Cir. 2005)........................................................................................... 12

Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.,
   ___ F.3d ___, 2007 WL. 2555941,
   07 Cal. Daily Op. Serv. 10,857 (9th Cir. 9/7/2007) ....................................................11-12

Walsh v. West Virginia (In re Security Gas & Oil, Inc.),
   70 B.R. 786 (Bankr. N.D. Cal. 1987)................................................................................ 11

### FEDERAL STATUTES

11 U.S.C.
   § 105 .........................................................................................................................1, 3, 11-12
   § 362(b)(4)...................................................................................................................1-2, 11

28 U.S.C.
   § 157(b)(2)(K) ..................................................................................................................... 3

### MISCELLANEOUS

H.R.Rep. No. 95-595 (1977) ............................................................................................... 11

W02-WEST:5SS1\400436007.4

MEMORANDUM OF P&A'S RE EMERGENCY
MOTION FOR TRO . .

# I.

## **INTRODUCTION**

The Billing Resource, dba Integretel, a California corporation (the "Debtor" or "Integretel"), the plaintiff in the above-captioned adversary proceeding and the debtor in the underlying bankruptcy case, seeks on an emergency basis an order from this Court staying pursuant to Section 105 of the Bankruptcy Code the proceedings against the Debtor in the action brought by the Federal Trade Commission (the "FTC") in the United States District Court for the Southern District of Florida (the "Florida Court"), including the enforcement of orders made in the Florida Action for the payment of money.  Unless the Debtor obtains relief from this Court, the Debtor will be unable to stay in business, pursue reorganization under Chapter 11, or treat its unsecured prepetition creditors equally.

The Florida Action "threaten[s] the integrity" of the bankruptcy estate, which is "precisely" the instance in which "Section 105 contemplates injunctive relief."  Canter v. Canter (In re Canter), 299 F.3d 1150, 1155 (9th Cir. 2002) (citation omitted).  The Florida Court has issued an order for the Debtor to pay a receiver appointed in the Florida Action (the "Receiver") an amount in excess of $1.7 million (the "Payment Order"), which the Florida Court has ruled is not subject to the automatic stay.  The Debtor strenuously disagrees with that ruling, and has filed an appeal to the Eleventh Circuit Court of Appeals.[1]  Only this Court, however, can issue a stay pursuant to Bankruptcy Code section 105 based upon its consideration of the Debtor's reorganization and the effect of the Florida Action on this bankruptcy case.  This Court can and should use its powers under Section 105 independently of the issue of whether the Florida Court's ruling concerning the automatic stay is correct.

---

[1] Integretel concedes that the FTC's prosecution of the Florida Action is not subject to the automatic stay pursuant to 11 U.S.C. § 362(b)(4).  However, the Debtor contends that the Receiver's efforts to enforce the Amended Preliminary Injunction against Integretel and his demand for payment of over $1.7 million to the receivership estate are stayed and the Debtor has appealed the Florida Court's orders insofar as it ruled differently.  The Debtor is seeking a stay pending appeal of this portion of the District Court's order.

-1-

MEMORANDUM OF P&A'S RE EMERGENCY
MOTION FOR TRO . .

1    Moreover, the Debtor needs the immediate ruling of this Court because the

2  Receiver persists in efforts to collect money from the Debtor without regard to the

3  Debtor's bankruptcy.  Most recently, the Receiver filed an emergency motion with the

4  Florida Court asking it to order payment by Tuesday, September 25, 2007 or to have the

5  Debtor's president appear in Florida on the following day.  (A copy of the Receiver's

6  "Emergency Motion in Furtherance of Pending Contempt Proceeding" is attached to the

7  Sacks Declaration as Exhibit A).  The Receiver was well aware that the debtor does not

8  presently have authority to use any funds until a cash management order is submitted and

9  entered and acknowledged in his motion that this Court has not granted the Debtor the use

10  of cash collateral and has set a further hearing on that matter for Wednesday, September 26

11  at 2:15 p.m.  The Florida Court denied this motion "on the grounds that the Bankruptcy

12  Court should have the opportunity to make its own determination as to Integretel's

13  motion,"[2] demonstrating that the payment issues need to be immediately addressed by this

14  Court.  The Debtor has therefore filed this motion on an emergency basis for a hearing on

15  shortened time.

16    In addition to requesting that the enforcement of the Payment Order be enjoined, the

17  Debtor requests that this Court enjoin the Florida Action entirely to afford the Debtor time

18  to file and confirm a plan of reorganization.  The Florida Action is extremely burdensome

19  to the Debtor as the result of the substantial attorneys' fees required in relation to the

20  Debtor's business and the diversion of management attention away from reorganization.

21  While the Florida Court has held that the Florida Action falls within the automatic stay

22  exception contained in Section 362(b)(4) of the Bankruptcy Code, it should nonetheless be

23  stayed so that it does not force the Debtor out of business as opposed to merely regulating

24  the Debtor's activities.  The Debtor no longer does business with the customers whose

25  improper activities prompted the institution of the Florida Action.  The FTC has never

26  sought a preliminary injunction against the Debtor in the Florida Action.  The Receiver,

27  _____
   [2] See Sacks Declaration, Exhibit B.

28

W02-WEST:5SS1\400436007.4                    MEMORANDUM OF P&A'S RE EMERGENCY
                                                              MOTION FOR TRO . .

1  acting on behalf of the estates of two former customers of the Debtor, claims that the

2  customers' prepetition claims against the Debtor for the payment of "reserves" withheld

3  from them constitute a property interest in the Debtor's cash based on an injunction issued

4  by the Florida Court.  The Debtor maintains that any obligation to the Receiver was a

5  prepetition payment obligation akin to every other unsecured creditor's claim.  That dispute

6  is within the core jurisdiction of this Court, which is charged with determining, among

7  other things, the validity, extent, or priority of liens.  28 U.S.C. § 157(b)(2)(K).  In the

8  meantime, the Debtor should be afforded an opportunity to pursue reorganization of its

9  business without being required to continue paying very significant attorneys' fees and

10  devoting substantial management and staff time to the Florida Action.

11      Unless the Florida Action is enjoined, the bankruptcy estate may be diminished by

12  the over $1.7 million claimed by the Receiver in connection with the former customers'

13  prepetition claims against the Debtor, which would violate the Bankruptcy Code's

14  principle of equal distribution to creditors.  This payment, and the very significant

15  attorneys' fees being consumed by the Florida Action, would interfere with the Debtor's

16  ability to stay in business and reorganize for the benefit of all of its creditors.

17      This is an appropriate case to issue a stay under Section 105 because if the Debtor is

18  forced out of business by the regulatory action, there will be nothing left to regulate.  Not

19  only would that outcome deny the Debtor the right to proceed under Chapter 11, but it

20  would be harmful to the Debtor's customers, who would not be able to easily switch their

21  business to one of the two other companies providing this service.  If the Debtor is forced

22  out of business, then there will be only two full-service competitors left in the billing

23  aggregator industry, a result seemingly at odds with the FTC's statutory mandate to foster

24  competition.  If the Debtor fails, the Debtor's employees would be deprived of their jobs.

25      The Court should enter an injunction pursuant to Section 105 of the Bankruptcy

26  Code against the prosecution of the Florida Action as to the Debtor.

27

28

-3-

1

**II.**

2

**FACTUAL STATEMENT**[3]

3

A.    **The Debtor's Business.**

4    The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy

5    Code on September 16, 2007 (the "Petition Date").  The Debtor is operating its business

6    pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  On September 19, 2007, the

7    Debtor filed an adversary proceeding against the FTC and the Receiver for declaratory and

8    injunctive relief based on the allegations herein.  (A copy of the complaint in the adversary

9    proceeding is attached to the Sacks Declaration as Exhibit C).

10    The Debtor was formed in 1988 based on a need for aggregators to facilitate billing

11    and collections on behalf of smaller telecommunications companies that provided

12    "alternative operator services" ("AOS") which otherwise could not afford to compete with

13    the larger local exchange carriers ("LECs" or "Telcos") such as AT&T.

14    AOS involves providing long-distance calling on an occasional or as-needed basis

15    in situations where often the consumer uses the service provider's assets or services

16    without the consumer or the service provider knowing each other's identity.  For example,

17    a service provider owning the service contract for a hotel chain has no idea as to the

18    identity of the consumer using its phones.  If an AOS provider facilitates a collect call it

19    needs a way to bill the consumer for that call.

20    The Debtor addressed a significant industry void by creating a service bureau

21    focused entirely on billing-related services for AOS providers and others needing a means

22    of billing consumers for their services.  As the cornerstone to its billing capability, the

23    Debtor maintains a full complement of billing and collection agreements with an estimated

24    _____

[3] The factual statements herein are supported by the concurrently filed declarations of Ken

25    Dawson (the "Dawson Declaration"), Neal Goldfarb (the "Goldfarb Declaration") and
Steven B. Sacks (the "Sacks Declaration") in support of the Emergency Motion, the

26    complaint in this adversary proceeding, the other papers of record, and upon such further
oral and documentary evidence as may be presented prior to or at the time of the hearing

27    on the Emergency Motion.

28

-4-

1    1,400 or more LECs and independent service providers so that it can place calls made

2    through an AOS on a LEC bill.  This infrastructure enables telecommunication service

3    providers to incorporate their charges within the phone bills of more than 90% of business

4    and residential consumers throughout the United States and Canada.

5         The Debtor quickly established itself as a leader in providing LEC billing solutions

6    for diverse and emerging products and services.  The Debtor presently offers a complete

7    array of complementary services including internet-delivered management and settlement

8    reporting, direct billing, customer care and collection support.  As a strategic back-room

9    business partner, the Debtor frees its clients to focus their efforts on promoting and selling

10   products and services.

11        The Debtor has served thousands of service providers over the years.  The vast

12   majority of the processed billings have been in support of smaller sized businesses that

13   otherwise would not have been able to compete.  It is the competitive pressure of these

14   smaller companies that has forced down the rates charged to consumers by the larger

15   telecommunication companies.

16        The Debtor has approximately thirty-seven employees.  Twenty-two of those

17   employees have been with the company for over five years, and thirteen have been with

18   the Debtor for over ten years.  In addition, the Debtor's services support, through

19   outsourced relationships, approximately 20-30 call center personnel in several different

20   call centers who are employed by a third-party vendor.

21   B.    **The Florida Action and the Debtor's Bankruptcy Filing.**

22        On February 27, 2006, the Federal Trade Commission (the "FTC") commenced a

23   lawsuit (i.e., the Florida Action) against three AOS providers, including Access One

24   Communications, Inc. ("Access One") and Network One Services, Inc. ("Network One"),

25   as well as their principals, alleging deceptive and unfair practices for unauthorized billing

26   of charges on phone bills – referred to as "cramming" – in violation of the Federal Trade

27

28

-5-

1   Commission Act (the "FTCA").[4]   Access One and Network One had previously been

2   customers of the Debtor (the "Prior Customers").  The Florida Court entered a temporary

3   restraining order and later a preliminary injunction.  The Florida Court appointed the

4   Receiver as the receiver for the defendants and certain of their affiliates.  An "Amended

5   Preliminary Injunction Order" was filed on September 25, 2006.  On or about September

6   21, 2006, the FTC filed an amended complaint which included claims against the Debtor

7   and another billing aggregator.

8           The FTC alleged in its Amended Complaint that the Debtor caused certain of the

9   Prior Customers' fraudulent charges to be placed on end users' phone bills and that the

10  Debtor was liable under the FTCA in spite of the fact that the LECs, not the Debtor,

11  perform the billing.

12          The FTC has sought injunctive relief against the Debtor as well as monetary redress

13  including restitution for the allegedly defrauded consumers.  There has been no finding

14  that the Debtor violated the FTCA.

15          The Debtor voluntarily stopped providing services for the Prior Customers over a

16  year prior to the FTC's filing of its Amended Complaint.  At the time that it stopped

17  providing services, the Debtor stopped making payments to the Prior Customers and

18  instead made a determination under the contracts with the Prior Customers that all further

19  amounts received from LECs on account of their billings should be booked as reserves.

20  This was done because of the Debtor's possible exposure to claims for refunds of the Prior

21  Customers' Billing Transactions.

22          Whenever the Debtor allocated an amount to the reserves for the Prior Customers,

23  the Debtor made a bookkeeping entry for that amount.  However, the Debtor does not have

24  a corresponding asset, such as a bank account, that contains the monies that were allocated

25  as reserves from the Prior Customers.  Moreover, there is no segregated account containing

26  ─────────────
    [4] The Florida Action is captioned Federal Trade Commission v. Nationwide Connections,
27  Inc., et al., Case No. 06-80180-Civ-Ryskamp, United States District Court for the Southern
    District of Florida.

28

-6-

1  the reserves of any customer, including either of the Prior Customers.  The Debtor does not

2  have enough monies to cover the full amount of reserves for all of the Debtor's customers.

3       In contrast to the FTC's allegations, the Debtor asserted that the Prior Customers'

4  wrongful conduct caused great injury to the Debtor, including by causing the Debtor to

5  incur fees and expenses to defend the FTC action.

6       The Receiver is seeking to collect all assets of the Prior Customers.  Toward that

7  end, the Receiver sought relief in the Florida Action by motion against the Debtor.  The

8  Receiver asserted that the Debtor owes the Prior Customers the amount that the Debtor

9  booked as reserves for the Prior Customers, which the Receiver alleged was an asset of the

10 Prior Customers, in an amount in excess of $1.7 million.  The Receiver further alleged that

11 the Debtor had violated the Amended Preliminary Injunction Order and should be held in

12 contempt for failing to turn over the sums demanded by the Receiver.

13      The Debtor filed a response opposing such relief on numerous grounds, including

14 that at the most, any rights the Prior Customers—and therefore the Receiver, who stood in

15 their shoes—had with respect to the reserves were simply those rights of a general,

16 unsecured creditor.  The Debtor also asserted that it had offsetting claims against the Prior

17 Customers which exceeded the amount of the Prior Customers' alleged reserves.   In

18 particular, to the extent the Debtor has any liability in the Florida Action, it arises from the

19 misconduct of the Prior Customers, not the Debtor, and the Prior Customers are liable to

20 the Debtor for such liability, as well as the costs and fees incurred in the Florida Action.

21 These costs and fees, and the liability asserted against the Debtor in the Florida Action, far

22 exceed the amount of any sums withheld from the Prior Customers as reserves.

23      The Florida Court entered an order on September 14, 2007 (the "Payment Order")

24 requiring that the Debtor pay over the amounts sought by the Receiver into a segregated

25 receivership account.  See Sacks Declaration, Exh. D.  The Payment Order was entered

26 upon the motion of the Receiver, not the FTC.

27      The Florida Court has since ruled that the Florida Action and the Payment Order are

28 not subject to the automatic stay and that the Florida Court can continue with its contempt

-7-

MEMORANDUM OF P&A'S RE EMERGENCY
MOTION FOR TRO . .

1   proceedings.  See Sacks Declaration, Exh. E.

2        The Debtor has expended over $700,000 in legal fees and costs to date in defending

3   the Florida Action.  That case is set for trial in February 2008.  The Debtor expects that

4   unless the FTC is enjoined from proceeding as to the Debtor and the Receiver is enjoined

5   from enforcing the Payment Order that it will be required to spend as much as $1 million

6   in legal fees and costs in defending the matter.  These fees will be incurred in completing

7   discovery, responding to an expected dispositive motion by the FTC, prosecuting the

8   Debtor's appeal from the Florida Court's Payment Order and related rulings, preparing for

9   trial and conducting a trial expected to consume 10-20 trial days.   See Goldfarb

10  Declaration.

11       The Debtor has also had to devote substantial and valuable management and

12  employee time and resources to the Florida Action.  Given the schedule in that case, the

13  Debtor's management will need to be diverted even more is issue and would be forced to

14  further incur such items, to the detriment of its reorganization efforts, if this action were

15  not stayed as against the Debtor.

16       The Debtor believes that it will ultimately prevail in the Florida Action, and that it

17  will ultimately be held to owe nothing to the Receiver.  However, the Debtor could not pay

18  the money sought by the Receiver and still continue its normal operations.  The Debtor

19  requested that the Receiver agree to a stay to the implementation and enforcement of the

20  Payment Order.  The Receiver refused.  The Debtor thereafter filed for bankruptcy

21  protection.

22  C.    **Irreparable Injury Will Occur Absent A Stay Of The Payment Order And The Florida Action.**

23

24       The Debtor filed for bankruptcy protection because it could not continue its

25  operations and pay over $1.7 million to the Receiver.  Nor can it afford to have the Florida

26  Action continue at the outset of this case, when it will divert its management's attention

27  from the reorganization effort and cost very significant attorneys' fees and costs that the

28  Debtor cannot afford.  The Debtor can only proceed with a successful reorganization if the

-8-

1   Florida Action, including the Payment Order, is stayed.

2        The Debtor has submitted a budget to this Court in connection with the Debtor's

3   cash collateral motion.  The budget shows that the Debtor had $1.9 million in cash at the

4   filing date and expects receivables to be paid in the next three weeks of $3.9 million.  If

5   that cash is not used to meet secured creditors' claims on it and to make payments to the

6   Debtor's current customers in exchange for continuing to submit receivables to the Debtor,

7   then they may, as soon as they are able to do so, stop doing business with the Debtor and

8   bring its operations to a halt.  The Chapter 11 filing has unsettled the Debtor's customer

9   relationships.  For the Debtor to reorganize it needs to retain these customers. It cannot do

10  so if its scarce resources are used for past claims asserted by the Receiver and in

11  connection with litigation with the FTC.

12       Moreover, if the Prior Customers' claims are paid now, they would receive far more

13  than their pro rata share of any funds available to return reserves to customers.  The

14  Debtor's current customers have no different entitlement to the Debtor's assets than the

15  Receiver.  If the other customers are not afforded similar relief, then the Prior Customers

16  will have been preferred to the detriment of the Debtor's other creditors.

17       Obviously, the FTC claims it is acting in the public interest by proceeding with its

18  claims against the Debtor for its involvement with the Prior Customers some two years

19  ago.  But the FTC cannot achieve any proper regulatory goal if continuing the Florida

20  Action merely puts the Debtor out of business, reducing competition in the marketplace

21  from three firms to two.   The Debtor plays an important role in helping keep

22  telecommunication prices down, thereby serving the public interest.  Unless the Florida

23  Action is stayed, the Debtor is likely to cease operations.  A forced liquidation of the

24  Debtor will forfeit the Debtor's going concern value, leaving the Debtor's creditors much

25  worse off.  A cessation of the business will also cost the Debtor's employees their

26  livelihoods.  This will leave no regulatory purpose to the Florida Action.

27       Putting the Debtor out of business would also prejudice the Debtor's existing

28  customers.  Unlike the two Prior Customers who are no longer operating, the Debtor's

W02-WEST:5SS1\400436007.4                    MEMORANDUM OF P&A'S RE EMERGENCY
                                             MOTION FOR TRO . .

1  other customers are still in business and likely would not be able to switch all of their

2  billing and collection needs over from the Debtor to one of the Debtor's competitors fast

3  enough to avoid substantial harm to their business operations.

4        Against the prospect of fatally injuring the Debtor by continuing the Florida Action

5  and enforcing the Payment Order, the FTC and the Receiver will suffer no comparable

6  injury if the Florida Action and the Payment Order are stayed.  The Debtor is now under

7  this Court's oversight.  It is not alleged to be continuing to engage in any improper conduct

8  that the Florida Action will remedy.  Delaying the Florida Action to give the Debtor a

9  breathing spell to reorganize threatens no important governmental or public interest that

10  has ever been articulated by the FTC.

11  D.     **The Debtor Has a Reasonable Likelihood of a Successful Reorganization.**

12        The Debtor believes it will be able to successfully confirm a plan of reorganization.

13  It bases that belief on the fact that on a going forward basis, the Debtor can be cash flow

14  positive if it maintains its existing level of revenue and does not incur extraordinary costs

15  arising from previous operations.  The Debtor has a number of avenues open to it to

16  reorganize.  It could propose a plan under which it establishes a pot from which unsecured

17  claims would be paid *pro rata*.  It could also propose to issue new common stock in

18  exchange for the unsecured debt, thus making its creditors into shareholders, with a stake

19  in outcome of future operations.  It could conclude a sale of its business to a competitor or

20  other buyer and the proceeds of that sale would comprise the distributions that unsecured

21  creditors would receive, after payment of secured claims and administrative costs.

22        Given sufficient time the Debtor can formulate a plan and negotiate that plan with

23  its creditors.  The Debtor faces no insuperable obstacles to successfully resolving this

24  bankruptcy case.

25                              **III.**

26                        **RELIEF REQUESTED**

27        The Debtor seeks an order from the Court staying the Florida Action, including the

28  Payment Order, until the Court enters a preliminary injunction granting that same relief.

-10-

W02-WEST:5SS1\400436007.4                    MEMORANDUM OF P&A'S RE EMERGENCY
                                             MOTION FOR TRO . .

**IV.**

**ARGUMENT**

A.    **The Court Has Authority Under Section 105 to Stay the Florida Action.**

"Section 105(a) gives the bankruptcy courts the power to stay actions that are not subject to the 11 U.S.C. § 362(a) automatic stay but 'threaten the integrity of a bankrupt's estate.'" Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc., ___ F.3d ___, 2007 WL 2555941, 07 Cal. Daily Op. Serv. 10,857, 10,859 (9th Cir. 9/7/2007) (citations omitted). Bankruptcy courts have the power to enjoin prosecution of governmental actions even if they fall under the police and regulatory power exception:

> There [is] a procedural avenue to forfend state actions that are not subject to the automatic stay but that threaten the bankruptcy estate: a request for an injunction under 11 U.S.C. § 105. The bankruptcy court's injunctive power is not limited by the delineated exceptions to the automatic stay . . .

Gruntz v. County of Los Angeles (In re Gruntz), 202 F.3d 1074, 1087 (9th Cir. 2000) (en banc). See H.R.Rep. No. 95-595, at 342 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6298 ("The effect of the [police powers] exception is not to make the action immune from injunction. The court has ample other powers to stay actions not covered by the automatic stay. Section 105 . . .grants the power to issue [such an injunction]."); Walsh v. West Virginia (In re Security Gas & Oil, Inc.), 70 B.R. 786, 792 (Bankr. N.D. Cal. 1987) ("well established that the bankruptcy court may . . . affirmatively enjoin acts against a debtor that are not prohibited by the automatic stay").

Enforcement of the Payment Order and the Receiver's continued pursuit of the bankruptcy estate's assets in the Florida Action clearly threaten the integrity of the bankruptcy estate's assets and this Court's jurisdiction over such assets. Accordingly, as shown below, the Debtor satisfies the standard for issuance of an injunction and this is a proper case for application of Section 105.

B.    **The Debtor Has Shown Entitlement to a Stay Under the Preliminary Injunction Standard in this Circuit.**

The Ninth Circuit clarified in a decision issued this month that it will apply the "usual preliminary injunction standard" in considering stays issued under Bankruptcy Code

-11-

section 105(a).  Excel Innovations, 07 C.D.O.S. at 10860.  Thus, in the bankruptcy context, a party seeking a Section 105 stay must show:  (1) a likelihood of success on the merits, meaning that the debtor has a reasonable likelihood of a successful reorganization; (2) the possibility of irreparable injury if relief is not granted; (3) a balance of hardships favoring the plaintiff; and (4) that the requested injunction is in the public interest (if applicable).  Id.  Alternatively, a party may be entitled to a preliminary injunction if the movant shows "*either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor."  Id. (emphasis in original).  The tests are not separate, but instead "represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases."  Id., quoting, Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1120 (9th Cir. 2005).

The circumstances here justify the issuance of a Section 105(a) injunction in favor of the Debtor evaluated under any of the relevant standards.

1.    **The Debtor Has a Reasonable Likelihood of a Successful Reorganization.**

In Excel Innovations, the Ninth Circuit found that the ordinary test of "success on the merits" means a reasonable likelihood of success in reorganizing if the requested injunctive relief is granted, which "is not a high burden."  Where the Debtor is a good candidate for reorganization, has a proactive history while in bankruptcy and has a potentially profitable operating business, it meets this standard.  Homestead Holdings, Inc. v. Broome & Wellington (In re PTI Holding Corp.), 346 B.R. 820, 830-31 (Bankr. D. Nev. 2006).

Enforcement of the Payment Order as well as the Receiver's continued pursuit of relief in the Florida Action against the Debtor and property of the estate will have devastating consequences on the Debtor and likely preclude its successful reorganization. But, if such actions are enjoined the Debtor believes it will be able to successfully confirm a plan of reorganization.  See Dawson Declaration.  As discussed above, the Debtor has a

-12-

1   number of alternatives that can be pursued to resolve its past liabilities.  In the short-term it

2   needs to maintain its ongoing business by convincing customers to continue doing business

3   with it and devoting maximum management attention to the reorganization effort.

4              2.        **The Debtor Will Suffer Irreparable and Severe Hardship if Required to
              Defend the Florida Action or Comply with the Payment Order.**
5

6          The Debtor and its bankruptcy estate risk irreparable harm unless enforcement of

7   the Payment Order and the Receiver's continued pursuit in the Florida Action of the Debtor

8   and estate property are enjoined.  The Payment Order requires that the Debtor pay over

9   $1.7 million to the Receiver in the Florida Action.  By proceeding with the enforcement of

10  the Payment Order, the Receiver is seeking nothing less than actual control over the assets

11  of the estate.  Doing so threatens "the bankruptcy court's exclusive jurisdiction over the *res*

12  of the debtor's estate and therefore can be enjoined."  FTC v. First Alliance Mortgage Co.

13  (In re First Alliance Mortgage Co.), 264 B.R. 634, 655 (C.D. Calif. 2001).

14         Further, the Debtor cannot pay over the money sought by the Receiver and have any

15  likelihood of being able to continue operations.  Enforcement of the Payment Order would

16  constitute "immediate threatened injury" and thus constitutes an ample basis for injunctive

17  relief.  Caribbean Marine Services Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988).

18         The Debtor and its bankruptcy estate would also suffer significant harm from being

19  required to continue litigation of the Florida action with expected fees in amounts so high

20  relative to the Debtor's bankruptcy estate, that permitting the Florida Action to proceed

21  constitutes a threat to the bankruptcy estate and a threat to the bankruptcy process.  See,

22  e.g., NLRB v. Superior Forwarding, Inc., 762 F.2d 695, 698-99 (8th Cir. 1985) (exposure

23  to three-week trial costing $65,000).  Here, the cost of pursuing an appeal, combined with

24  the costs of responding to dispositive motions expected to be filed by the FTC, completing

25  discovery, preparing for and participating in trial will likely be about $1 million, a sum that

26  the Debtor cannot afford to pay and still continue its business.

27         Similarly, permitting the continued litigation of the Florida Action during the first

28  90 days of this bankruptcy case, particularly where the Florida Action is set to start trial in

-13-

1   less than five months, would have an extremely detrimental impact on the Debtor and the

2   bankruptcy estate due to the required diversion of the Debtor's management's limited time,

3   energy and resources.  See Homestead Holdings, Inc. v. Broome & Wellington (In re PTI

4   Holding Corp.), 346 B.R. 820, 827-28 (Bankr. D. Nev. 2006) (diversion of time or

5   energies of key estate personnel during "crucial period in the operational life and

6   reorganization of the debtor" can constitute irreparable harm).  This would have a

7   disproportionately prejudicial impact in this bankruptcy case.   Unlike many larger

8   corporate debtors with well-staffed management teams who have the resources to

9   simultaneously operate their business, navigate the chapter 11 process and manage a

10  separate "bet the company" litigation occurring on the other side of the country, here the

11  Debtor's management consists of just a few individuals.

12          The Debtor's bankruptcy estate would also suffer other irreparable harm.  If the

13  Debtor is required to pay over $1.7 million to the Receiver instead of using its cash on

14  hand to address current, post-bankruptcy liabilities, then the Receiver will have preferred

15  itself to the detriment of all of the Debtor's other creditors.  Such an action violates one of

16  the bedrock foundations of bankruptcy law – equality of distribution among the debtor's

17  creditors.  The inequality here will be heightened by the fact that the payment will likely

18  force the Debtor out of business, leaving the rest of the Debtor's creditors and the

19  bankruptcy estate much worse off, having lost the Debtor's intrinsic going concern value.

20          Moreover, if the Debtor is forced to cease business operations, such cessation would

21  have drastic prejudicial consequences on the Debtor's customers, many of whom likely

22  would not be able to switch all of their billing and collection needs over from the Debtor to

23  one of the Debtor's competitors fast enough to avoid substantial harm to their business

24  operations.  The Debtor's employees would also suffer from the loss of their jobs.

25          3.      **No Serious Hardship will Befall the FTC or the Receiver if the Florida
                    Action is Stayed.**
26

27          In contrast, granting the requested injunctive relief presents relatively little hardship

28  to the Receiver.  The two Prior Customers are no longer in business.  The Receiver would

-14-

1   merely be precluded from obtaining an unfair advantage by enforcing that the Payment

2   Order and from continuing its pursuit of the prepetition contract claims the Receiver

3   asserts on behalf of the Debtor's two Prior Customers in the Florida Action.  Instead, the

4   Receiver will be afforded the same opportunity to pursue the two Prior Customers' claims

5   as the Bankruptcy Code provides to every other similarly situated creditor – the ability to

6   file a proof of claim against the Debtor.

7          Nor will the FTC or consumers suffer any hardship comparable to that of the Debtor

8   as a consequence of delay in adjudicating the Florida Action.  Aside from monetary

9   redress, the FTC's action addresses whether the Debtor should be subject to any injunctive

10  relief regulating its future business operations.  Of course, if there are no future business

11  operations, then the continued prosecution of the Florida Action will be meaningless.  And

12  there is no reason why the injunctive and monetary aspects of the Florida Action cannot be

13  delayed long enough to give the Debtor a chance to propose a reorganization plan under

14  which the Debtor addresses the claims asserted by the FTC, or which provides for the

15  resumption of that litigation post-confirmation.

16          4.    **Serious Questions Are Raised And The Balance Of Hardships Tips
17                Strongly In Favor Of Granting A TRO And Preliminary Injunction.**

18          The Debtor has indubitable rights under the Bankruptcy Code to pursue a

19  Congressionally-authorized bankruptcy reorganization and this Court has a strong interest

20  in effectuating the Code's principles concerning equitable treatment of similar creditors.

21  This case presents serious questions about how to protect these rights and interests in light

22  of the Receiver's claim to the Debtor's limited cash resources and the FTC's efforts to

23  enforce the FTCA.  The Debtor seeks an injunction here to avoid having the interests of all

24  the other parties in this case put at risk by the FTC and the Receiver's claims, which

25  jeopardize the Debtor's entire chapter 11 case and its ability to reorganize.  Moreover,

26  enforcement of the Payment Order and the continued pursuit of the Florida Action will

27  conflict with this Court's administration of the Debtor's bankruptcy case and its bankruptcy

28  estate.  For these reasons, serious questions are raised which satisfy this prong.

-15-

1    Similarly, for the reasons set forth above, the balance of the hardships tips strongly

2 in favor of the requested relief.  Failure to grant the requested relief will have disastrous

3 results for the Debtor, its bankruptcy estate, its creditors, its employees, its customers and

4 the public at large.  In contrast, granting the requested relief means that the claims of the

5 Prior Customers, asserted by the Receiver, will be treated in the same manner as other,

6 similarly situated creditors.  The balance of hardships clearly weighs in favor of granting

7 the requested relief.

8    Therefore, the Debtor has also satisfied this alternate test, and the Court should

9 accordingly grant the requested temporary restraining order and preliminary injunction.

10    5.    **Granting a Stay is not Inconsistent with the Public Interest.**

11    The public interest also weighs in favor of the requested injunctive relief.

12 Chapter 11 of the Bankruptcy Code codifies Congress' decision that reorganization and

13 rehabilitation of debtors is in the public interest.  Enforcement of the Payment Order and

14 the continued litigation of the Florida Action have potentially disastrous consequences to

15 the Debtor and its bankruptcy estate, forcing the Debtor to part with funds essential for the

16 continued operation of its business, jeopardizing its reorganization, and likely forcing it to

17 liquidate.  The United States Supreme Court has stated that "the policy of Chapter 11 is to

18 permit successful rehabilitation of debtors."  NLRB v. Bildisco & Bildisco, 465 U.S. 513,

19 527 (1984).  Reorganization of the debtor and maximizing the value of the bankruptcy

20 estate are two of the primary objectives of Chapter 11.  In re Bonner Mall Partnership,

21 2 F.3d 899, 915 (9th Cir. 1993), dismissed as moot, 513 U.S. 18 (1994).

22    Failure to grant the requested injunctive relief will likely result in cessation of the

23 Debtor's business and its liquidation, prejudicial impact on the Debtor's creditors,

24 significant harm to the Debtor's customers' businesses, and the loss of employment for the

25 Debtor's employees.  Absent the requested injunctive relief, the Receiver and the Prior

26 Customers' claims it is pursuing will be advantaged in ways not contemplated by the

27 Bankruptcy Code's carefully detailed priority distribution procedures.  In addition, the

28 public at large will be harmed by the loss of one of the three remaining billing aggregators

-16-

1   whose services help keep prices down in the telecommunications industry.

2       In contrast, if the requested injunctive relief is granted, the Payment Order will

3   simply be treated the same way as other orders for payment of money are treated under the

4   Bankruptcy Code.  Similarly, the two Prior Customers' claims pursued by the Receiver will

5   simply be treated the same way as other prepetition contract claims are treated under the

6   Bankruptcy Code.

7                                           **V.**

8                                        **NOTICE**

9       A copy of the Motion and supporting documents is being served by email or

10  facsimile on (a) the Receiver's counsel; (b) the FTC's counsel; and (c) the Office of the

11  United States Trustee.

12                                         **VI.**

13                                    **CONCLUSION**

14      The relief requested by the Debtor is absolutely essential for the Debtor's survival,

15  to protect its creditors, to protect its customers, to protect its employees, and to protect the

16  entire bankruptcy estate.  The Debtor is entitled to a temporary restraining order and a

17  preliminary injunction for the reasons set forth herein enjoining the Florida Action and the

18  enforcement of the Payment Order pending the Debtor's effort to confirm a plan of

19  reorganization.

20  Dated: September 24, 2007

21                          Respectfully submitted,

22                          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

23

24                          By        /s/ Steven B. Sacks

25                                    STEVEN B. SACKS
                                      Proposed Attorneys for Debtor The Billing
26                                    Resource, dba Integretel

27

28

-17-

MEMORANDUM OF P&A'S RE EMERGENCY
                                                            MOTION FOR TRO . .