SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
   Including Professional Corporations
MICHAEL H. AHRENS, Cal. Bar No. 44766
STEVEN B. SACKS, Cal. Bar No. 98875
JEFFREY K. REHFELD, Cal. Bar No. 188128
ORI KATZ, Cal. Bar No. 209561
Four Embarcadero Center, 17th Floor
San Francisco, California  94111-4106
Telephone:    415-434-9100
Facsimile:    415-434-3947

Proposed Attorneys for The Billing Resource, dba Integretel

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

[SAN JOSE DIVISION]

| | |
|---|---|
| In re<br><br>THE BILLING RESOURCE, dba INTEGRETEL, a California corporation,<br><br>               Debtor.<br><br>Tax ID: 33-0289863 | Case No. 07-52890<br><br>Chapter 11 |
| THE BILLING RESOURCE, dba INTEGRETEL, a California corporation,<br><br>               Plaintiff,<br><br>      v.<br><br>FEDERAL TRADE COMMISSION, and DAVID R. CHASE, not individually, but solely in his capacity as receiver for Nationwide Connections, Inc., Access One Communications, Inc., Network One Services, Inc., 411TXT, Inc., CELL-INFO-USA, INC., Enhanced Billing Services, Inc., Toll Free Connect, Inc., Cripple Creek Holdings, LLC, Built to Last, LLC, Not Fade Away, LLC, He's Gone, LLC, The Other One, LLC, Turn on Your Love Light, LLC, China Cat Sunflower, LLC, Lazy River Road Holdings, LLC,<br><br>               Defendants. | Adv. Proc. No. 07-05156<br><br>**SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:      October 17, 2007<br>Time:      2:00 p.m.<br>Place:     United States Bankruptcy Court<br>            280 South First Street<br>            San Jose, California<br>Judge:     Hon. Arthur S. Weissbrodt<br>Courtroom:  3020 |

# I.

# **INTRODUCTION**

The Court has issued an Order to Show Cause on Integretel's motion for a preliminary injunction against the Federal Trade Commission ("FTC") and David Chase (the "Receiver") staying pursuant to Section 105 of the Bankruptcy Code the proceedings against the Debtor in the action brought by the Federal Trade Commission (the "FTC") in the United States District Court for the Southern District of Florida (the "Florida Court"), including the enforcement of orders made in the Florida Action for the payment of money. Integretel has previously submitted evidence that it needs this relief in order to continue in business, pursue reorganization under Chapter 11, and treat its unsecured prepetition creditors equally.

Integretel submits herewith additional evidence of the financial effect that continued litigation of the Florida Action and enforcement of the payment order would have on its business. That evidence demonstrates that Integretel needs the funds sought by the Receiver to continue operations and that it cannot afford the likely costs of continued litigation of the Florida Action.

Integretel also offers further evidence of the fact that it is not holding any property that belongs to the Receiver and did not do so even as of the entry in the Florida Action of the injunction that the Receiver claims to be enforcing. Rather, any property that could conceivably be an asset of the Debtor's former customers for whom the Receiver was appointed was dissipated at or about the time that it was received, long before the issuance of any injunctive relief in the Florida Action. Accordingly, the Florida Court's orders to pay the Receiver over $1.7 million represent an ordinary judgment against the Debtor which constitutes an unsecured claim in this bankruptcy case. From the issuance of the temporary restraining order and preliminary injunction by the Florida Court to the filing of Integretel's bankruptcy petition, no money was ever set aside for the Receiver's claim. While the Florida Court nonetheless entered its orders in September 2007 commanding that Integretel pay over the amount denominated on its books as reserves to the Receiver,

those orders cannot create a "property interest" where none exists. The Debtor has withheld "reserve" amounts from each of its past and current customers. None are being afforded the right to invade the Debtor's bank account to retrieve funds that they might wish to call their own. The Receiver's claim is not superior to that of any other creditor even though he has obtained a judgment from the Florida Court.

As previously outlined by the Debtor, the Florida Action and the Florida Court's Omnibus Order "threaten[s] the integrity" of the bankruptcy estate, which is "precisely" the instance in which "Section 105 contemplates injunctive relief." <u>Canter v. Canter (In re Canter)</u>, 299 F.3d 1150, 1155 (9th Cir. 2002) (citation omitted). This is an appropriate case to issue a stay under Section 105 because the Debtor can only have an opportunity to reorganize if it preserves its existing resources while it operates in Chapter 11.

## II.

## FACTUAL STATEMENT

### A.  **The Debtor's Chapter 11 Case.**[1]

During the first month of this Chapter 11 case, the Debtor has moved aggressively to pursue a reorganization. It has obtained the support of the Official Unsecured Creditors' Committee (the "Committee") to continue operations at this time while continuing to expeditiously negotiate with interested parties concerning its future. During this period, the Debtor has functioned without over $1.7 million that was placed in a blocked account pending further rulings of this Court (the "Blocked Account"). The Debtor has also continued to litigate the Florida Action during this period.

The Debtor met with the full Committee at a meeting on October 10. The Committee consented to the Debtor's continued use of cash collateral on the terms proposed by the Debtor in its latest budget on an interim basis for a period of two to three weeks. During this time, the Debtor has committed to negotiate with the Committee a

---

[1] The facts set forth herein are supported by the accompanying Declaration of Ken Dawson.

1 term sheet for a plan of reorganization contemplating a continuation of business operations
2 with the goal of allowing the Debtor to exit bankruptcy as quickly as possible, while also
3 maximizing value to unsecured creditors. Based on the information provided and the
4 discussion during the October 10 meeting, the Committee concluded that the Debtor has a
5 reasonable chance to successfully reorganize.

6 B. **The Debtor's Ability to Operate Without a Preliminary Injunction.**

7 The Debtor has submitted a budget showing that it can operate in Chapter 11 and
8 remain administratively solvent so long as it does not have to turn over $1.7 million to the
9 Receiver, nor expend at least $1 million in litigation with the FTC and the Receiver.[2] The
10 Debtor has engaged the services of FTI Consulting to review the reasonableness of the
11 Debtor's Budget. Mr. Paul Weber, an experienced workout consultant, reviewed the
12 Debtor's Budget and concluded that it is reasonable and constitutes a reasonable forecast of
13 the post-petition transactions of the Debtor. See Weber Declaration at ¶ 15.

14 Mr. Weber also conducted an analysis of the Debtor's Budget which shows that the
15 Blocked Account funds are needed by the Debtor and that the Debtor cannot remain
16 administratively solvent if it pays $1 million in fees to defend the Florida Action and
17 litigate with the Receiver and satisfies the Receiver's $1.7 million claim. The "Alternative
18 Budget" attached to the Weber Declaration assumes the Blocked Account is not available
19 to the Debtor and the Florida Action continues. It shows that in that case there would not
20 be sufficient funds at all times to cover the Debtor's post-petition obligations to customers.
21 The Debtor wants to comply with the U.S. Trustee's guidelines for post-petition operations
22 by being able to pay its post-petition debts. It therefore has to retain sufficient cash to
23 cover both administrative operating expenses and its administrative obligation to remit
24 funds to customers. Hence, the Blocked Account funds are needed and the Debtor should
25 be allowed to reorganize without expending substantial legal fees to defend the Florida

---

[2] The facts in this section and in section D. below are supported by the accompanying Declaration of Paul Weber.

Action.

C. **The Florida Court's Orders.**

The Florida Court ruled in its Payment Order filed on September 14, 2007 that the Debtor was required to turn over the reserves held on account of the former customers "as of the issuance of the TRO." The Payment Order nowhere fixes the amount of the liability imposed by the Florida Court. On September 21, 2007, after the Debtor's bankruptcy filing, the Florida Court issued an order holding the automatic stay inapplicable to the Florida Action in which it said that the Payment Order had "ruled that the reserve funds are the property of the receivership estate." That order further said that Integretel had been "ordered to pay the current reserve funds, amounting to $1,762,762.56, immediately to the Receiver." Thus, to the Florida Court, the accounting entries made by the Debtor constituted assets of the receivership estate. The Florida Court was unconcerned with whether the Debtor in fact had any actual funds that were reserves of the former customers, segregated or otherwise, dismissing as "a distinction without a difference" the Debtor's contention that there were no actual funds. The Florida Court's order thus concluded that the existence of accounting entries for reserves on the Debtor's books was sufficient to require the Debtor to pay over the amount stated to the Receiver.

D. **The Debtor Has no Funds that Belong to the Receiver.**

While the FTC claims that what it calls the "Reserve Funds" "are funds generated from Integretel's billing and collection of unauthorized charges,"[3] the fact is that the Debtor has not had any reserve funds belonging to the Debtor's former customers since almost the same time that funds were received by the Debtor on account of accounts receivable purchased from these customers, as once the Debtor did not remit funds to the former customers it used them for other purposes in the Debtor's business.

Under the Debtor's Settlement Process as it worked before the filing of this Bankruptcy Case, when the Debtor received payments from the LECs it would in turn

---

[3] FTC Memorandum in Opposition to Cash Collateral Motion, at 5.

1  settle its obligations to its customers.  Under the Debtor's contracts with its customers, it
2  had the right to retain some portion of those proceeds and pay the part that was held back
3  and unremitted to the customer at a later time.  All of the funds received from the LECs
4  were commingled by the Debtor in its general "Wire-In Account," used by the Debtor in its
5  normal operations.  It is called the "Wire-In Account" as the LECs were directed to wire all
6  moneys into this account.  Except in a few unique instances, and not with regard to the
7  Debtor's former customers Access One and Network One, there never was a separate
8  "reserve" or "withhold" account set up for individual customer funds.

9         In connection with the Settlement Process, sometimes the Debtor withheld funds
10  that otherwise could have gone to a customer.  There are various reasons under the
11  customer contracts that the Debtor was entitled to do so.  The Debtor did not set up any
12  separate accounts for money withheld from individual customers and at best only made
13  bookkeeping entries for these sums.

14         When money with respect to any specific customer was transferred under the
15  Settlement System to the Debtor by the LECs, it was commingled in the Wire-In Account.
16  The money in the Wire-In Account was used within days by the Debtor, not staying in the
17  account more than two weeks.  There is no means by which money paid by the LECs into
18  the Wire-In Account on account of a particular receivable that was not remitted to that
19  customer of the Debtor could then be traced.  Because the Debtor did not segregate any
20  money that it withheld, but merely made accounting entries reflecting its liabilities, the
21  withheld money would immediately be used for other obligations of the Debtor.

22         The Debtor discontinued business with Access One and Network One over a year
23  before any FTC action was brought against the Debtor or the former customers.  Any
24  money transferred by the LECs to the Debtor with respect to those two customers was
25  commingled into the Wire-In Account with all other funds of the Debtor and was spent
26  long before the Debtor was served with a temporary restraining order or a preliminary
27  injunction in the FTC's action against Access One and Network One.
28

## III.

## ARGUMENT

A. **The Court Should Utilize its Authority Under Section 105 to Stay the Florida Action.**

The first month of this case has provided additional evidence of the Debtor's need for the preliminary injunction, as well as the probability that it would benefit from it. The time during which this motion has been pending has afforded the Debtor with additional opportunity to begin the reorganization process, meet with the official Committee, develop a comprehensive budget for a six-month period, and evaluate whether it can operate if it satisfies the Payment Order and litigates with the FTC during this period. The Debtor has demonstrated genuine prospects for reorganization. It has started a dialogue with the Committee and obtained support for continued operations and further interim use of cash collateral. Its budget demonstrates that it operate successfully and maintain administrative solvency, though only if it is not required to expend $1.76 million to satisfy the Payment Order and approximately $1 million to litigate the Florida Action.

In addition, the Debtor has previously provided ample evidence of the threat to this Debtor's continued existence posed by the Payment Order and the Florida Action in terms of the diversion that will be required of management's attention from the reorganization and toward litigating with the Receiver and the FTC as the trial date set in the Florida Court looms closer.

In Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc., ___ F.3d ___, 2007 WL 2555941, *7, 07 Cal. Daily Op. Serv. 10,857, (9th Cir. Sept. 7, 2007), the Ninth Circuit found that the ordinary test of "success on the merits" means a reasonable likelihood of success in reorganizing if the requested injunctive relief is granted, which "is not a high burden." The facts here demonstrate probability of success on the merits—i.e., through a successful reorganization—as the Court has already indicated. Indeed, in the last month the Debtor has commenced a productive working relationship with the Committee and is seeking an operating plan of reorganization. The facts also demonstrate that the Debtor has satisfied the remaining standard for issuance of a

preliminary injunction, i.e., that it will suffer irreparable injury unless the preliminary injunction is granted, that the balance of hardships tips in its favor, and that the public interest favors an injunction.

B. **The Receiver has no More than an Unsecured Claim Against the Debtor.**

The Court correctly suggested in its findings in support of issuance of an order to show cause in connection with this motion that the Receiver is almost certainly only an unsecured creditor of the Debtor. The Receiver instead urges that it is entitled to payment of $1.76 million based on the Payment Order issued by the Florida Court and that the Receiver should therefore not be enjoined from enforcing that order.[4]

The Receiver continues in this Court to base his claim on the theory that the Debtor holds the "Subject Funds" that should be turned over to the Receiver under the Payment Order. The Receiver defines as being the $1.7 million which the Florida Court "ordered Debtor to turn over." By defining Subject Funds with reference to the Payment Order and not to any property actually held by the Debtor, the Receiver effectively admits that the Payment Order is merely a money judgment. There are no "Subject Funds," only the Debtor's bank accounts containing undifferentiated monies received long after any relationship with the Prior Customers had ended.[5]

By referring to "Subject Funds" when there are no such funds, the Receiver seeks to avoid the effect of the Debtor's bankruptcy filing on the Debtor's obligations to the Receiver.[6] Outside of bankruptcy, the Receiver could compel adherence to the Florida

---

[4] See Receiver's Second Supplemental Opposition to Motion for Authority to Use Cash Collateral, filed October 10, 2007, at p. 2, line 13 and thereafter.

[5] The same is true with regard to the FTC's use of the term "Reserve Funds," as the Debtor no longer has, and did not have at the time of the Florida Court's preliminary injunction, any of the money that generated by allegedly unauthorized charges

[6] The Receiver also erroneously suggests that all matters with regard to its rights to recover against the Debtor in this Court have already been determined by the Florida Court's orders. That is not correct, as the Debtor continued in possession of all of its property when it filed for bankruptcy protection and once it did so, this Court's jurisdiction over the

Court's order regardless of whether or not any actual, segregated fund existed from which to make the payment ordered by the Florida Court. However, once the Debtor filed for bankruptcy protection, the Payment Order's command could only be enforced at the expense of all unsecured creditors other than the Receiver. This distinction has generally been discussed by courts in the context of a constructive trust remedy, where courts have often expressed that "privileging of one unsecured claim over another clearly thwarts the principle of ratable distribution underlying the Bankruptcy Code." In re Flanagan, 2007 U.S. App. LEXIS 23622, *18 (2d Cir. Oct 9, 2007)

The Ninth Circuit has recognized the distinction between the enforceability of judgments like the Payment Order outside of bankruptcy and within that realm for over 40 years. In its decision in Elliott v. Bumb, 356 F.2d 749, 754-55 (9th Cir. 1966), the court refused to allow state law to control whether a creditor would be entitled to claim a trust existed over the debtor's commingled funds, saying that state law yields to bankruptcy principles, which require tracing. The court followed Elliott in Matter of Esgro, Inc., 645 F.2d 794, 798 (9th Cir. 1981), saying "Even if California imposes a trust on commingled funds, this trust cannot be enforced in a federal bankruptcy proceeding." See also In re North American Coin & Currency, Ltd., 767 F.2d 1573, 1575 (9th Cir. 1985) ("state law must be applied in a manner consistent with federal bankruptcy law"). In addition, "[b]oth the Ninth Circuit Court of Appeals and California courts have consistently held that a party seeking to establish a trust over commingled funds must trace those funds." In re Advent Mgmt. Corp., 178 B.R. 480, 488 (B.A.P. 9th Cir. 1995), aff'd, 104 F.3d 293 (9th Cir.

---

Debtor's assets was exclusive and ousted any prior in rem jurisdiction asserted by the Florida Court. See 28 U.S.C. § 1334(e); Tennessee Student Assistance Corp. v. Hood, 541 U.S. 440, 448 (2004) ("A bankruptcy court's in rem jurisdiction permits it to 'determin[e] all claims that anyone, whether named in the action or not, has to the property or thing in question.); In re Crown Vantage, Inc., 421 F.3d 963, 971 (9th Cir. 2005) ("requirement of uniform application of bankruptcy law dictates that all legal proceedings that affect the administration of the bankruptcy estate be brought either in bankruptcy court or with leave of the bankruptcy court."); In re Modern Boats, Inc., 775 F.2d 619, 620 (5th Cir. 1985) (admiralty court's jurisdiction over vessel yielded once bankruptcy filed). .

1997). Thus, as the Second Circuit recently noted, the "'equities of bankruptcy are not the equities of the common law.'" In re Flanagan, 2007 U.S. App. LEXIS 23622, *18 (2d Cir. Oct 9, 2007), quoting In re Omegas Group, Inc., 16 F.3d 1443, 1452 (6th Cir. 1994).

The Payment Order is nothing more than a money judgment determining the Debtor's purported liability to the Receiver. While it is based on the concept that the Receiver had a property interest in the Debtor's bank accounts as of the issuance of the Florida Court's injunction, the Payment Order does not and could not call for the turnover of any actual, identifiable property to the Receiver but merely directs the Debtor to pay over the amount of its reserve liability from any funds the Debtor has available to it. The Receiver has never claimed that it can trace the funds received by the Debtor from the former customers to an identifiable fund that still exists. Rather, he correctly interprets the Payment Order as being a judgment commanding the payment of money.[7] The Debtor has demonstrated that whether measured at the outset of the injunctive relief granted by the Florida Court, or today, the Debtor holds no funds that can be traced from the Former Customers to the Debtor's existing bank accounts. Under these circumstances, the Receiver's claim, however denominated by the Florida Court, is only an unsecured claim in this bankruptcy case. While that order may be fully enforceable but for the Debtor's bankruptcy filing, it must be considered in this Court in accord with the principles established under the Bankruptcy Code.

---

[7] In light of the nature of the Payment Order as creating an unsecured obligation, this Court can issue a stay of the enforcement of that order whether or not that decision is a final adjudication. The Payment Order itself stated that "District courts have in rem jurisdiction over *disputed* receivership property and therefore can bind non-parties (such as Integretel), through *orders to protect and preserve disputed receivership property. . ..*" Payment Order, at 7 (emphasis added). In its post-bankruptcy Order Granting Motion for Clarification as to Scope of Stay, the Florida Court adopted the FTC's characterization of the Payment Order, saying "The Court has already ruled that the reserve funds are neither the property of the 'bankruptcy estate' nor Integretel." Whether or not the Florida Court has issued a final order does not affect whether in fact there exists any Subject Funds that the Florida Court could exercise jurisdiction over. As noted above, the Florida Court expressly held that it was irrelevant to its decision whether any actual fund existed.

1    Accordingly, this Court should enjoin further enforcement of the Payment Order, as
2 the Receiver is seeking nothing less than actual control over the assets of the estate.  Doing
3 so threatens "the bankruptcy court's exclusive jurisdiction over the *res* of the debtor's estate
4 and therefore can be enjoined."  <u>FTC v. First Alliance Mortgage Co. (In re First Alliance
5 Mortgage Co.)</u>, 264 B.R. 634, 655 (C.D. Calif. 2001).

### C. **The FTC Should be Enjoined from Prosecuting the Florida Action as to the Debtor.**

The Debtor has also demonstrated that it cannot both reorganize and litigate the action brought by the FTC.  Not only would the expenses of doing so be more than the estate could bear, the effect of having to litigate an intensive, hard fought battle with the FTC during the next five months would be completely inconsistent with achieving a reorganization in the same time period.  At the end of the day, the regulatory purpose to the Florida Action would elude all of the FTC's efforts because there would be no Debtor left to regulate.  In addition, any money judgment that the FTC might obtain would be one more unsecured claim unlikely to realize any substantial dividend.

## IV.

## CONCLUSION

The Court should exercise its jurisdiction under Section 105 to protect the Debtor's property for the benefit of all of its creditors and to protect the Debtor's right to reorganize without diversion and the waste of estate assets that would result from its continued participation in the Florida Action.

Dated: October 12, 2007

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By  /s/ Steven B. Sacks
STEVEN B. SACKS
Proposed Attorneys for Debtor The Billing Resource, dba Integretel