# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 06-80180-Civ-Ryskamp/Vitunac

---

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

NATIONWIDE CONNECTIONS, INC., et al.,

Defendants.

---

## PLAINTIFF FTC'S EMERGENCY MOTION FOR CLARIFICATION THAT THE AUTOMATIC STAY DOES NOT APPLY TO THE FTC'S LAW ENFORCEMENT ACTION AND THE ONGOING CONTEMPT PROCEEDING AND SUPPORTING MEMORANDUM OF LAW

In this enforcement action brought by Plaintiff Federal Trade Commission ("FTC" or "Commission"), Defendant The Billing Resource d/b/a Integretel ("Integretel") has filed a Notice of Bankruptcy instructing the Court that it has filed a petition under Chapter 11 of the Bankruptcy Code.[1] The Notice of Bankruptcy further instructs all parties to "please take further notice that Section 362 of the Bankruptcy Code operates as an automatic stay. . ." [DE 612]. Integretel's bare-bones "Notice of Bankruptcy" fails to notify this Court, however, that it has also filed emergency motions in its bankruptcy case to use cash collateral and its existing bank accounts – which would permit Integretel to dissipate the very reserve funds ("Reserve Funds") that this Court has already ordered Integretel to turn over immediately. [DE 610].

Indeed, Integretel has failed to disclose to the Bankruptcy Court that this Court has already ruled that the $1,762,762.56 in Reserve Funds is receivership property and not property

---

[1] *In re The Billing Resource, dba Integretel*, Case No. 07-52890, pending in the U.S. Bankruptcy Court for the Northern District of California, San Jose Division before the Hon. Arthur S. Weissbrodt.

of Integretel.[2] [DE 610]. Because Integretel has failed to provide the Bankruptcy Court with a copy of this Court's Omnibus Order [DE 610], and because the Bankruptcy Court has scheduled a hearing on Integretel's emergency motions for September 21,[3] the FTC seeks an emergency ruling to clarify that the automatic bankruptcy stay in section 362(a) of the Bankruptcy Code does not apply to the prosecution of the FTC's case in chief or the contempt proceeding, including enforcement of the Court's Omnibus Order requiring Integretel to turnover Reserve Funds to the Receiver.

## I.   BACKGROUND

### A.   Procedural History of FTC's Enforcement Action

On February 27, 2006, Plaintiff Federal Trade Commission commenced this action for injunctive and other equitable relief against the Nationwide defendants[4] for violations of Section 5 of the FTC Act, 15 U.S.C. § 45(a) ("Enforcement Action"). The Complaint alleged that the Nationwide defendants engaged in a massive billing scam in which more than thirty million dollars in phony collect call charges were "crammed" onto consumers' telephone bills.[5] The same day that the Commission filed suit, this Court entered an *ex parte* temporary restraining order ("TRO") that, among other things, shut down the Nationwide defendants' unlawful operation and appointed a temporary receiver for the corporate defendants. [DE 18]. On March 8, after a contested hearing, the Court issued a Preliminary Injunction that, *inter alia*, made the

---

[2] The Receiver has filed an opposition to both motions.

[3] The Bankruptcy Court originally scheduled a hearing on these two motions for Thursday, September 20. The hearing has been postponed until Friday, September 21 at 1:30 PST.

[4] The Nationwide defendants are: Nationwide Connections, Inc.; Access One Communications, Inc.; Network One Services, Inc.; Willoughby Farr; Mary Lou Farr; Yaret Garcia; Erika Riaboukha; and Qaadir Kaid. The five individual defendants each answered the Commission's Complaint; the three corporate defendants have defaulted.

[5] *See, e.g.*, FTC's Memo. of Points & Auths. in Supp. of *Ex Parte* Mot. for TRO [DE 17] at 4–14; Receiver's Mot. for OSC Why Integretel Should Not Be Held in Contempt [DE 243] at 2.

temporary receiver permanent.[6]

As the Commission has explained in numerous pleadings before, the Nationwide defendants certainly did not act alone in their flagrant cramming scheme. Integretel and BSG[7] (collectively, "Aggregator defendants") played a pivotal role by, among other things, processing the bogus charges that they claimed consumers were liable to pay. Indeed, but for the Aggregator defendants' contracts with the local phone companies and their active involvement during the course of more than two and a half years of billing, consumers would not have been victimized to the extent that they were.[8]

Accordingly, on September 21, 2006, the FTC filed an Amended Complaint that added both Integretel and BSG as defendants. [DE 255]. As in its original Complaint, the Commission alleges the same two causes of action against all of the defendants: (1) that the defendants deceptively represented that consumers were obligated to pay charges appearing on their telephone bills for collect calls that were never made or authorized; and (2) that the defendants unfairly billed consumers for collect telephone calls that consumers never received or authorized. In late October 2006, the Aggregators filed their Answers, including numerous purported affirmative defenses which the Court has now stricken. [DE 286, 292, 611]. Pursuant to the Court's Order Modifying the Amended Scheduling Order, discovery is set to close on October 5, 2007.

### B.    Contempt Proceeding

As this Court is aware, Integretel never disclosed to this Court or to the Receiver that it

---

[6] The Court also entered an Amended Preliminary Injunction on September 25, 2006 after a contempt hearing involving defendants Willoughby Farr and Mary Lou Farr. [DE 233]. For purposes of this Motion, the FTC refers to the Amended Preliminary Injunction and the Preliminary Injunction as the "Preliminary Injunction."

[7] BSG includes defendants BSG Clearing Solutions North America, LLC, Billing Concepts, Inc., and ACI Billing Services, Inc.

[8] *See, e.g.*, FTC's Combined Reply to Integretel's Opp. to Receiver's Mot. for OSC, and Opp. to Integretel's Mot. to Stay [DE 399-1] at 3–6.

was holding more than $1.35 million[9] in Reserve Funds that belonged to two of the Nationwide defendants – Access One and Network One – in spite of several provisions of the TRO and Preliminary Injunction that required Integretel to do so. On the contrary, upon being served with the TRO, Integretel sent the FTC an unsworn statement from its President claiming that "no amounts are currently due and owing" to Access One and Network One. [DE 610, p. 2].

When the Receiver finally learned – seven months later – about the Reserve Funds Integretel had been holding, the Receiver filed a Motion for an Order to Show Cause Why Integretel Should Not Be Held in Contempt ("Contempt Motion" or "Contempt Proceeding"). [DE 243]. In response to the Contempt Motion, Integretel filed a 52-page response (not including exhibits), a Motion to Modify Prior Injunctive Orders [DE 294], a Motion to Stay Contract Claims [DE 363], and an appeal of the Preliminary Injunction to the 11th Circuit.[10] The FTC opposed Integretel's motions and filed a reply in support of the Receiver's Contempt Motion. The Court held a lengthy hearing at which two of Integretel's counsel presented argument, and at which the FTC and Receiver both argued in favor of the Contempt Motion.

On Friday, September 14, 2007, this Court issued its Omnibus Order [DE 610], which ordered Integretel to pay the current Reserve Funds immediately to the Receiver and ordered Integretel to show cause in writing within ten days why it should not be held in contempt for failing to turn over the Reserve Funds. The Court also denied Integretel's Motion to Modify and Motion to Stay Contract Claims. In so holding, the Court ruled that the subject Reserve Funds are property of the receivership – not property belonging to Integretel.

Notwithstanding this Court's determination that the Reserve Funds were receivership assets – and not Integretel's property – Integretel has brazenly sought to relitigate these very issues in the the Bankruptcy Court in the Northern District of California. As described below, however, Integretel has failed to mention that this Court has already decided that the Reserve

---

[9] As of June 30, 2006, the Reserve Funds had grown to $1,762,762.56.

[10] The appeal had been stayed pending this Court's resolution of Integretel's Motion to Modify Prior Injunctive Orders.

-4-

Funds are not part of Integretel's bankruptcy estate.

C.    **Integretel's Attempt to Relitigate the Reserve Issues in Bankruptcy Court**

On Sunday, September 16, 2007, just two days after this Court's Omnibus Order on the Contempt Proceedings, Integretel filed a petition for chapter 11 bankruptcy. Integretel also concurrently filed: (1) an Emergency Motion for Use of Cash Collateral and Granting Replacement Liens ("Cash Collateral Motion") (attached as Exhibit 1); and (2) an Emergency Motion for Order Authorizing Use of Existing Bank Accounts and Cash Management Systems ("Cash Management Motion") (attached as Exhibit 2).

In essence, both motions seek permission to use existing cash collateral and existing bank accounts for the continued operation of Integretel's business. Because Integretel did not separate its clients' reserve funds and instead commingled them with its operating funds, the cash collateral and existing bank accounts at issue include the Reserve Funds that Integretel has been holding and using in violation of the TRO and Preliminary Injunction – the very same funds that were the subject of this Court's Omnibus Order issued on September 14, 2007.

Importantly, however, neither motion attached this Court's Omnibus Order. Furthermore, neither motion disclosed that this Court has already ruled that the $1,762,762.56 in Reserve Funds are receivership assets and therefore not property of Integretel's estate. In spite of this Court's order that Integretel turn over the Reserve Funds immediately to the Receiver, Integretel contends in its bankruptcy filings that "it currently owes nothing to the Receiver." [Exh. 1, p. 9; Exh. 2, p. 7.] Indeed, Integretel claims that "it will ultimately prevail. . . with respect to amounts which are the subject of and required to be paid under the [Omnibus Order]" as if this Court has not already ruled that the Reserve Funds were property of the receivership estate.

The FTC plans to oppose Integretel's two emergency motions at the hearing that has been noticed for September 21 in San Jose. In the meantime, however, the FTC urges this Court to clarify that the automatic bankruptcy stay does not apply to the prosecution of the FTC's Enforcement Action or the ongoing Contempt Proceeding.

## ARGUMENT

II. **NEITHER THIS ACTION NOR THE CONTEMPT PROCEEDING ARE STAYED BY DEFENDANT INTEGRETEL'S BANKRUPTCY FILING**

### A. This Court Has Jurisdiction to Determine That the Automatic Stay Does Not Apply

As an initial matter, this Court has jurisdiction to determine its own jurisdiction, as well as to decide whether the automatic stay applies to this action or the contempt proceeding pending before the Court. *See U.S. Dep't of Housing & Urban Dev't v. Cost Control Mktg. & Sales Mgmt.*, 64 F.3d 920, 927 n.11 (4th Cir. 1995); *Brock v. Morysville Body Works, Inc.*, 829 F.2d 383 (3d Cir. 1987); *NLRB v. Edward Cooper Painting, Inc.*, 804 F.2d 934, 939 (6th Cir. 1986); *In re Baldwin-United Corp. Litigation*, 765 F.2d 343, 347 (2d Cir. 1985); *NLRB v. Evans Plumbing Co.*, 639 F.2d 291 (5th Cir. 1981).

Further, as the *Cost Control* court noted, "because the district court's jurisdiction attached first in time, it was superior." *Id.; see also United States v. Delta Distributors Co., Inc.*, 1996 WL 460112 (June 21, 1996 S.D.W.Va.) (same).

### B. The FTC's Enforcement Action is Not Stayed

The FTC's prosecution of this action to protect consumers from unfair and deceptive trade practices is excepted from the automatic stay under Bankruptcy Code § 362(b)(4), the governmental regulatory exception to the stay.[11] 11 U.S.C. § 362(b)(4) provides:

> (b) the filing of a petition under section 301, 302, or 303 of this title . . . does not operate as a stay − . . .
> (4) under (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit

---

[11] The exemptions within § 362(b) are effective automatically upon the commencement of the bankruptcy case. By its express terms, the stay of Section 362(a) arises immediately upon the filing of a petition under Section 301, 302 or 303 of the Code, "[e]xcept as provided in subsection (b)." 11 U.S.C. § 362(a) (emphasis added). Thus, the stay does not become effective to the extent provided in those exemptions. *See, e.g., In re Fucilo*, No. 00-36261(CGM), 2002 WL 1008935, at *12 n.6 (Bankr. S.D.N.Y. Jan. 24, 2002); *In re Pincombe*, 256 B.R. 774, 781 (Bankr. N.D. Ill. 2000) (governmental agency is not required to seek relief from the stay before continuing proceedings against a debtor).

-6-

* * * to enforce such governmental unit's * * * police and regulatory power, including the enforcement of a judgment other than a money judgment * * *."[12]

Thus, to the extent provided in § 362(b)(4), governmental regulatory or police actions are excepted from the automatic stay of:

(1)     the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor . . .;

(2)     the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the [bankruptcy] case . . .;

(3)     any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; . . . [and]

(6)     any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the [bankruptcy] case . . . .

11 U.S.C. § 362(a).

The legislative history expressly states that this exception from the automatic stay applies to suits by the government "to prevent or stop violation of fraud, environmental protection, *consumer protection*, safety, or similar regulatory laws." H.R. Rep. No. 989, 95th Cong., 2d Sess. 52, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5838 (emphasis added).

The FTC's Enforcement Action falls squarely within this exception to the automatic stay. Under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), the Commission is authorized to seek injunctive relief against violations of the statutes it enforces whenever it "has reason to believe" that an injunction "would be in the interest of the public." This grant of authority was "designed to enable the Commission to carry out its mandate to protect the public interest through prompt and aggressive enforcement of the laws it administers." 119 Cong. Rec. 21435, 21443 (93d Cong., 1st Sess. June 26, 1973) (Remarks of Senator Henry M. Jackson).

Thus, numerous courts have recognized that actions brought by the FTC under Section 13(b), including actions seeking preliminary injunctive relief and ancillary relief in the form of an asset freeze and receivership, are not subject to the automatic stay. *See, e.g., In re First Alliance Mortgage Co.*, 264 B.R. 634, 647-51 (C.D. Cal. 2001) (reversing the bankruptcy court and

---

[12] Section 362(b)(4) was amended in 1998 by, *inter alia*, combining former subsections (b)(4) and (b)(5). *See SEC v. Brennan*, 230 F.3d 65, 74 (2d Cir. 2000). The case law that developed under former § 362(b)(4) and 362(b)(5) remains as viable guidance in interpreting new Section 362(b)(4). *See* 3 Collier on Bankruptcy ¶ 362.05[5][b] (16th ed. 1999).

holding that FTC's action to enforce consumer protection and fair lending laws falls within the § 362(b)(4) exemption from the stay; *FTC v. American Standard Credit Sys.*, 874 F. Supp. 1080, 1083 (C.D. Cal. 1994); *FTC v. Austin Galleries of Illinois, Inc.*, No. 88 C 3845, 1991 U.S. Dist. LEXIS 1223, *3 (N.D. Ill. Feb. 5, 1991); *FTC v. R.A. Walker & Assocs., Inc.*, 37 B.R. 608 (D.D.C. 1983). The foregoing authorities are consistent with the principles applied by the Eleventh Circuit and the courts of appeals generally in actions to enforce regulatory schemes. *See, e.g., Brock v. Rusco Industries, Inc.*, 842 F.2d 270 (11th Cir. 1988) (automatic stay inapplicable to action by Secretary of Labor under Fair Labor Standards Act seeking injunction against debtor's sale of goods); *SEC v. First Financial Group of Texas*, 645 F.2d 429 (5th Cir. 1981) (automatic stay inapplicable to action seeking injunctive relief, asset freeze and receivership); *CFTC v. Petro Marketing Group, Inc.*, 700 F.2d 1279 (9th Cir. 1983) (automatic stay inapplicable to action seeking injunctive relief, asset freeze and receivership).

In addition to injunctive relief, the FTC seeks monetary relief in this action, including disgorgement, restitution and consumer redress. The dual purposes of deterring unlawful behavior by making such behavior more expensive and holding violating parties accountable bring this action squarely within the § 362(b)(4) police and regulatory powers exemption. *See, e.g., SEC v. Brennan*, 230 F.3d 65, 72 (2d Cir. 2000) ("When the government seeks to impose financial liability on a party, it is plainly acting in its police or regulatory capacity – it is attempting to curb certain behavior (such as defrauding investors, or polluting groundwater) by making the behavior that much more expensive."); *United States v. Nicolet, Inc.*, 857 F.2d 202, 209-10 (3d Cir. 1988); *SEC v. Towers Financial Corp.*, 205 B.R. 27, 31 (S.D.N.Y. 1997) (disgorgement is an equitable remedy that is merely ancillary to the SEC's scheme of injunctive remedies and is designed to make securities fraud unprofitable); *In re Bilzerian*, 146 B.R. 871, 873 (Bankr. M.D. Fla. 1992).

Therefore, § 362(b)(4) of the Bankruptcy Code permits the continuation of this action for injunctive relief against defendant Integretel and the *entry* of a money judgment against defendant Integretel.[13] *See, e.g., NLRB v. 15th Ave. Iron Works, Inc.*, 964 F.2d 1336, 1337 (2d

---

[13] The FTC acknowledges that *enforcement, i.e.*, collection, of any money judgment it

(continued...)

Cir. 1992); *NLRB v. Continental Hagen Corp.*, 932 F.2d 828, 832-35 (9th Cir. 1991); *NLRB v. Edward Cooper Painting, Inc.*, 804 F.2d 934, 942-43 (6th Cir. 1986); *EEOC v. Rath Packing Co.*, 787 F.2d 318, 326-27 (8th Cir. 1986); *Penn Terra Ltd. v. Dept. of Environmental Resources*, 733 F.2d 267, 275 (3d Cir. 1984); *In re Bilzerian*, 146 B.R. 871, 873 (Bankr. M.D. Fla. 1992).[13]

## C.    The Contempt Proceeding Is Not Stayed

The Contempt Proceeding, including the enforcement of this Court's Order requiring Integretel to turnover the Reserve Funds to the Receiver, is not stayed by Integretel's bankruptcy filing for three reasons.

First, with respect to acts involving property, the automatic stay applies solely to protect property of the bankruptcy estate or property of the debtor. *See* 11 U.S.C. § 362(a)(2) (enforcement of a pre-petition judgment against the debtor or property of the estate); 362(a)(3) (act to obtain possession of or control property of the estate or property from the estate); 362 (a)(4) (act to enforce a lien against property of the estate); 362(a)(5) (act to enforce lien against property of the debtor). Subject to certain exceptions not relevant herein, property of the bankruptcy estate consists of "interests of the debtor in property *as of the commencement of the case.*" 11 U.S.C. § 541(a)(1) (emphasis added). Because this Court ruled – before Integretel filed its bankruptcy petition – that the Reserve Funds are property of the Receivership Estate, by definition that property is neither property of the "bankruptcy estate" nor the debtor, Integretel. Therefore, the Contempt Proceeding is not stayed by § 362(a).

Second, the § 362(b)(4) exception also applies to civil contempt proceedings brought by a governmental unit in the exercise of its police or regulatory powers. *See SEC v. Bilzerian*, 131 F. Supp. 2d 10 (D.D.C. 2001) (finding that the civil contempt proceeding fell within the § 362(b)(4) exemption, the court incarcerated the debtor after he failed to provide financial information required by purgation provisions of prior disgorgement order); *NLRB v. Sawulski*, 158 B.R. 971, 978 (E.D. Mich. 1993) ("pursuant to § 362(b)(4), this Court may continue the contempt

---

[13] (...continued)
obtains in this case against defendant Integretel falls outside the § 362(b)(4) exception.

[14] Notwithstanding Integretel's apparent position that the automatic stay applies to this Enforcement Action, Integretel has continued to conduct discovery in this case, including taking two of its own depositions and participating in three others since its bankruptcy filing.

proceeding initiated by the NLRB for [the debtor's] noncompliance with the [National Labor Relations Act]."). Although the Contempt Proceeding at issue here was initiated by the Receiver, the Receiver is enforcing the Amended Preliminary Injunction obtained by the FTC pursuant to the agency's exercise of its regulatory enforcement powers, and in doing so the Receiver is acting in his capacity as an agent of this United States District Court. [DE 233, ¶ 8] Moreover, the FTC effectively joined the Receiver's motion by filing a response in support thereof. [DE 399]. Accordingly, the Contempt Proceeding is also exempt from the automatic stay pursuant to Bankruptcy Code § 362(b)(4).

Third, regardless of whether § 362(b)(4) applies, Integretel's bankruptcy filing does not stay the Contempt Proceeding because it does not deprive this Court of its inherent power to enforce the integrity of its orders and take steps necessary to ensure that defendant Integretel complies with its orders. "[C]ontempt orders to uphold the dignity of the court are excepted from the automatic stay." *NLRB v. Sawulski*, 158 B.R. 971, 975 (E.D. Mich. 1993); *see also SEC v. Wolfson*, 309 B.R. 612, 620 (D. Utah 2004); *U.S. Sprint Communications Co. v. Buscher*, 89 B.R. 154, 157 (D. Kan. 1988); *Guariglia v. Community Nat'l Bank & Trust Co.*, 382 F. Supp. 758, 761 (E.D.N.Y. 1974), *aff'd*, 516 F.2d 896 (2d Cir. 1975) (decided under the former Bankruptcy Act of 1898); *In re Montana*, 185 B.R. 650, 652 (Bankr. S.D. Fla. 1995) (Cristol, C.J.); *accord In re Gedeon*, 31 B.R. 942, 946 (Bankr. D. Colo. 1983) (court held that civil contempt fine "imposed to uphold the dignity of the court" is nondischargeable under Section 523 of the Code); *In re Marini*, 28 B.R. 262, 265 (Bankr. E.D.N.Y. 1983) (same).

The *Wolfson* case is particularly instructive. In that civil securities fraud case, the defendants filed for bankruptcy literally four hours before a district court hearing on a civil contempt motion filed by the SEC against the defendants. The SEC sought the return of funds taken by the defendants in violation of the district court's order freezing defendants' assets. After concluding that the SEC's prosecution of the underlying securities fraud action was excepted from the automatic stay pursuant to § 362(b)(4) of the Bankruptcy Code, the court, citing a string of analogous cases, held that "[i]nherent in this conclusion is the determination that the civil contempt proceeding against [defendant] is not stayed." 309 B.R. at 320.

Accordingly, contrary to the sweeping and unsubstantiated "Notice of Bankruptcy" filed by Integretel, the commencement of Integretel's bankruptcy case does not stay either the pending

Contempt Proceeding against Integretel, including the turnover order, or the FTC's prosecution of this consumer protection action against Integretel.

## IV. CONCLUSION

For the foregoing reasons, the FTC urges this Court to clarify that the automatic bankruptcy stay does not apply to the prosecution of the FTC's case in chief to the point of judgment or the prosecution of the Contempt Proceeding. Because the Bankruptcy Court has scheduled a hearing for September 21, 2007 at 1:30 p.m. PST, the Commission seeks emergency relief.

Dated: September 20, 2007

Of Counsel:

MICHAEL MORA
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(ph) 202-326-3373
(fax) 202-326-2558

Respectfully Submitted,

LAURA KIM (A550099)
lkim@ftc.gov
COLLOT GUERARD (A5500480)
cguerard@ftc.gov
RICHARD McKEWEN (A5501046)
rmckewen@ftc.gov
ROBERT SCHOSHINSKI (A5500684)
rschoshinski@ftc.gov

Federal Trade Commission
600 Pennsylvania Ave., NW, H-286
Washington, DC 20580
(ph) 202-326-3734 (Kim)/202-326-3338 (Guerard)
202-326-3071 (McKewen)/202-326-3219 (Schoshinski)
(fax) 202-326-3395

ATTORNEYS FOR PLAINTIFF
FEDERAL TRADE COMMISSION

### Statement Pursuant to Local Rule 7.1.A.3

Counsel for the FTC attempted to resolve this matter in good faith with Integretel but was unable to do so prior to filing this motion.

Laura Kim

-11-

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2007, I served the foregoing document on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via email or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

LAURA KIM

## SERVICE LIST
### Case No. 06-80180 - CIV-RYSKAMP/VITUNAC

**Mark D. Johnson, Esq.**
markdjohnsonpa@bellsouth.net
10 Central Pkwy., Ste. 210
Stuart, FL 34994
Telephone: 772-223-7700
Facsimile: 772-223-1177
*Attorney for Defendants Yaret Garcia,*
*Qaadir Kaid, and Erika Riaboukha*

**Willoughby Farr**
DC # 653974
Avon Park Correctional Institution
P.O. Box 1100
County Road 64 East
Avon Park, FL 33826-1100
*pro se Defendant*
*(by U.S. Mail)*

**Mary Lou Farr**
c/o James Stonehill
1006 Churchill Circle South
West Palm Beach, FL 33405
Telephone: 561-582-2876
*pro se Defendant*
*(by Federal Express)*

**Andrew G. Berg, Esq.**
agberg@kslaw.com, kdinan@kslaw.com,
ctapie@kslaw.com, tgoldman@kslaw.com,
jthomas@kslaw.com, jpollack@kslaw.com
King & Spalding LLP
1700 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: 202-626-2924
Facsimile: 202-626-3737
*Attorney for Defendants BSG Clearing*
*Solutions, North America, LLC,*
*ACI Billing Services, Inc., d/b/a OAN, and*
*Billing Concepts, Inc.*

**Jeffrey Schneider, Esq.**
JCS@tewlaw.com
Tew Cardenas LLP
Four Seasons Tower, 15th Fl.
1441 Brickell Ave.
Miami, FL 33131-3407
Telephone: 305-539-2481
Facsimile: 305-536-1116
*Attorney for Receiver David R. Chase*

**Steven E. Siff, Esq.**
Ssiff@mwe.com
Maustin@mwe.com
McDermott Will & Emory LLP
201 S. Biscayne Blvd., Ste. 2200
Miami, FL 33131
Telephone: 305-358-3500
Facsimile: 305-347-6500
*Attorney for Defendants BSG Clearing*
*Solutions, North America, LLC,*
*ACI Billing Services, Inc., d/b/a OAN, and*
*Billing Concepts, Inc.*

**Derick J. Rodgers**
drodgers@lawdcm.com
Davis Cedillo & Mendoza Inc
McCombs Plaza Suite 500
755 E Mulberry Avenue
San Antonio, TX 78212
Telephone: 210-822-6666
Fax: 210-822-1151
*Attorney for Defendants BSG Clearing*
*Solutions, North America, LLC,*
*ACI Billing Services, Inc., d/b/a OAN, and*
*Billing Concepts, Inc.*

# SERVICE LIST
## Case No. 06-80180 - CIV-RYSKAMP/VITUNAC

**Michael Woodbury, Esq.**
michael.woodbury@woodbury-santiago.com
Woodbury & Santiago, P.A.
Two Datran Center - Penthouse 1A
9130 South Dadeland Boulevard
Miami, FL 33156
Telephone: 305-669-9570
Facsimile: 305-669-8616
*Attorney for Grunspan Trust, et al.*

**Chad A. Dean, Esq.**
chad@schuylaw.com
118 W. Adams St., #800
Jacksonville, FL 32202
Telephone: 904-353-5884
Facsimile: 904-353-5994
*Attorney for Primus Automotive
Financial Services and Ford Motor Credit
Co.*

**Thomas G. Long, Esq.**
tlong@barnettbolt.com
hwanders@barnettbolt.com
Barnett, Bolt, Kirkwood, Long
601 Bayshore Blvd., Ste 700
Tampa, FL 33606
Telephone: 813-253-2020
Facsimile: 813-251-6711
*Attorney for BMW Financial Services*

**Michael David McDonough, Esq.**
12798 Forrest Hill Boulevard
Wellington, FL 33414
Telephone: 561-791-0590
*Attorney for Third Party Defendants/Cross
Defendants German Miranda, Jesus Sandoval
(by Federal Express)*

**Richard Gordin, Esq.**
rgordin@tighepatton.com
slancellotta@tighepatton.com
ngoldfarb@tighepatton.com
Tighe Patton Armstrong Teasdale, PLLC
1747 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: 202-565-2881
Facsimile: 202-454-2805
*Attorney for Defendant The Billing Resource.
d/b/a Integretel*

**Martin John Alexander**
marty.alexander@hklaw.com
scott.newman@hklaw.com
Holland & Knight
222 Lakeview Avenue, Suite 1000
West Palm Beach, FL 33401
Telephone: 561-650-8036
Facsimile: 561-650-8399
*Attorney for Defendant The Billing Resource,
d/b/a Integretel*

**Rosanne Brady, Esq.**
Rosanne@macalusolaw.com
peter@macalusolaw.com
The Law Office of Peter N. Macaluso
3302 N. Tampa Street
Tampa, FL 33603
Telephone: 813-251-2831
Facsimile: 813-228-7004
*Attorney for Third Party Defendant/Cross
Defendant Ronny Morillo*

**Jessy Mendoza**
6117 Blue Grass Circle
Lake Worth, FL 33463
*Third Party Defendant
(by Federal Express)*

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
   Including Professional Corporations
MICHAEL H. AHRENS, Cal. Bar No. 44766
GERALDINE A. FREEMAN, Cal. Bar No. 111483
JEFFREY K. REHFELD, Cal. Bar No. 188128
ORI KATZ, Cal. Bar No. 209561
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4106
Telephone:    415-434-9100
Facsimile:     415-434-3947
Email:        mahrens@sheppardmullin.com
           jrehfeld@sheppardmullin.com
           okatz@sheppardmullin.com

Proposed Attorneys for THE BILLING RESOURCE,
dba INTEGRETEL

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>THE BILLING RESOURCE, dba Integretel, a California corporation,<br><br>              Debtor.<br><br>Tax ID: 33-0289863 | Case No. 07-52890<br><br>Chapter 11<br><br>**EMERGENCY MOTION FOR ORDER AUTHORIZING USE OF EXISTING CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS**<br><br>Date:       [TBD]<br>Time:      [TBD]<br>Place:     United States Bankruptcy Court<br>            280 South First Street<br>            San Jose, California<br>Judge:    [TBD]<br>Courtroom: [TBD] |

1    This emergency motion (the "Motion") is filed on behalf of the above-captioned debtor
2    The Billing Resource, dba Integretel, a California corporation (the "Debtor"). The Motion is
3    based on the discussion below, the concurrently filed declaration of Ken Dawson (the "Dawson
4    Declaration") in support of the Motion, the other papers of record, and upon such further oral and
5    documentary evidence as may be presented prior to or at the time of the hearing on the Motion.
6    A copy of the Motion is being served by email, facsimile, or overnight delivery as soon as
7    is practicable on: (a) the Debtor's creditors holding the thirty largest unsecured claims, (b) the
8    Debtor's alleged secured creditors; (c) the office of the United States Trustee, and (d) other
9    significant parties in interest, including counsel for both the Federal Trade Commission and the
10   receiver appointed in certain pending litigation in Federal District Court for the Southern District
11   of Florida. As soon as the Bankruptcy Court sets a hearing on the Motion, the Debtor will send
12   out a notice of that hearing to the above entities.
13   The Motion is made on the grounds that under the Bankruptcy Local Rules and United
14   States Trustee's Guidelines, the Debtor is required to close or freeze all of its bank accounts upon
15   filing its chapter 11 petition for relief. The Debtor has eight bank accounts as follows: (1) wire in
16   account, (2) wire out account, (3) operating account, (4) tax checking account, (5) an account for
17   vouchers, (6) future bad debt account, (7) payroll account, and (8) a 401(k) account.[1]
18   These accounts collectively comprise the Debtor's cash management system, which is an
19   important business practice that enables the Debtor to maintain strict control over the receipt and
20   disbursement of cash, and generate timely and accurate financial information critical to managing
21   its operations. The Debtor's cash management system is not just an essential internal support
22   system, but is a central part of the services that the Debtor provides to its customers. If the
23   Debtor's cash management practices and procedures are disrupted, the Debtor's efforts to
24   reorganize will be severely and substantially impaired.
25
26
27
28

---

[1] A list of each of these accounts is attached hereto as Exhibit A.

-1-

I.

## STATEMENT OF FACTS

A.    The Debtor's Background and the Debtor's Business.

The Debtor has filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code as of the date of this Motion (the "Petition Date"). The Debtor is operating its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.[2]

The Debtor was originally formed in 1988 based on a need for aggregators to facilitate billing and collections on behalf of smaller telecommunications companies that otherwise could not afford to compete with the larger local exchange carriers ("LECs" or "Telcos") such as AT&T. At that time "alternative operator services" ("AOS") was a growing market segment and affordable billing solutions allowed private companies to compete with the LECs in niche areas like public payphones, hotels, and prisons. In the payphone market, for example, many of the incumbent LECs' phones were perceived to be relatively poorly maintained and expensive to use. Today, most LECs have exited the payphone market.

In the pre-subscribed long distance business, typically the service provider establishes a long-term service relationship with the consumer. In contrast, AOS involves a casual relationship where often the consumer uses the service provider's assets or services without the consumer or the service provider even knowing at that time each other's identity. For example, a service provider owning the service contract for a hotel chain has no idea what the true identity is of the consumer using its phones. When a collect call is placed, often the only information that the AOS provider has are the basic elements of the call itself, i.e., the telephone number the call is placed from, the telephone number to which the call is placed, the date and time of the call, and the duration of the call. While the called party may have accepted the charges, the AOS provider can only bill such collect calls by one of two methods: (1) using a direct invoice; or (2) via the

---

[2] "Bankruptcy Code" refers to 11 U.S.C. §§ 101-1531, inclusive. "Rule" refers to the Federal Rules of Bankruptcy Procedure.

-2-

1  consumer's home LEC.[3]  Each of these methods has many drawbacks.

2      In addition to AOS providers, the Debtor services customers offering enhanced products

3 and services such as voice mail, online directory listings and bundled calling plans. While these

4 services may be billed to credit cards, often consumers are hesitant to use their credit cards for

5 such intangible purchases and, therefore, may prefer alternate billing choices such as the LEC

6 phone bill.

7      Under the direct invoice method, the service provider would need to first purchase the

8 consumer's billing name and address from a reliable source and then print, stuff and mail an

9 invoice. The per unit cost of these administrative functions could be prohibitively high without a

10 substantial volume. As many service providers' names are not well known, a high percentage of

11 these invoices are also likely to be thrown away or ignored. Since the average billing charge may

12 be very small, collections efforts are cost prohibitive. Unless the service provider has a powerful,

13 household brand name, the direct invoice billing method is typically impracticable.

14      Similarly, billing the consumer's home LEC also presents numerous difficulties. With this

15 method, the service provider needs to have first invested millions of dollars in specialized software

16 to interface with each LEC's billing system as well as to decipher their resulting reports and data

17 streams. In addition, the service provider would need billing and collection contracts with every

18 LEC[4], which would cost about $2 million to obtain and implement, take 6-12 months to set up,

19 and require ongoing fee minimums of over $100,000 per month.

20      The Debtor addressed a significant industry void by creating a service bureau focused

21 entirely on billing-related services. As the cornerstone to its billing capability, the Debtor

22 maintains a full complement of billing and collection agreements with an estimated 1,400 or more

23 LECs, including all major LECs and numerous independents. This infrastructure enables

24 telecommunication service providers to incorporate their charges within the phone bills of greater

25 _____

26 [3] The AOS provider could have required the caller to use a credit card or charge his or her hotel room, but that is not a competitive offering for a consumer wishing to make a collect call.

27 [4] The AOS provider needs every LEC agreement because it has no way to know in advance the identity of the billed party.

28

W02-WEST:FJR:400433133.1         CASH MANAGEMENT MOTION

1    than 90% of business and residential consumers throughout the United States and Canada. By

2    using a billing aggregator like the Debtor, the fixed overhead is already in place and the per unit

3    billing cost is typically lower than the direct approach. Moreover, the LEC bill adds credibility to

4    the charge and provides a substantially higher collection rate.

5         The Debtor quickly established itself as a leader in providing LEC billing solutions for

6    diverse and emerging products and services. The Debtor presently offers a complete array of

7    complementary services including internet-delivered management and settlement reporting, direct

8    billing, customer care and collection support. As a strategic back-room business partner, the

9    Debtor frees its clients to focus their efforts on promoting and selling products and services.

10        The Debtor has served thousands of service providers over the years. The vast majority of

11   the processed billings have been in support of smaller sized businesses that otherwise would not

12   have been able to compete. It is the competitive pressure of these smaller companies that has

13   forced down the rates charged to consumers by the larger telecommunication companies.

14        The Debtor's office is in San Jose, California. The Debtor leases that office space. The

15   Debtor has no other offices or real estate leases. The Debtor owns no real estate. The Debtor has

16   approximately thirty-seven employees. Twenty-two of those employees have been with the

17   company for over five years, and thirteen have been with the Debtor for over ten years. In

18   addition, the Debtor's services support, through outsourced relationships, approximately 20-30 call

19   center personnel in several different call centers who are employed by a third-party vendor. This

20   function used to be internally managed by the Debtor until a few years ago.

21        In July of 2000, the Debtor formed a subsidiary called eBillit, Inc., now known as

22   PaymentOne Corporation (hereinafter, "PaymentOne"), a Delaware corporation, to address the

23   specialized billing and support requirements of the internet. PaymentOne is a majority-owned

24   subsidiary of the Debtor. In 2002, the Debtor formed another subsidiary, Inmate Calling

25   Solutions, LLC, dba ICSolutions (hereinafter, "ICSolutions"), to target the correctional industry.

26   ICSolutions provides a full, end-to-end call processing and support system to facilitate inmate

27   calling including collect and pre-paid calling as well as a variety of complementary products and

28   services. ICSolutions is a majority-owned subsidiary of the Debtor. In 2004, the Debtor formed

-4-

1   another subsidiary, Information Services 900 LLC (hereinafter, "IS 900"), to target the

2   provisioning, rating, formatting and billing of 900 call traffic. IS 900 is a majority-owned

3   subsidiary of the Debtor.

4   B.    The Debtor's Contracts With Its Customers.

5          The relationship between the Debtor and its AOS provider customers is governed by a

6   contract between the Debtor and the customer. The typical contract provides that the customer

7   submit to the Debtor the customer's billing transactions (the "Billing Transactions") in a data

8   format acceptable to the Debtor. If the Billing Transaction does not satisfy certain processing

9   criteria then the Debtor may reject it. If not rejected then the accounts receivable submitted as part

10  of the Billing Transaction becomes an account receivable of the Debtor and not the customer. The

11  typical contract provides that "Client [i.e., the customer] acknowledges that the Billing Contracts

12  with Telcos [i.e., LECs] are structured as a purchase of accounts receivable..."

13         The customers have no ownership interest in the proceeds of the billing transactions after

14  the Billing Transactions are submitted to the Debtor. After the Billing Transactions are submitted

15  and the accounts receivable from the LECs becomes property of the Debtor, the customer is only

16  an unsecured creditor of the Debtor, with claims for certain "distributions" under the contract

17  between the Debtor and the customer. Generally, those "distributions" will be payable by the

18  Debtor about 90 or so days after the Billing Transaction is submitted to the Debtor by the

19  customer. Detailed formulas are set forth in the contracts for computing the amounts that the

20  Debtor is required to pay the customers. The Debtor is authorized to withhold from the customer

21  its fees and not to pay amounts that may be used by the Debtor to resolve disputes, make other

22  adjustments and maintain as reserves.

23         Under the typical contract it is provided that each week the Debtor shall transfer by wire to

24  the customer's bank account the Net Proceeds identified in the prior week. "Net Proceeds" is

25  defined as the gross value of the Billing Transactions that are remitted to the LECs, less amounts

26  withheld by the LECs, less amounts due to the Debtor, and less other fees and reserves. This

27  amount is due only as such amounts are determined from the information provided from the LECs,

28  and that is generally 90 days after submission of the Billing Transactions.

-5-

**C. Claims Based Upon Billing Transactions Submitted To The Debtor Prior To The Debtor's Bankruptcy Filing Shall Be Treated As Pre-Petition Claims.**

As previously discussed, the Debtor's customers have no ownership interest in the proceeds of the billing transactions after the Billing Transactions are submitted to the Debtor. After the Billing Transactions are submitted and the accounts receivable from the LECs becomes property of the Debtor, the customer is only an unsecured creditor of the Debtor, with claims for certain "distributions" under the contract between the Debtor and the customer. Accordingly, all Billing Transactions which were submitted to the Debtor prior to the Debtor's bankruptcy filing shall be treated as pre-petition claims. In contrast, all Billing Transactions submitted to the Debtor after the Debtor's bankruptcy filing shall be treated as post-petition claims.

**D. The Florida Action and the Debtor's Need to File for Bankruptcy.**

On February 27, 2006, the Federal Trade Commission (the "FTC") commenced a lawsuit (the "Florida Action") in the United States District Court for the Southern District of Florida (the "Florida Court") against Nationwide Connections, Inc. ("Nationwide"), Access One Communications, Inc. ("Access One") and Network One Services, Inc. ("Network One"), three AOS providers, as well as their principals, alleging deceptive and unfair practices for unauthorized billing of charges on phone bills -- referred to as "cramming" -- in violation of the Federal Trade Commission Act (the "FTCA").[5] The Florida Court entered a temporary restraining order and later a preliminary injunction. The Florida Court appointed a receiver (the "Receiver") for Nationwide, Access One and Network One and certain of their affiliates. An "Amended Preliminary Injunction Order" was filed on September 25, 2006. On or about September 21, 2006, the FTC filed an amended complaint which included claims against the Debtor and another billing aggregator. Access One and Network One were two of the Debtor's prior AOS provider customers (Access One and Network One collectively shall be referred to as the "Prior Customers"). The FTC alleged in its amended complaint that the Debtor caused certain of the

---

[5] The Florida Action is captioned Federal Trade Commission v. Nationwide Connections, Inc., et al., Case No. 06-80180-Civ-Ryskamp, United States District Court for the Southern District of Florida.

1 | Prior Customers' fraudulent charges to be placed on end users' phone bills and that the Debtor was

2 | liable under the FTCA. The Debtor filed an answer denying the FTC's allegations.

3 | The Receiver filed a motion seeking to hold the Debtor in contempt for allegedly failing to

4 | turn over to the Receiver, on behalf of the Prior Customers, certain reserves under the Prior

5 | Customers' contracts with the Debtor (the "Subject Contracts") in alleged amount exceeding $1.4

6 | million. The Debtor filed a response opposing such relief on numerous grounds. The grounds

7 | included without limitation that the Debtor had no obligation to pay any funds to the Receiver

8 | under the Subject Contracts. In addition, the Debtor did not hold any specific designated funds

9 | allocable to reserves for the Prior Customers, because consistent with the Debtor's general practice

10 | regarding reserves, the Debtor treated them solely as bookkeeping entries, without segregating or

11 | otherwise designating specific funds for purposes of the reserves.

12 | The Florida Court filed an order on September 14, 2007 (the "Payment Order") requiring

13 | that the Debtor pay the disputed substantial moneys into a segregated receivership account.[6]

14 | The Debtor believes that it will ultimately prevail in the Florida Action, including with

15 | respect to amounts which are the subject of and required to be paid under the Payment Order, and

16 | contends that it currently owes nothing to the Receiver. However, the Debtor's business could not

17 | endure parting with such a substantial amount of money, as even the temporary loss of such a

18 | large amount of funds would have had devastating consequences on the Debtor's business

19 | operations, and consequently on the Debtor's creditors, employees and stakeholders. The Debtor

20 | does not have sufficient funds to pay the monies required under the Payment Order and at the

21 | same time make payments required for the Debtor's business operations. In addition, making the

22 | payment required by the Payment Order would gravely impair the Debtor's ability to pay other

23 | customers any amounts that the Debtor determines should be paid in accordance with the reserve

24 | provisions of the respective contracts. There is no segregated reserve account for any customer,

25 | and the Debtor does not have enough cash to cover the full amount of reserves for all customers.

26 |

27 | [6] Though the FTC is a party to the Florida Action, the Payment Order which caused the filing of
this bankruptcy case was entered upon the motion of the Receiver, not a motion by the FTC.

28 |

1    Thus, paying the Receiver under the Payment Order would give the Receiver preferential

2    treatment as compared to all of the Debtor's other customers. Accordingly, the Debtor filed for

3    bankruptcy protection to allow for an orderly and equitable administration of its assets for the

4    benefit of all claimants and stakeholders and to preserve its business operations and the

5    livelihoods of its employees.

6                                    **II.**

7                      **RELIEF REQUESTED**

8       The Debtor seeks an order authorizing the use and maintenance of all aspects of its cash

9    management system and bank accounts. Specifically, the Debtor seeks to maintain its operating

10    and concentration accounts, depository accounts, disbursement accounts, and payroll accounts,

11    and the flow of money between such accounts (and the other accounts identified on <u>Exhibit A</u>

12    attached hereto) with the modifications proposed below in Section III of this Motion.

13                                   **III.**

14      **THE CASH MANAGEMENT SYSTEM AND HOW IT WORKS**

15       The Debtor's cash management system is described in the paragraphs below. The system

16    is complex and involves over half a dozen bank accounts. Attached hereto as <u>Exhibit B</u> is a chart

17    that illustrates the flow of funds described below.

18    A.    <u>Funds Enter the Cash Managements System Through the Wire In Account</u>

19       The Debtor submits billing information to the LECs who provide the Debtor with billing

20    services. The LECs in turn bill their end users. Over a variety of timeframes after the billing

21    transactions are submitted to the LECs by the Debtor, the LECs pay the Debtor on account of all

22    of the aggregate billing transaction submitted in a similar period by all of Debtor's customers

23    based on each LECs formulas, lag periods and off-set rights and independent of any actual

24    collections that may have occurred. The payments from the LECs are made into the Debtor's

25    "wire in" account.[7] Funds are transferred into this account on a daily basis throughout each day.

26

27    [7] Each of the Debtor's bank accounts is at Comerica Bank. The wire in account is account number
1890647140. The name of each of Comerica's bank accounts and the corresponding account

28    numbers are listed on the spreadsheet attached hereto as <u>Exhibit A</u>. Comerica Bank is listed as an

-8-

B.  Funds Are Transferred from the Wire In Account to the Wire Out Account

Once a week, typically on a Thursday, the Debtor settles its accounts with its customers. These settlements first require a disbursement from the "wire in" account to the "wire out" account. The wire out account is a zero balance account. This means that all of the funds that are transferred in to the wire out account are generally transferred out of that same account on the very same day. From the wire out account, the Debtor transfers its funds either to its clients or one of the following accounts: (1) operating account, (2) tax account, (3) voucher account, or (4) future bad debt account. Each of those accounts is described below, as well as the other accounts which are not central to the cash management system.

1.  Operating Account

Funds wired into the operating account are used to pay the Debtor's vendors, employees and other normal operating expenses.

2.  Tax Account

Taxes that the Debtor is required to collect in connection with its business operations are transferred into this account. Those funds are subsequently remitted to a third party tax processor, who in turn remits payment to the relevant taxing authorities on behalf of the Debtor. Funds in the tax account might sit for up to a week at a time before the Debtor's tax processor draws on the funds to make payments.

3.  Voucher Account

Certain of the Debtor's end users are occasionally entitled to a refund or credit. This might be the result of an error in billing, or might occur when a customer accidentally signs up for an undesired service (i.e., customer's 10 year old son signs up for service). Approximately 95% of these errors are corrected electronically through an automated credit transaction. The other 5%, however, are handled through the issuance of a voucher to the customer. This voucher is redeemable for cash which is drawn from the voucher account.

_____

authorized depository on a list maintained by the local Office of the United States Trustee.

W02-WEST:FJR:400433133.1                                                              CASH MANAGEMENT MOTION

1        4.   Future Bad Debt Account

2           This account is used to hold excess funds, if any, from weekly settlements. These funds are

3    then used as a primary source to cover subsequent operating shortfalls including settlement

4    obligations that exceed available funds from the wire-in account. The balance in this account is

5    subject to significant variations, and from time to time may be almost fully depleted due to

6    fluctuations in the need for funds and the availability of funds from other sources.

7        5.   Other Accounts

8           In addition to the accounts described above, the Debtor has separate accounts for payroll

9    and its 401(k). The payroll account is shown on the cash management flow chart attached hereto

10   as Exhibit B. The 401(k) account is not shown on that chart because it is not central to the cash

11   management system. Both the payroll and 401(k) account are listed on Exhibit A attached hereto.

12   C.   The Proposed Post-Petition Cash Management System

13          The Debtor proposes to maintain the cash management system described above with the

14   following changes. The signature cards on all of the Debtor's accounts will be changed to reflect

15   the Debtor's "debtor-in-possession" status. The Debtor will work with its bank to ensure that no

16   pre-petition checks or other pre-petition claims are honored other than payroll checks to the extent

17   that this Court authorizes the Debtor to honor pre-petition priority obligations to employees. As

18   set forth above, all Billing Transactions which were submitted to the Debtor prior to the Debtor's

19   bankruptcy filing shall be treated as pre-petition claims. The cash management system, with these

20   changes, would remain in place subject to further orders of this Court.

21   D.   Benefits of the Cash Management System

22          The existing cash management system, though complex, is efficient and effective. It is the

23   product of many years of operations in this specific area of telecommunications. It would be

24   extremely disruptive to the Debtor's ongoing business operations if the Debtor had to shut the

25   existing system down, a result which would be extremely harmful to the Debtor's creditors and the

26   Debtor's bankruptcy estate. It would likely take several days, if not weeks, for the Debtor to

27   implement a replacement cash management system, and during that time the Debtor's ability to

28   function as a going concern would be severely hampered. At a minimum, the Debtor would have

W02-WEST:FJR\400433133.1                                          CASH MANAGEMENT MOTION

1   to cause at least 20-25 LECs to change their well-established payment procedures with the Debtor.

2   For many reasons, not the least of which is that many LECs are extremely large and bureaucratic

3   enterprises, the likelihood of being able to get each of the LECs to successfully change their

4   payment procedures in the extremely short time frame required in order not to harm the Debtor's

5   business is highly unlikely. Similarly, the Debtor would have to establish new payment procedures

6   with its 40-50 clients. Without the ability to smoothly process ingoing and outgoing payments on

7   an uninterrupted basis, the Debtor's business could grind to a halt. And, at the very least, would

8   result in the Debtor unnecessarily having to dedicate a large amount of scarce resources in an

9   attempt to comply with the requirements, the Debtor likely breaching many of its contracts while

10  attempting to comply with the requirements, and the Debtor losing valuable goodwill.

11                                          **IV.**

12                                     **ARGUMENT**

13          A request for authority to continue using existing cash management is considered a "simple

14  matter" and bankruptcy courts routinely grant such requests. See In re Baldwin United Corp., 79

15  B.R. 321, 327 (Bankr. S.D. Ohio 1987); see also In re The Charter Co., 778 F.2d 617, 621 (11th

16  Cir. 1985) (finding use of pre-petition cash management system was consistent with Bankruptcy

17  Code). The Court is authorized to grant the relief requested pursuant to § 105(a) of the

18  Bankruptcy Code, which provides that the Court "may issue any order, process, or judgment that

19  is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The use

20  of the existing bank accounts as part of the cash management system will benefit the Debtor's

21  creditors and estate, because it will allow for the seamless and continuous operation of the

22  Debtor's business. The Debtor has brought this Motion on an emergency basis because the

23  continued use of its existing cash management system and bank accounts is absolutely essential to

24  its ability to operate. The Debtor's cash management system, as modified by this Motion, more

25  than adequately protects the Debtor's creditors and the bankruptcy estate.

26

27

28

-11-

V.

## CONCLUSION

The Debtor respectfully requests that the Court enter an order: (i) authorizing the Debtor to continue using its cash management system and maintain all of the bank accounts listed on <u>Exhibit A</u> attached hereto, with the signature cards on each account changed to reflect the Debtor's "debtor-in-possession" status, and (ii) granting such other and further relief as is just and proper. A copy of a proposed order, generally in the form the Debtor contemplates requesting the Court sign granting this Motion, is attached hereto as <u>Exhibit C</u>.[8]

Dated: September 16, 2007

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By           /s/ Jeffrey K. Rehfeld
                  JEFFREY K. REHFELD
          Proposed Attorneys for Debtor The Billing Resource,
                    dba Integretel

---

[8] The Debtor reserves the right to request that the Court sign a form of order different than that attached as <u>Exhibit C</u>.

-12-

1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2      Including Professional Corporations
    MICHAEL H. AHRENS, Cal. Bar No. 44766
3   GERALDINE A. FREEMAN, Cal. Bar No. 111483
    JEFFREY K. REHFELD, Cal. Bar No. 188128
4   ORI KATZ, Cal. Bar No. 209561
    Four Embarcadero Center, 17th Floor
5   San Francisco, California  94111-4106
    Telephone:    415-434-9100
6   Facsimile:    415-434-3947
    Email:        mahrens@sheppardmullin.com
7                 jrehfeld@sheppardmullin.com
                  okatz@sheppardmullin.com
8
9   Proposed Attorneys for THE BILLING RESOURCE,
    dba INTEGRETEL
10

11                 UNITED STATES BANKRUPTCY COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                       SAN JOSE DIVISION

14

15  | In re | Case No. 07-52890 |
16  | THE BILLING RESOURCE, dba Integretel, a | Chapter 11 |

17  California corporation,

    **EMERGENCY MOTION FOR USE OF
18               Debtor.           CASH COLLATERAL AND GRANTING
                                   REPLACEMENT LIENS**
    Tax ID: 33-0289863
19

20  Date:      [TBD]
    Time:      [TBD]
21  Place:     United States Bankruptcy Court
               280 South First Street
22             San Jose, California
    Judge:     [TBD]
23  Courtroom: [TBD]

24

25

26

27

28

W02-WEST:FKA\400433179.1                          EMERGENCY CASH COLLATERAL MOTION

1     This emergency motion (the "Motion") is filed on behalf of the above-captioned debtor

2  The Billing Resource, dba Integretel, a California corporation (the "Debtor"). The Motion is

3  based on the discussion below, the concurrently filed declaration of Ken Dawson (the "Dawson

4  Declaration") in support of the Motion, the other papers of record, and upon such further oral and

5  documentary evidence as may be presented prior to or at the time of the hearing on the Motion.

6  The Motion is brought pursuant to 11 U.S.C. §§ 105, 361 and 363 and Federal Rule of Bankruptcy

7  Procedure 4001 ("FRBP").

8     As soon as the Court sets a hearing on the Motion, the Debtor will send out a notice to the

9  parties identified in Section IV of this Motion.

10     The Debtor must have immediate access to cash collateral to maintain its business

11  operations and pay its ongoing operational expenses, including without limitation the payment of

12  vendors, its employees and other costs and expenses which are essential to the Debtor's continued

13  viability. Without the ability to use cash collateral, the Debtor cannot meet these expenses and is

14  in jeopardy of having to cease business operations, which would be devastating to the Debtor, its

15  creditors and its entire bankruptcy estate, as well as cause significant harm to the Debtor's

16  customers who depend upon the Debtor and the services it provides. The Debtor needs the use of

17  cash collateral now to avoid immediate and irreparable harm to the Debtor and its bankruptcy

18  estate. The Debtor, therefore, requests that the Court enter an order approving the Stipulation (as

19  that term is defined below) and allowing the interim use of cash collateral and granting certain

20  replacement liens, and that the Court set a final hearing for the Debtor's use of cash collateral and

21  granting certain replacement liens, as set forth herein.

22     There are five entities that claim a security interest in assets that might be "cash

23  collateral."[1] Following is a summary of the five entities, and the manner in which their claims are

24  proposed to be treated:

25

26  [1] The names of these entities and their addresses are also listed on <u>Exhibit A</u> attached hereto. The
    Debtor does <u>not</u> concede that any entity possesses a valid, perfected and enforceable security

27  interest in cash collateral of the Debtor, and the Debtor reserves all rights and defenses in
    connection therewith.

28

W02-WEST:FKA:400433179.1

1     (a) PaymentOne Corporation ("PaymentOne") and POL, Inc. ("POL"). PaymentOne has

2 stipulated to the use of cash collateral and a copy of that stipulation (the "Stipulation") is attached

3 as Exhibit E. In this Motion the Debtor seeks approval of the Stipulation. PaymentOne and POL

4 together assert claims of approximately $15.4 million and $196,000, respectively, and claim a

5 security interest in accounts and other cash collateral. The Debtor intends to provide PaymentOne

6 and POL adequate protection in the more than $24 million[2] of cash and accounts receivable of the

7 Debtor that are free and clear except for the claims of PaymentOne and POL.

8     (b) Three Customers' Invalid Lien Claims. Three customers[3] have filed UCC-1 financing

9 statements and the description of the collateral is not in accounts of the Debtor or in any other cash

10 collateral of the Debtor. However, out of an abundance of caution, the Debtor has brought this

11 Motion to make sure that it may continue to use its own accounts notwithstanding these asserted

12 invalid security interest claims. Although the contracts of these three customers are worded

13 slightly differently, in each of the three cases the customer took a security interest in its own

14 claims against the Debtor. This is not "accounts" of the Debtor, and the three customers therefore

15 have no valid claims in cash collateral. However, the Debtor will not in this Motion ask that this

16 dispute be resolved now. The Debtor will give these three customers the same lien in postpetition

17 assets, but agree that such postpetition lien is only as valid as the prepetition lien. Even if these

18 three customers had a security interest in accounts, which they do not, they are adequately

19 protected. The claims of these three customers collectively total approximately $3.7 million, and

20 there is more than enough protection in the $24 million plus of receivables of the Debtor if these

21 three customers have an interest in those receivables.

22

23

24

---

25 [2] The $24 million in receivables does not take into account the intercompany receivable from the

26 Debtor's subsidiary, Inmate Calling Solutions, LLC, dba ICSolutions (hereinafter, "ICSolutions").

27 [3] These three customers are Network Telephone Services, Inc. ("Network Telephone"), Personal

Voice, Inc. ("Personal Voice") and Public Communication Services, Inc. ("Public

28 Communication").

W02-WEST:FKA:400433179.1

# I.

## STATEMENT OF FACTS

A.   The Debtor's Background and the Debtor's Business.

The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on September 16, 2007 (the "Petition Date"). The Debtor is operating its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.[4]

The Debtor was originally formed in 1988 based on a need for aggregators to facilitate billing and collections on behalf of smaller telecommunications companies that otherwise could not afford to compete with the larger local exchange carriers ("LECs" or "Telcos") such as AT&T. At that time "alternative operator services" ("AOS") was a growing market segment and affordable billing solutions allowed private companies to compete with the LECs in niche areas like public payphones, hotels, and prisons. In the payphone market, for example, many of the incumbent LECs' phones were perceived to be relatively poorly maintained and expensive to use. Today, most LECs have exited the payphone market.

In the pre-subscribed long distance business, typically the service provider establishes a long-term service relationship with the consumer. In contrast, AOS involves a casual relationship where often the consumer uses the service provider's assets or services without the consumer or the service provider even knowing at that time each other's identity. For example, a service provider owning the service contract for a hotel chain has no idea what the true identity is of the consumer using its phones. When a collect call is placed, often the only information that the AOS provider has are the basic elements of the call itself, i.e., the telephone number the call is placed from, the telephone number to which the call is placed, the date and time of the call, and the duration of the call. While the called party may have accepted the charges, the AOS provider can only bill such collect calls by one of two methods: (1) using a direct invoice; or (2) via the

---

[4] "Bankruptcy Code" refers to 11 U.S.C. §§ 101-1531, inclusive. "Rule" refers to the Federal Rules of Bankruptcy Procedure.

EMERGENCY CASH COLLATERAL MOTION

consumer's home LEC.[5]  Each of these methods has many drawbacks.

In addition to AOS providers, the Debtor services customers offering enhanced products and services such as voice mail, online directory listings and bundled calling plans. While these services may be billed to credit cards, often consumers are hesitant to use their credit cards for such intangible purchases and, therefore, may  prefer alternate billing choices such as the LEC phone bill.

Under the direct invoice method, the service provider would need to first purchase the consumer's billing name and address from a reliable source and then print, stuff and mail an invoice. The per unit cost of these administrative functions could be prohibitively high without a substantial volume.  As many service providers' names are not well known, a high percentage of these invoices are also likely to be thrown away or ignored.  Since the average billing charge may be very small, collections efforts are cost prohibitive.  Unless the service provider has a powerful household brand name, the direct invoice billing method is typically impracticable.

Similarly, billing the consumer's home LEC also presents numerous difficulties.  With this method, the service provider needs to have first invested millions of dollars in specialized software to interface with each LEC's billing system as well as to decipher their resulting reports and data streams.  In addition, the service provider would need billing and collection contracts with every LEC[6], which would cost about $2 million to obtain and implement, take 6-12 months to set up, and require ongoing fee minimums of over $100,000 per month.

The Debtor addressed a significant industry void by creating a service bureau focused entirely on billing-related services.  As the cornerstone to its billing capability, the Debtor maintains a full complement of billing and collection agreements with an estimated 1,400 or more LECs, including all major LECs and numerous independents.  This infrastructure enables telecommunication service providers to incorporate their charges within the phone bills of greater

---

[5] The service provider could have required the caller to use a credit card or charge his or her hotel room, but that is not a competitive offering for a consumer wishing to make a collect call.

[6] The service provider needs every LEC agreement because it has no way to know in advance the identity of the billed party.

W02-WEST:FKA:400433179.1

EMERGENCY CASH COLLATERAL MOTION

than 90% of business and residential consumers throughout the United States and Canada. By using a billing aggregator like the Debtor, the fixed overhead is already in place and the per unit billing cost is typically lower than the direct approach. Moreover, the LEC bill adds credibility to the charge and provides a substantially higher collection rate.

The Debtor quickly established itself as a leader in providing LEC billing solutions for diverse and emerging products and services. The Debtor presently offers a complete array of complementary services including internet-delivered management and settlement reporting, direct billing, customer care and collection support. As a strategic back-room business partner, the Debtor frees its clients to focus their efforts on promoting and selling products and services.

The Debtor has served thousands of service providers over the years. The vast majority of the processed billings have been in support of smaller sized businesses that otherwise would not have been able to compete. It is the competitive pressure of these smaller companies that has forced down the rates charged to consumers by the larger telecommunication companies.

The Debtor's office is in San Jose, California. The Debtor leases that office space. The Debtor has no other offices or real estate leases. The Debtor owns no real estate. The Debtor has approximately thirty-seven employees. Twenty-two of those employees have been with the company for over five years, and thirteen have been with the Debtor for over ten years. In addition, the Debtor's services support, through outsourced relationships, approximately 30 call center personnel in several different call centers who are employed by a third-party vendor. This function used to be internally managed by the Debtor until a few years ago.

In July of 2000, the Debtor formed a subsidiary called eBillit, Inc., now known as PaymentOne Corporation (hereinafter, "PaymentOne"), a Delaware corporation, to address the specialized billing and support requirements of the internet. PaymentOne is a majority-owned subsidiary of the Debtor. In 2002, the Debtor formed another subsidiary, ICSolutions, to target the correctional industry. ICSolutions provides a full, end-to-end call processing and support system to facilitate inmate calling including collect and pre-paid calling as well as a variety of complementary products and services. ICSolutions is a majority-owned subsidiary of the Debtor. In 2004, the Debtor formed another subsidiary, Information Services 900 LLC (hereinafter, 'IS

-5-

EMERGENCY CASH COLLATERAL MOTION

1  900"), to target the provisioning, rating, formatting and billing of 900 call traffic. IS 900 is a

2  majority-owned subsidiary of the Debtor.

3  **B.** <u>The Debtor's Contracts With Its Customers.</u>

4  The relationship between the Debtor and its AOS provider customers is governed by a

5  contract between the Debtor and the customer. The typical contract provides that the customer

6  submit to the Debtor the customer's billing transactions (the "Billing Transactions") in a data

7  format acceptable to the Debtor. If the Billing Transaction does not satisfy certain processing

8  criteria then the Debtor may reject it. If not rejected then the accounts receivable submitted as part

9  of the Billing Transaction becomes an account receivable of the Debtor and not the customer. The

10  typical contract provides that "Client [i.e., the customer] acknowledges that the Billing Contracts

11  with Telcos [i.e., LECs] are structured as a purchase of accounts receivable..."

12  The customers have no ownership interest in the proceeds of the billing transactions after

13  the Billing Transactions are submitted to the Debtor. After the Billing Transactions are submitted

14  and the accounts receivable from the LECs becomes property of the Debtor, the customer is only

15  an unsecured creditor of the Debtor, with claims for certain "distributions" under the contract

16  between the Debtor and the customer. Generally, those "distributions" will be payable by the

17  Debtor about 90 or so days after the Billing Transaction is submitted to the Debtor by the

18  customer. Detailed formulas are set forth in the contracts for computing the amounts that the

19  Debtor is required to pay the customers. The Debtor is authorized to withhold from the customer

20  its fees and not to pay amounts that may be used by the Debtor to resolve disputes, make other

21  adjustments and maintain as reserves. The reserves are merely bookkeeping entries. The Debtor

22  does not have any accounts segregated by individual client which hold any reserves.

23  Under the typical contract it is provided that each week the Debtor shall transfer by wire to

24  the customer's bank account the Net Proceeds identified in the prior week. "Net Proceeds" is

25  defined as the gross value of the Billing Transactions that are remitted to the LECs, less amounts

26  withheld by the LECs, less amounts due to the Debtor, and less other fees and reserves. This

27  amount is due only as such amounts are determined from the information provided from the LECs,

28  and that is generally 90 days after submission of the Billing Transactions.

C.    Claims Based Upon Billing Transactions Submitted To The Debtor Prior To The Debtor's Bankruptcy Filing Shall Be Treated As Pre-Petition Claims.

As previously discussed, the Debtor's customers have no ownership interest in the proceeds of the billing transactions after the Billing Transactions are submitted to the Debtor. After the Billing Transactions are submitted and the accounts receivable from the LECs becomes property of the Debtor, the customer is only an unsecured creditor of the Debtor, with claims for certain "distributions" under the contract between the Debtor and the customer. Accordingly, all Billing Transactions which were submitted to the Debtor prior to the Debtor's bankruptcy filing shall be treated as pre-petition claims. In contrast, all Billing Transactions submitted to the Debtor after the Debtor's bankruptcy filing shall be treated as post-petition claims.

D.    Entities Claiming Security Interests In Cash Collateral

The Debtor does not have a traditional bank lender. However, PaymentOne, FOL, Network Telephone, Personal Voice and Public Communication (collectively referred to herein as the "Alleged Cash Collateral Secured Creditors") claim to hold valid, perfected and enforceable security interests in certain assets of the Debtor which constitute "cash collateral" as defined in Bankruptcy Code section 363(a) (such assets of the Debtor shall be referred to herein as the "Cash Collateral").[7]

The Debtor does not concede that any entity possesses a valid, perfected and enforceable security interest in the Debtor's Cash Collateral and reserves all rights and defenses in connection therewith. However, as discussed in further detail below, in light of the Debtor's urgent need to use Cash Collateral and in order to avoid having to immediately resolve any disputes regarding creditors' alleged security interests in Cash Collateral of the Debtor, the Debtor proposes to provide that each of the entities be granted a replacement lien of the same kind and type as it possessed prepetition which replacement lien shall be effective only to the extent that each such entity's prepetition liens were valid, perfected and enforceable. To the extent that each entity's

---

[7]    Also, other creditors assert security interests in certain of the Debtor's other non-cash collateral assets. Specifically, Highline Capital Corp. and CIT Technology Financing Services, Inc. assert security interests in certain of the Debtor's office and computer equipment.

EMERGENCY CASH COLLATERAL MOTION

1   prepetition liens were valid, perfected and enforceable, each such entity's replacement liens on
2   post-petition property shall have the same priority vis-a-vis other liens and interests as each of the
3   respective entity's pre-petition liens and security interests have vis-a-vis such other liens and
4   interests.

5   E.      The Florida Action and the Debtor's Need to File for Bankruptcy.

6           On February 27, 2006, the Federal Trade Commission (the "FTC") commenced a lawsuit
7   (the "Florida Action") in the United States District Court for the Southern District of Florida (the
8   "Florida Court") against Nationwide Connections, Inc. ("Nationwide"), Access One
9   Communications, Inc. ("Access One") and Network One Services, Inc. ("Network One"), three
10  AOS providers, as well as their principals, alleging deceptive and unfair practices for unauthorized
11  billing of charges on phone bills – referred to as "cramming" – in violation of the Federal Trade
12  Commission Act (the "FTCA").[8]   The Florida Court entered a temporary restraining order and
13  later a preliminary injunction.   The Florida Court appointed a receiver (the "Receiver") for
14  Nationwide, Access One and Network One and certain of their affiliates.   An "Amended
15  Preliminary Injunction Order" was filed on September 25, 2006. On or about September 21, 2006,
16  the FTC filed an amended complaint which included claims against the Debtor and another billing
17  aggregator.   Access One and Network One were two of the Debtor's prior AOS provider
18  customers (Access One and Network One collectively shall be referred to as the "Prior
19  Customers").   The FTC alleged in its amended complaint that the Debtor caused certain of the
20  Prior Customers' fraudulent charges to be placed on end users' phone bills and that the Debtor was
21  liable under the FTCA.   The Debtor filed an answer denying the FTC's allegations.

22          The Receiver filed a motion seeking to hold the Debtor in contempt for allegedly failing to
23  turn over to the Receiver, on behalf of the Prior Customers, certain reserves under the Prior
24  Customers' contracts with the Debtor (the "Subject Contracts") in an alleged amount exceeding
25  $1.4 million.   The Debtor filed a response opposing such relief on numerous grounds.   The
26  _____
    [8] The Florida Action is captioned <u>Federal Trade Commission v. Nationwide Connections, Inc., et
27  al.</u>, Case No. 06-80180-Civ-Ryskamp, United States District Court for the Southern District of
    Florida.
28

1    grounds included without limitation that the Debtor had no obligation to pay any funds to the

2    Receiver under the Subject Contracts. In addition, the Debtor asserted that it did not hold any

3    specific designated funds allocable to reserves for the Prior Customers, because consistent with the

4    Debtor's general practice regarding reserves, the Debtor treated them solely as bookkeeping

5    entries, without segregating or otherwise designating specific funds for purposes of the reserves.

6         The Florida Court filed an order dated September 14, 2007 (the "Payment Order")

7    requiring that the Debtor pay the disputed substantial moneys into a segregated receivership

8    account.[9]

9         The Debtor believes that it will ultimately prevail in the Florida Action, including with

10    respect to amounts which are the subject of and required to be paid under the Payment Order, and

11    contends that it currently owes nothing to the Receiver. However, the Debtor's business could not

12    endure parting with such a substantial amount of money, as even the temporary loss of such a

13    large amount of funds would have had devastating consequences on the Debtor's business

14    operations, and consequently on the Debtor's creditors, employees and stakeholders. The Debtor

15    does not have sufficient funds to pay the monies required under the Payment Order and at the

16    same time make payments required for the Debtor's business operations. In addition, making the

17    payment required by the Payment order would gravely impair the Debtor's ability to pay other

18    customers any amounts that the Debtor determines should be paid in accordance with the reserve

19    provisions of the respective contracts. There is no segregated reserve account for any customer,

20    and the Debtor does not have enough cash to cover the full amount of reserves for all customers.

21    Thus, paying the Receiver under the Payment Order would give the Receiver preferential

22    treatment as compared to all of the Debtor's other customers. Accordingly, the Debtor filed for

23    bankruptcy protection to allow for an orderly and equitable administration of its assets for the

24    benefit of all claimants and stakeholders and to preserve its business operations and the

25    livelihoods of its employees.

26

27    _____

      [9] Though the FTC is a party to the Florida Action, the Payment Order which caused the filing of

28    this bankruptcy case was entered upon the motion of the Receiver, not a motion by the FTC.

-9-

## II.

### RELIEF REQUESTED

The Debtor seeks an order of the Court allowing it to use the Cash Collateral. The Debtor needs immediate use of the Cash Collateral to permit it to continue to operate, including without limitation for payment of its vendors, employees, as well as its other business operations, all as set forth on the budget (the "Budget") attached to this Motion as Exhibit C (and also attached to the Dawson Declaration). The Debtor can only continue to operate if it has access to the Cash Collateral. In return for the use of the Cash Collateral, the Debtor proposes to maintain each of the Alleged Cash Collateral Secured Creditor's security interests by granting each of them a replacement lien as described in Bankruptcy Code § 361(2) and discussed in greater detail below.

The Debtor requests two hearings — an immediate first-day hearing on an emergency basis (the "Interim Hearing") at which the Debtor will request interim authority to use Cash Collateral until a Final Hearing can be scheduled, and a Final Hearing at which time the Debtor will seek authority to use Cash Collateral on a final basis. At the Interim Hearing, the Debtor requests that the Court set a date for the Final Hearing and that the Court prescribe that notice of the Final Hearing be sent only to (i) those entities alleging a security interest in the Debtor's Cash Collateral as well as the Debtor's other purported secured creditors, as they are the only entities which the Debtor is aware of who purport to assert a lien on any property of the estate, (ii) the Office of the United States Trustee, (iii) the 30 largest creditors as set forth on the Schedule filed by the Debtor pursuant to FRBP 1007(d); (iv) the Receiver and the FTC, and (v) other significant parties in interest.

Prior to the Final Hearing, the Debtor may file and serve additional pleadings including without limitation additional financial information justifying its entitlement to use Cash Collateral.

### III.

### ARGUMENT

The Debtor requests the Court's immediate authority to use Cash Collateral on an interim basis and on a final basis to fund the Debtor's day-to-day operations including the expenses of this bankruptcy case. Absent such relief, the Debtor will be compelled to cease business operations.

-10-

1   That would be extremely damaging to the Debtor and its creditors. It would also be extremely

2   detrimental to the Debtor's customers who depend upon the Debtor for the services the Debtor

3   provides, and whose businesses would be extremely prejudiced by the delay that would arise if the

4   Debtor were to cease operations thereby forcing the customers to try and switch their billing

5   requirements over to one of the few other remaining billing aggregators. The Debtor's use of Cash

6   Collateral is necessary to avoid immediate and irreparable harm to the Debtor and its bankruptcy

7   estate.

8          The relief requested herein is appropriate. Bankruptcy Code § 363(c)(2) provides that a

9   debtor may not use cash collateral without either the consent of the secured party or an order of the

10  court. Section 363(e) provides that a court may condition the debtor's use of cash collateral on the

11  debtor providing "adequate protection" of the secured party's interest in the collateral being used.

12  Bankruptcy Code Section 361 states that when adequate protection is required under Section 363,

13  adequate protection may take the form of:

14         (2) providing to such entity an additional or replacement lien to the extent that
           any such . . . use . . . results in a decrease in the value of such entity's interest in
15         such property.

16  11 U.S.C. § 361(2).

17         The type of adequate protection that is appropriate in a particular case will depend on the

18  nature of the case. Indeed, "[a]dequate protection [is] a concept which is to be decided flexibly on

19  the proverbial case-by-case basis." In re O'Connor, 808 F.2d 1393, 1396-97 (10th Cir. 1987).

20  Here, for the Debtor to continue its business operations it will need to use the Cash Collateral in

21  which the Alleged Cash Collateral Secured Creditors claim to have an interest. The most

22  appropriate form of adequate protection the Debtor can provide to the Alleged Cash Collateral

23  Secured Creditors is to grant each of the Alleged Cash Collateral Secured Creditors a replacement

24  lien, to the extent of Cash Collateral used, on all post-petition property of the same type and

25  character as the property to which the respective Alleged Cash Collateral Secured Creditor's pre-

26  petition lien extended.

27         An equity cushion has also been held to provide adequate protection. See, e.g., Id.; Pistole

28

-11-

1   v. Mellor, 734 F.2d 1396, 1400 (9th Cir. 1984) ("In fact, it has been held that the existence of any

2   equity cushion, standing alone, can provide adequate protection."); In re Grant Broadcasting of

3   Philadelphia, Inc., 75 B.R. 819 (E.D. Pa. 1987). Attached as an exhibit to the Dawson Declaration

4   is a balance sheet of the Debtor (the "Balance Sheet"). The Balance Sheet shows that as of the

5   date thereof, the Debtor had current assets of $24 million, including $13.8 million of accounts

6   receivables from LECs. Based upon the Debtor's business history, the Debtor believes that as of

7   the date of this Motion, the Debtor's total current assets including its receivables, are in amounts

8   similar to the amounts listed for each of those categories on the Balance Sheet. Based upon the

9   Debtor's business history, the Debtor should collect the LEC accounts receivable on a rolling basis

10  over the next ninety (90) days.

11      As discussed in further detail below: (i) PaymentOne is adequately protected by a

12  replacement lien and possesses a significant equity cushion; (ii) POL is adequately protected by a

13  replacement lien (POL also possesses a significant equity cushion); and (iii) each of Network

14  Telephone, Personal Voice and Public Communication Services, to the extent that it even

15  possesses valid, perfected and enforceable prepetition liens in the Debtor's Cash Collateral, is

16  adequately protected by the grant of replacement liens of the same kind and type as it possessed

17  prepetition.

18  A.    PaymentOne Has Stipulated To The Use Of Cash Collateral and in Any Event is
            Adequately Protected by the Grant of a Replacement Lien
19

20      PaymentOne has stipulated to the Debtor's use of Cash Collateral. A copy of the

21  Stipulation is attached as Exhibit E. PaymentOne asserts a claim against the Debtor in the

22  approximate sum of $15.4 million. PaymentOne purports to hold valid, perfected and enforceable

23  security interests in various assets of the Debtor pursuant to a security agreement between

24  PaymentOne and the Debtor. PaymentOne has a filed a UCC-1 financing statement which states

25  that it covers accounts and other Cash Collateral.[10]

26      In summary, the PaymentOne Stipulation provides that PaymentOne shall be provided a

27  [10] Relevant documents regarding the security interests alleged by the Alleged Cash Collateral
    Secured Creditors are attached as exhibits to the Dawson Declaration.
28

-12-

1   replacement lien, to the extent of cash collateral used, on all post-petition property of the same
2   type and character as the property to which PaymentOne's pre-petition lien extended.[11]
3   PaymentOne's replacement liens on the post-petition property shall have the same priority vis-a-
4   vis other liens and interests as PaymentOne's pre-petition liens and security interests have vis-a-vis
5   such other liens and interests.

6       The replacement liens granted to PaymentOne pursuant to the PaymentOne Stipulation are
7   intended to preserve PaymentOne's position vis-a-vis the Debtor and other creditors of the estate
8   so that PaymentOne's position vis-a-vis the Debtor and such other creditors is neither diminished
9   nor enhanced by the Debtor's use of Cash Collateral and PaymentOne's receipt of replacement
10  liens.    PaymentOne's replacement liens as provided in the PaymentOne Stipulation shall be
11  automatically perfected pursuant to the Court's Order approving the PaymentOne Stipulation and
12  PaymentOne shall not be required to take any further action to perfect such liens.

13      Even aside from the PaymentOne Stipulation, the Debtor should be permitted to use any
14  Cash Collateral with PaymentOne has a valid interest therein.  PaymentOne is clearly adequately
15  protected as it holds a $15.4 million claim against approximately $24 million of accounts
16  receivable and cash.  PaymentOne shall be provided a replacement lien, to the extent of cash
17  collateral used, on all post-petition property of the same type and character as the property to
18  which PaymentOne's pre-petition lien extended.  The Proposed Order paragraphs 4-7 describes the
19  adequate protection requested to be afforded to PaymentOne.

20      Upon approval of the Motion (even if the PaymentOne Stipulation is not approved),
21  PaymentOne's replacement liens on the post-petition property shall have the same priority vis-a-
22  vis other liens and interests as PaymentOne's pre-petition liens and security interests have vis-a-vis
23  such other liens and interests.  The replacement liens granted to PaymentOne are intended to
24  preserve PaymentOne's position vis-a-vis the Debtor and other creditors of the estate so that
25  PaymentOne's position vis-a-vis the Debtor and such other creditors is neither diminished nor

26

27  [11] See Section V of this Motion for additional discussion regarding important terms of the
    Stipulation.
28

-13-

1 | enhanced by the Debtor's use of Cash Collateral and PaymentOne's receipt of replacement liens.

2 | PaymentOne's replacement liens shall be automatically perfected pursuant to the Court's Order and

3 | PaymentOne shall not be required to take any further action to perfect such liens. The Proposed

4 | Order, paragraph 4, describes this (arguably) modification of nonbankruptcy law relating to the

5 | perfection of a lien on property of the bankruptcy estate.

6 | The replacement liens granted to PaymentOne are subordinated to any expenses of this

7 | bankruptcy case including without limitation fees and expenses of professionals retained by the

8 | Debtor and any official committee appointed in this bankruptcy case as well as those of any trustee

9 | subsequently appointed in the bankruptcy case and such trustee's professionals. Paragraph 6 of the

10 | proposed order granting the motion attached hereto as Exhibit D (the "Proposed Order") contains

11 | provisions regarding professionals' fees and expenses.

12 | Notwithstanding anything to the contrary set forth in this Motion, the Debtor does not

13 | concede that PaymentOne has any valid, perfected or enforceable prepetition liens or security

14 | interests in the Cash Collateral or any of the Debtor's other assets, and the Debtor and

15 | PaymentOne reserve all rights and defenses with respect thereto. The replacement liens granted to

16 | PaymentOne are effective only to the extent that PaymentOne's prepetition liens in the Cash

17 | Collateral are valid, perfected and enforceable.

18 | As previously mentioned, PaymentOne is a majority-owned subsidiary of the Debtor, and

19 | thus is an "insider" of the Debtor under Bankruptcy Code section 101(31). The Debtor believes

20 | that it may have certain objections to the security interest alleged by PaymentOne, including the

21 | following. In January 2005 PaymentOne filed its UCC-1 financing statement with the California

22 | Secretary of State naming "Integretel, Incorporated" as the debtor thereunder. On February 7,

23 | 2005, the Debtor changed its name from "Integretel, Incorporated" to "The Billing Resource" with

24 | the California Secretary of State. Under UCC Section 9507(c) when a debtor changes its name

25 | such that the financing statement of a secured creditor becomes "seriously misleading," the

26 | financing statement ceases to be effective to perfect a security interest in collateral acquired by the

27 | debtor more than four months after the change (here June 7, 2005), unless an amendment to the

28 | financing statement which renders it not seriously misleading is filed within four months after the

-14-

EMERGENCY CASH COLLATERAL MOTION

1 change. Thus, a debtor in possession may avoid the security interests in the collateral under an

2 ineffective financing statement, resulting in unsecured creditor status. PaymentOne did not file a

3 financing statement with the California Secretary of State adding The Billing Resource as a debtor

4 until October 18, 2006, within one year of the Debtor's Petition Date. The Debtor reserves all

5 rights in connection with this and any other objections to PaymentOne's alleged security interest.

6 B.     POL is Adequately Protected by the Grant of a Replacement Lien

7        POL, Inc. ("POL") asserts a claim against the Debtor in the approximate sum of $196,000.

8 Pursuant to an agreement and release between POL and certain related parties,[12] on the one hand,

9 and the Debtor on the other hand, POL claims to hold valid, perfected and enforceable security

10 interests in various assets of the Debtor. POL has a filed a UCC-1 financing statement and a

11 security agreement which states that POL possesses a security interest in accounts and other Cash

12 Collateral of the Debtor.

13       The Debtor has supplied certain financial information in support of its Motion, including

14 the Balance Sheet attached to the Dawson Declaration. The Debtor has accounts receivable and

15 cash in excess of approximately $24 million. The only two entities that have a security interest in

16 the accounts of the Debtor are POL and arguably PaymentOne. Together their claims amount to

17 approximately $15.6 million. As long as operations continue post petition these receivables

18 should be maintained at the same level. No post petition financing is sought, and the only parties

19 with a claim on these accounts are Payment One and POL. Hence, there is a substantial equity

20 cushion that both of these creditors have in the accounts, and that equity will be maintained as

21 they are being granted a replacement lien in the receivables that are generated post petition. The

22 Court should order that POL is adequately protected by the granting of a replacement lien, similar

23 to the replacement lien being granted to PaymentOne, and allow the use of Cash Collateral. The

24 Proposed Order describes the adequate protection requested to be afforded to POL (paragraphs 9-

25

26 [12] Those POL-related parties are listed on Exhibit B to this Emergency Motion. To the extent
those related parties assert an interest in the Cash Collateral of the Debtor, the Debtor in this
27 motion moves for relief to use such Cash Collateral consistent with the relief being sought against
POL.
28

12), the possible modification of nonbankruptcy law relating to the perfection of a lien on property of the bankruptcy estate (paragraph 8) and the provisions regarding professionals' fees and expenses (paragraph 11).

Notwithstanding anything to the contrary set forth in this Motion, the Debtor does not concede that POL has any valid, perfected or enforceable prepetition liens or security interests in the Cash Collateral or any of the Debtor's other assets, and the Debtor reserves all rights and defenses with respect thereto. The replacement liens that the Debtor requests that the Court grant to POL pursuant to this Motion are effective only to the extent that POL's prepetition liens in the Cash Collateral are valid, perfected and enforceable.

C.    <u>Network Telephone Does Not Possess a Valid, Perfected and Enforceable Interest in the Debtor's Cash Collateral, But to the Extent It Does, It Is Adequately Protected by the Grant of a Replacement Lien</u>

Network Telephone asserts a claim against the Debtor in the approximate sum of $1.3 million. Network Telephone purports to hold valid, perfected and enforceable security interests in various items pursuant to a master services agreement between Network Telephone and the Debtor. Network Telephone has a filed a UCC-1 financing statement which states that it covers the following collateral:

> Security interest in any Net Proceeds and IGT Reserve that may become due to Secured Party under the Master Services Agreement and related documentation entered into between Integretel, Incorporated and Network Telephone Services, Inc. dated as of August 1, 2004.

Network Telephone does not possess any security interests in the Debtor's Cash Collateral – since Network Telephone's alleged security interest is <u>not</u> in any assets of the Debtor, but instead purports simply to be in amounts to which Network Telephone may be entitled under its contract with the Debtor. Network Telephone's contract with the Debtor provides in relevant part that:

> 6.    Settlement of Amounts Due.    [Network Telephone] shall be entitled to all collected amounts, up to an including the gross value of the Billing Transactions remitted to the Telcos, less any amounts due and owing to IGT hereunder including, without limitation, Unbillables, Adjustments, Telco Holdback, excess Uncollectables (pursuant any True-up), Fees, Telco Fees and IGT Reserves (such difference being the "Net Proceeds").

-16-

1  Because Network Telephone has purported to take a security interest in the amounts which may be
2  owing to Network Telephone under its contract with the Debtor, i.e., the "Net Proceeds," rather
3  than any of the Debtor's assets such as the Debtor's deposit accounts or accounts, Network
4  Telephone does not possess a security interest in the Debtor's Cash Collateral. Similarly, as set
5  forth above the Debtor maintains no account containing reserves segregated by client, and as such
6  Network Telephone does not possess a security interest in the Debtor's Cash Collateral based upon
7  on an alleged security interest in any IGT Reserve (which is merely a bookkeeping entry). The
8  fact that Network Telephone's contract with the Debtor provides that the Billing Contracts with
9  Telcos are structured as a purchase of accounts receivable and that Network Telephone "transfers
10  to [the Debtor] any rights in the Billing Transactions necessary for [the Debtor] to fulfill its
11  obligations [under the contract] in compliance with the Billing Contracts with Telcos" only further
12  supports Network Telephone's lack of any security interest in the Debtor's Cash Collateral.

13       Notwithstanding Network Telephone's obvious lack of a security interest in the Debtor's
14  Cash Collateral, that issue does not need to be finally resolved now especially in light of the
15  Debtor's urgent need to use Cash Collateral. Instead the Debtor proposes to provide Network
16  Telephone a postpetition lien on the same items in which Network Telephone purported to hold a
17  prepetition lien. Accordingly, the Debtor requests that Network Telephone be provided
18  replacement liens, to the extent of cash collateral used in which Network Telephone has an
19  interest, on all post-petition property of the same type and character as the property to which
20  Network Telephone's pre-petition liens extended. As adequate protection of Network Telephone's
21  interests in Cash Collateral and the Debtor's use of the same, the Debtor requests that the Court
22  approve its grant to Network Telephone, to the extent that Network Telephone's prepetition liens
23  are valid, perfected and enforceable, replacement liens in all categories of assets of the Debtor's
24  estate in which Network Telephone holds valid, perfected and enforceable prepetition liens of the
25  same kind and type, subject only to valid, existing prepetition liens, including both existing and
26  after-acquired property, to the fullest extent necessary to realize all Cash Collateral actually
27  expended by the Debtor pursuant to this Motion. Network Telephone's replacement liens as
28  provided in this Motion shall be automatically perfected pursuant to the Court's Order approving

-17-

1   this Motion and Network Telephone shall not be required to take any further action to perfect such

2   liens.

3       Network Telephone's replacement liens on the post-petition property shall have the same

4   priority vis-a-vis other liens and interests as Network Telephone's pre-petition liens and security

5   interests have vis-a-vis such other liens and interests. The replacement liens granted to Network

6   Telephone pursuant to this Motion are intended to preserve Network Telephone's respective

7   position vis-a-vis the Debtor and other creditors of the estate so that Network Telephone's position

8   vis-a-vis the Debtor and such other creditors is neither diminished nor enhanced by Debtor's use of

9   Cash Collateral and Network Telephone's receipt of replacement liens. The replacement liens that

10   the Debtor requests that the Court grant to Network Telepone pursuant to this Motion are effective

11   only to the extent that Network Telephone's prepetition liens in the Cash Collateral are valid,

12   perfected and enforceable.

13       The replacement liens granted to Network Telephone shall be subordinated to any

14   expenses of this bankruptcy case including without limitation fees and expenses of professionals

15   retained by the Debtor and any official committee appointed in this bankruptcy case as well as

16   those of any trustee subsequently appointed in the bankruptcy case and such trustee's

17   professionals. The Proposed Order describes the adequate protection requested to be afforded to

18   Network Telephone (paragraphs 14-17), the possible modification of nonbankruptcy law relating

19   to the perfection of a lien on property of the bankruptcy estate (paragraph 14) and the provisions

20   regarding professionals' fees and expenses (paragraph 16).

21   D.   <u>Personal Voice Does Not Possess a Valid, Perfected and Enforceable Interest in the</u>

22       <u>Debtor's Cash Collateral, But to the Extent It Does, It Is Adequately Protected by the Grant</u>
<u>of a Replacement Lien</u>

23       Personal Voice asserts a claim against the Debtor in the approximate sum of $1.9 million.

24   Personal Voice purports to hold valid, perfected and enforceable security interests in various items

25   pursuant to a billing services agreement between Personal Voice and the Debtor. Personal Voice

26   has a filed a UCC-1 financing statement which states that it covers the following collateral:

27       Integretel Incorporated ("IGT") hereby grants Personal Voice ("PV") a first

28       position security interest in all collected amounts due and owing to PV pursuant

1  to that certain billing services agreement dated April 19, 2000 and amended
2  October 01, 2001, and any amendments thereto, ("Agreement") by and between
   IGT and PV, arising from Billing Transactions, as such term is defined under the
3  Agreement, generated and submitted by PV to IGT, after consideration of all
   amounts which are or will become due to IGT or may be retained or held by IGT
4  pursuant to the Agreement.

5  The Debtor contends that Personal Voice does not possess any security interests in the

6  Debtor's Cash Collateral for the same reasons that Network Telephone did not possess any such

7  security – i.e., Personal Voice's alleged security interest is not in any assets of the Debtor, but

8  instead purports simply to be in amounts to which Personal Voice may be entitled under its

9  contract with the Debtor. Personal Voice's contract with the Debtor provides in relevant part that:

10     9. Remittal Of Customer Funds. Customer shall be entitled to the gross value of
       its Billing Transactions less any applicable deductions set forth in Sections 6 and
11     8 hereunder (such difference being the "Net Proceeds").

12  Because Personal Voice has purported to take a security interest in the amounts which may be

13  owing to it under its contract with the Debtor, rather than any of the Debtor's assets such as the

14  Debtor's deposit accounts or accounts, Personal Voice does not possess a security interest in the

15  Debtor's Cash Collateral. Similarly, as set forth above the Debtor maintains no account containing

16  reserves segregated by client, and as such Personal Voice does not possess a security interest in

17  the Debtor's Cash Collateral based upon on an alleged security interest in any reserves under the

18  parties' contract. Furthermore, the fact that the Debtor's Billing Contracts with Telcos are

19  structured as a purchase of accounts receivable is but further support for Personal Voice's lack of

20  any security interest in the Debtor's Cash Collateral.

21     Like the treatment proposed to be afforded to Network Telephone pursuant to this Motion,

22  the Debtor will give Personal Voice a replacement lien in the same assets that it had an interest in

23  prepetition. As in the case of Network Telephone, the Debtor contends that the security was

24  granted in assets that do not belong to the Debtor and is invalid; but, resolution of that objection

25  need not take place now.

26     The replacement liens granted to Personal Voice shall be subordinated to any expenses of

27  this bankruptcy case including without limitation fees and expenses of professionals retained by

28

-19-

W02-WEST:FKA:400433179.1

EMERGENCY CASH COLLATERAL MOTION

1    the Debtor and any official committee appointed in this bankruptcy case as well as those of any

2    trustee subsequently appointed in the bankruptcy case and such trustee's professionals. The

3    Proposed Order describes the adequate protection requested to be afforded to Personal Voice

4    (paragraphs 19-22), the possible modification of nonbankruptcy law relating to the perfection of a

5    lien on property of the bankruptcy estate (paragraph 19) and the provisions regarding

6    professionals' fees and expenses (paragraph 21).

7    E.    Public Communication Does Not Possess a Valid, Perfected and Enforceable Interest in the
           Debtor's Cash Collateral, But to the Extent It Does, It Is Adequately Protected by the Grant
8          of a Replacement Lien

9          Public Communication asserts a claim against the Debtor in the approximate sum of

10   $500,000. Public Communication purports to hold valid, perfected and enforceable security

11   interests in various items pursuant to a master services agreement between Public Communication

12   and PaymentOne (which was then known as eBillit and sometimes referred to in the parties'

13   master services agreement as "EBI"). The Debtor and PaymentOne subsequently entered into an

14   assignment agreement whereby PaymentOne assigned all of its rights and obligations under that

15   master services agreement to the Debtor. A UCC-1 financing statement has been filed which lists

16   PaymentOne as the secured party and which states that it covers the following collateral:

17
           Pursuant to that certain Support Services Agreement dated July 1, 2000, as may
18         be amended, ("Agreement") by and between Integretel, Incorporated ("IGT") and
           PaymentOne Corporation ("P1"), IGT does hereby grant to P1's client, Public
19         Communication Services, Inc. ("PCS"), a first priority security interest in any and
           all Net Proceeds, as such term is defined under the Agreement, that may be in
20         IGT's possession from time to time, arising from or relating to the processing of
           Accounts of PCS as such Accounts are designated by P1 under the Agreement.
21

22         The UCC-1 financing statement does not even list Public Communication as the secured

23   party. Thus, it is ineffective as to Public Communication.

24         In addition, the Debtor contends that Public Communication does not possess any security

25   interests in the Debtor's Cash Collateral for the same reasons that neither Network Telephone nor

26   Personal Voice possessed any such security – i.e., Public Communication's alleged security

27   interest is not in any assets of the Debtor, but instead purports simply to be in amounts to which

28   Public Communication may be entitled under its contract with the Debtor. The UCC-1 financing

-20-

1   statement asserts that the Debtor granted Public Communication a security interest in the "Net
2   Proceeds" under the Support Services Agreement between the Debtor and PaymentOne arising
3   from or related to the processing of Public Communication account, however, the Support
4   Services Agreement:  (1) does not grant any security interests; (2) provides for no third-party
5   beneficiaries and thus does not provide any rights to Public Communication; and (3) the definition
6   of Net Proceeds under that agreement provides yet again that Net Proceeds are simply amounts
7   due to PaymentOne under the Support Services Agreement, not assets of the Debtor.

> 2(d). . . . In the event that EBI, at its option, has elected to utilize a billing
> page under Integretel's Billing Contracts, then Integretel shall remit to EBI
> all funds received from Telcos with respect to Data Records submitted to
> Telcos under Integretel's Billing Contracts, after adjusting for applicable
> Adjustments, Unbillables and True-up, less any amounts necessary to
> cover Reserves and unpaid Service Fees (such net amount being the "Net
> Proceeds").

13  Moreover, the Support Services Agreement, cited in the UCC-1 financing statement
14  purportedly giving Public Communication certain rights, does not provide that Integretel grants
15  Public Communication a security interest in anything.  In addition, the security interest granted to
16  Public Communication in its contract with EBI (who since assigned its rights and obligations
17  thereunder to the Debtor) does not mention any security interest in any accounts being granted to
18  Public Communication and is narrower than the description of collateral listed in the UCC-1
19  financing statement purportedly in Public Communication's favor.  The security interest granted to
20  Public Communication in its contract with EBI provided in relevant part that:

> 7. Settlement of Amounts Due.  [Public Communication] shall be entitled to all
> collected amounts, up to an including the gross value of the Billing Transactions
> remitted to the Telcos, less any amounts due and owing to EBI hereunder
> including, without limitation, Unbillables, Adjustments, Telco Holdback, excess
> Uncollectables (pursuant any True-up), Fees, Telco Fees and EBI Reserves (such
> difference being the "Net Proceeds"). . . . IN RECOGNITION OF CLIENT'S
> RIGHTS TO ANY NET PROCEEDS HEREUNDER, EBI HEREBY GRANTS
> TO CLIENT A FIRST PRIORITY SECURITY INTEREST IN ANY AND ALL
> NET PROCEEDS, THAT MAY BE IN EBI'S POSSESSION FROM TIME TO
> TIME AND EBI SHALL FILE A UCC-1 AND TAKE ALL OTHER
> REASONABLE STEPS TO ACKNOWLEDGE AND PERFECT CLIENT'S
> SECURITY INTEREST IN SUCH PROCEEDS.

28

1      Notwithstanding Public Communication's obvious lack of a security interest in the Debtor's

2 Cash Collateral, that issue does not need to be finally resolved now especially in light of the

3 Debtor's urgent need to use Cash Collateral. Instead, like the treatment the Debtor proposes to

4 provide to Network Telephone and Personal Voice, the Debtor proposes to provide Public

5 Communication a postpetition lien on the same items in which Public Communication purported

6 to hold a prepetition lien. Accordingly, the Debtor requests that Public Communication be

7 provided replacement liens, to the extent of cash collateral used in which Public Communications

8 has an interest, on all post-petition property of the same type and character as the property to

9 which Public Communication's pre-petition liens extended. As adequate protection of each of

10 Public Communication's interests in Cash Collateral and the Debtor's use of the same, the Debtor

11 requests that the Court approve its grant to Public Communication, to the extent that Public

12 Communication's prepetition liens are valid, perfected and enforceable, replacement liens in all

13 categories of assets of the Debtor's estate in which Public Communication holds valid, perfected

14 and enforceable prepetition liens of the same kind and type, subject only to valid, existing

15 prepetition liens, including both existing and after-acquired property, to the fullest extent

16 necessary to realize all Cash Collateral in which Public Communications has an interest actually

17 expended by the Debtor pursuant to this Motion. Public Communication's replacement liens as

18 provided in this Motion shall be automatically perfected pursuant to the Court's Order approving

19 this Motion and Public Communication shall not be required to take any further action to perfect

20 such liens. The replacement liens granted to Public Communication pursuant to this Motion are

21 subordinated to any expenses of this bankruptcy case including without limitation fees and

22 expenses of professionals retained by the Debtor and any official committee appointed in this

23 bankruptcy case as well as those of any trustee subsequently appointed in the bankruptcy case and

24 such trustee's professionals. The Proposed Order describes the adequate protection requested to be

25 afforded to Public Communication (paragraphs 24-27), the possible modification of

26 nonbankruptcy law relating to the perfection of a lien on property of the bankruptcy estate

27 (paragraph 24) and the provisions regarding professionals' fees and expenses (paragraph 26).

28

-22-

## IV.

## NOTICE

A copy of the Motion is being served by facsimile, email or overnight delivery as soon as practicable on (a) each of the Alleged Cash Collateral Secured Creditors, (b) the Debtor's creditors holding the thirty largest unsecured claims, (c) the Office of the United States Trustee, and (d) other significant parties in interest, including the Receiver and the FTC. As soon as the Court sets a hearing on the Motion, the Debtor will send out a notice to the foregoing parties.

## V.

## COMPLIANCE WITH GUIDELINES

This Court's guidelines for financing motions (the "Guidelines") require that certain provisions contained in the Motion and related documents be highlighted with respect to cash collateral stipulations. The table below is provided in order to comply with the Guidelines.

| Guideline and Provision of Final Order | Explanation | Page of Stipulation |
|---|---|---|
| **Guideline 2 – Provision of Adequate Protection.** The Stipulation provides PaymentOne with a super-priority administrative expense pursuant to Bankruptcy Code Section 507(b). | The Debtor believes this proposed term is reasonable under the circumstances, and is limited in this context. | 4 |
| **Guideline 6 – Lien Perfection.** The liens granted by the Court are deemed valid, enforceable and perfected as of the date of the entry of the Order without the need for any further notice, filing or other act. | The Debtor believes it would be cumbersome and wasteful to require the alleged secured parties to perfect their interests under applicable non-bankruptcy law under the circumstances. | 4 |
| **Guideline 9 – Limitation of Right Under § 506(c).** Professionals retained by the Debtor and any official committee appointed in this bankruptcy case, as well as those of any trustee subsequently appointed in the bankruptcy case and such trustee's professionals, are not entitled, directly or indirectly, to charge the Collateral or the property covered by the replacement liens, whether by operation of Sections 105 or 506(c) of the Bankruptcy Code. | This term is part of the interim relief sought and is narrow in its scope. | 5 |

-23-

EMERGENCY CASH COLLATERAL MOTION

# VI.

## CONCLUSION

The Debtor respectfully requests that the Court enter an order granting the relief requested in this Motion on an interim and final basis and grant such other and further relief as is just and proper. A copy of the proposed order, generally in the form the Debtor's currently intend to present to the Court requesting interim approval of the Motion (i.e., the "Proposed Order"), is attached hereto as Exhibit D.[13]

Dated: September 16, 2007

                          Respectfully submitted,

                          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

                          By _____
                                    /s/ Jeffrey K. Rehfeld
                                 JEFFREY K. REHFELD
                          Proposed Attorneys for Debtor The Billing Resource,
                                      dba Integretel

---

[13] The Debtor reserves the right to submit a different form of Order approving this Motion.

W02-WEST:FKA\400433179.1

EMERGENCY CASH COLLATERAL MOTION