WILLIAM BLUMENTHAL
General Counsel

JOHN F. DALY
Deputy General Counsel - Litigation

JOHN ANDREW SINGER
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC  20580
Telephone:  (202) 326-3234
Facsimile:  (202) 326-2447
Email: jsinger@ftc.gov

ATTORNEY FOR FEDERAL
TRADE COMMISSION

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

THE BILLING RESOURCE d/b/a INTEGRETEL,               )
                                                                                    )
                                                                                    )
                                    Debtor-Plaintiff-Appellee,             )
                                                                                    )
                    v.                                                             )        No. 5:07-CIV-5758-RMW
                                                                                    )
FEDERAL TRADE COMMISSION et al.,                           )
                                                                                    )
                                    Defendant-Appellant.                   )
                                                                                    )

On Appeal from the United States Bankruptcy Court for
the Northern District of California, No. 07-52890, Adversary
Proceeding No. 07-5156 (Weissbrodt)

**REVISED EXHIBIT 25 TO
DEFENDANT-APPELLANT FEDERAL TRADE COMMISSION'S
COMBINED MOTIONS FOR  STAY PENDING APPEAL
AND FOR CHANGE OF VENUE PURSUANT TO 28 U.S.C. § 1412**

Entered on Docket
**November 02, 2007**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

**FILED**

NOV 0 2 2007

CLERK
United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:                                    ]    Case No. 07-52890-ASW
                                          ]
THE BILLING RESOURCE, dba                 ]    Chapter 11
INTEGRETEL, a California                  ]
corporation,                             ]
                                          ]
                     Debtor.             ]
_____]
THE BILLING RESOURCE, dba                 ]    Adversary No. 07-5156
INTEGRETEL, a California                  ]
corporation,                             ]
                                          ]
                     Plaintiff,          ]
vs.                                       ]
                                          ]
FEDERAL TRADE COMMISSION, et al.,         ]
                                          ]
                     Defendants.         ]
_____]

MEMORANDUM DECISION RE ORDER TO SHOW CAUSE
REGARDING PRELIMINARY INJUNCTION

Before the Court is an Order to Show Cause ("OSC") why a

preliminary injunction should not issue enjoining the Federal Trade

Commission ("FTC") and David R. Chase ("Receiver"), not

individually, but solely in his capacity as receiver for Access One

Communications, Inc. ("Access One") and Network One Services, Inc.

("Network One")[1] from taking actions against The Billing Resource,

_____

[1] In addition to these two entities, Receiver is also the receiver for several other entities in
(continued...)

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  dba Integretel ("Integretel" or "Debtor")[2] in the action captioned

2  <u>Federal Trade Commission v. Nationwide Connections, Inc., et al.</u>,

3  Case No. 06-80180-Civ-Ryskamp ("Florida Action") pending in the

4  United States District Court for the Southern District of Florida

5  ("Florida Court"). Debtor seeks to enjoin the FTC from prosecuting

6  the enforcement aspect of the Florida Action ("Enforcement Action")

7  against Debtor (and <u>not</u> against the other defendants in that

8  action) as well as enjoining the Receiver from implementing or

9  enforcing the Omnibus Order entered in the Florida Action on

10 September 14, 2007 ("Omnibus Order") (as it relates solely to

11 Debtor, and not to any other defendants). Debtor also seeks to

12 unblock $1,762,762.56 currently held by Debtor in a blocked account

13 ("Blocked Account"). These funds were taken from Debtor's general

14 commingled funds and placed temporarily in the Blocked Account

15 pursuant to a stipulation between Debtor and Receiver -- at the

16 suggestion of the Court -- entered into at the September 26, 2007

17 hearing on Debtor's interim motion for use of cash collateral.

18      A hearing on the OSC was held on October 17, 2007 and the

19 matter has been submitted for decision. Debtor is represented by

20 Michael H. Ahrens, Esq. and Steven B. Sacks, Esq. of Sheppard,

21 Mullin, Richter & Hampton, LLP. FTC is represented by Michael P.

22 Mora, Esq. and Collot Guerard, Esq. Receiver is represented by

23 Walter K. Oetzell, Esq. of Danning, Gill, Diamond & Kollitz, LLP

24 and Jeffrey C. Schneider, Esq. of Tew Cardenas LLP. The Official

25

26 [1](...continued)
   the litigation brought by FTC in which Receiver was appointed. The only two receivership entities
27 that are relevant to these proceedings are Access One and Network One.

28      [2] This Court will use Integretel to differentiate actions taken by or events related to Debtor
   that occurred pre-petition.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    2

1  Committee of Unsecured Creditors ("Committee") is represented by
2  John D. Fiero, Esq. of Pachulski Stang Ziehl & Jones LLP.  Creditor
3  POL, Inc. is represented by Kathryn S. Diemer, Esq. of Diemer,
4  Whitman & Cardosi, LLP.  Creditor PaymentOne Corporation
5  ("PaymentOne") is represented by Stephen H. Warren, Esq. of
6  O'Melveny & Myers LLP.  Creditor United Online, Inc. is represented
7  by Jeffrey K. Garfinkle, Esq. of Buchalter Nemer.  BSG Billing
8  Solutions is represented by James A. Pardo, Jr., Esq. and Felton E.
9  Parrish, Esq. of King & Spalding LLP.
10       This Memorandum Decision constitutes the Court's findings of
11  fact and conclusions of law, pursuant to Rule 7052 of the Federal
12  Rules of Bankruptcy Procedure.
13
14                              I.
15                            FACTS
16  **A.  Debtor's Business**[3]
17       Debtor provides billing-related and other services for smaller
18  private telecommunications companies that compete with large local
19  exchange carriers ("LECs") in niche areas such as public pay
20  phones, hotels and prisons ("Alternative Operator Services").
21  Private telecommunications companies that provide Alternative
22  Operator Services have difficulty billing for "collect" and other
23  types of calls, since most individuals do not pay invoices from
24  these unknown companies and those companies cannot bill the
25  individuals through the individual's normal telephone bill.  Debtor

---

[3] While "Debtor" refers to the post-petition business entity and "Integretel"refers to the pre-petition business entity, the Court uses Debtor in the following section rather than Integretel because the section describes Debtor's business both pre- and post-petition.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

was created in 1988 to address this void in the marketplace.
Debtor has billing and collection agreements with an estimated
1,400 LECs -- both major local exchange companies and numerous
independents.  Debtor's infrastructure permits private
telecommunications providers to incorporate such providers' charges
into the phone bills of more than 90% of business and residential
consumers throughout the United States and Canada.

   The typical service contract between Debtor and its service
provider customers provides that the customer submits to Debtor the
customer's billing transaction in a data format acceptable to
Debtor.  In the typical service contract, the customers acknowledge
that these billing transactions are structured as a purchase of
accounts receivable.  Debtor contends that its customers have no
ownership interest in the proceeds of the billing transaction after
the billing transactions are submitted to Debtor and its customers
hold only an unsecured claim against the distributions payable by
Debtor to the customer under the service contracts -- usually in 90
or so days.  The service contracts provide detailed formulas for
computing the amounts Debtor owes to its customers.  Debtor
maintains certain reserves for disputes, fees and other adjustments
as bookkeeping entries only.

   The service contracts provide that each week Debtor transfer
by wire to its customers' bank accounts the net proceeds identified
in the prior week as defined by the service contracts.  This amount
is forwarded approximately 90 days after the submission of the
billing transaction.  Once Debtor receives a billing transaction,
Debtor submits the billing information to the LECs and the LECs in
turn bill the end user.  At varying intervals, the LECs make

1  payments into Debtor's "wire in" account based on the billing
2  transactions previously submitted to the LEC.  Funds are
3  transferred into this account every day throughout the day.
4       Once a week -- typically on a Thursday -- Debtor settles its
5  accounts with its customers.  To settle accounts, Debtor disburses
6  funds from the "wire in" account to the "wire out" account.  The
7  "wire out" account is a zero balance account meaning that all funds
8  transferred into that account are generally transferred out to
9  several other accounts on the same day.  It is from these other
10 accounts that Debtor: (1) pays its vendors, employees and other
11 operating expenses; (2) collects taxes that Debtor is required to
12 collect in connection with Debtor's business; (3) makes payments to
13 LEC end users that are entitled to a cash voucher for a refund;[4]
14 and (4) holds excess funds, if any, from weekly settlements to
15 cover subsequent operating shortfalls including settlement
16 obligations that exceed available funds in the "wire in" account.
17      Debtor has approximately thirty-seven employees.  In 2000,
18 Debtor formed PaymentOne as a subsidiary to address the specialized
19 billing and support requirements of the internet.  Debtor owns 97%
20 of PaymentOne.  In 2002, Debtor formed another majority-owned
21 subsidiary known as Inmate Calling Solutions, LLC to target the
22 correctional industry and in 2004, Debtor formed yet another
23 majority-owned subsidiary known as Information Services 900 LLC to
24 target 900 call traffic.
25

---

26   [4] Certain individual or business consumers are occasionally entitled to a refund or a credit.
27 This results, inter alia, from an error in billing. Debtor asserts that 95% of these cases are corrected
   electronically through an automated credit transaction. In the 5% of errors handled through the
28 issuance of a voucher to the consumer, the voucher -- redeemable for cash -- is drawn from the
   voucher account.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.            5

**B.  Florida Action**

On February 27, 2006, the FTC commenced the Florida Action in the Florida Court against three Alternative Operator Services providers as well as their principals (not Integretel or its principals) for alleged deceptive and unfair practices for unauthorized billing of charges on phone bills in violation of the Federal Trade Commission Act.  The FTC alleged that these defendants had defrauded consumers throughout the United States of more than $30 million by placing unauthorized collect call charges onto consumers' telephone bills.  At the request of the FTC, the Florida Court entered an *ex parte* temporary restraining order ("TRO") that shut down the defendants' alleged unlawful operation, froze the defendants' personal and corporate assets and appointed Receiver as temporary receiver for the corporate defendants.  Two of the corporate defendants -- Access One and Network One -- were prior customers of Integretel (collectively, "Prior Customers"). On March 8, 2006, a preliminary injunction was entered ("Preliminary Injunction") and Receiver was permanently appointed.

Both the TRO and the Preliminary Injunction provided, *inter alia*, that any business entity served with a copy of the TRO or Preliminary Injunction

> that holds, controls, or maintains custody of any account or asset of any Defendant, or has held, controlled or maintained custody of any such account or asset at any time since the date of entry of this Order, shall:
>
> A.   Hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, encumbrance, disbursement, dissipation, conversion, sale, or other disposal of any such asset except by further order of the Court;

. .   .   .

1    TRO at page 8; Preliminary Injunction at page 9.  The FTC asserts

2    that the FTC served Integretel with the TRO within days of the

3    entry of the TRO.

4        On March 6, 2006, Integretel's president, Ken Dawson,

5    submitted a letter to the FTC stating in relevant part that:

6    (a) Integretel had service contracts with the Prior Customers;

7    (b) pursuant to the service contract with the respective Prior

8    Customer, each Prior Customer was entitled to certain proceeds from

9    billing transactions; however (c) each Prior Customer was in

10   default under the service contract and no amounts were currently

11   due and owing.  Mr. Dawson noted that Integretel had not processed

12   any billing for Access One since May 2005 nor for Network One since

13   June 2003.  With respect to each Prior Customer, Mr. Dawson stated:

14   "[t]o the extent proceeds become due to [Prior Customer] in the

15   future, we will establish a separate bank account into which such

16   funds will be deposited and notify your office accordingly."[5]  Pre-

17   petition Integretel did not establish any such separate bank

18   account.

19       On September 21, 2006, the FTC filed an amended complaint

20   asserting claims against Integretel for Integretel's collection of

21   alleged fraudulent charges.  Specifically, the complaint asserts

22   that Integretel deceptively billed consumers for collect calls that

23   were never made, received or authorized.  In its complaint, the FTC

24   seeks a monetary judgment as well as multiple forms of non-monetary

25   relief such as a permanent injunction against pertinent law

26

27

28      [5] Letter dated March 6, 2006 from Ken Dawson to Roberto Menjivar, Attachment B to Declaration of Laura Kim in Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction filed on October 1, 2007.

1    violations, "fencing-in" injunctive relief, rescission of contracts
2    and a claims procedure for consumer redress. Integretel filed an
3    answer denying the FTC's allegations. Integretel's principals were
4    not named in the amended complaint.

5         On October 16, 2006, Receiver filed a motion in the Florida
6    Court seeking to hold Integretel in contempt of court for
7    Integretel's alleged failure to turn over to the Receiver on behalf
8    of the Prior Customers certain "reserves" under the service
9    contracts with the Prior Customers in an alleged amount in excess
10   of $1.4 million. Integretel opposed the motion on various grounds,
11   including: (a) Integretel did not hold any such reserves in a
12   separate account; (b) the service contracts in place with the Prior
13   Customers permitted Integretel to withhold certain monies owed to
14   the Prior Customers as "reserves"; and (c) Integretel was not
15   obligated to turn over those funds under the respective service
16   contracts. Integretel also filed its own motions to modify the
17   Florida Court's injunctive orders and to stay the contract claims
18   pending arbitration. A hearing on these motions was held on
19   April 12, 2007.

20        On September 14, 2007, the Florida Court entered the Omnibus
21   Order. In the Omnibus Order, the Florida Court found that
22   Integretel held reserves in the amount of $1,762,762.56 on behalf
23   of the Prior Customers as of June 30, 2007 ("Commingled Funds").
24   The Florida Court stated that Integretel's assertion that the
25   "reserves" were not held as segregated funds but rather were kept
26   in a pooled account and tracked via an internal accounting entry
27   was "a distinction without a difference, since the TRO captures
28   funds 'held on behalf of, or for the benefit of, a Defendant.'"

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  Omnibus Order at 3.  The Florida Court noted that "[a]n entity need

2  not be an agent, partner, joint venturer, trustee, fiduciary, or

3  legal representative to possess funds that one is holding 'on

4  behalf of' another person or entity..."  Id.  The Florida Court

5  also rejected Integretel's arguments that Integretel could retain

6  the "Commingled Funds" to fund Integretel's assertion of an

7  indemnity claim or liquidated damages for breach of contract

8  against the Prior Customers.  Id. at 4.

9      Regarding Integretel's motions, the Florida Court denied

10  Integretel's request to stay the contract claims pending

11  arbitration of those claims pursuant to the service contract

12  arbitration clause, since the Florida Court concluded that Receiver

13  was not bound by the those clauses.  The Florida Court stated in

14  particular:

15      The Receiver's claim is not a claim at law governed by
        pre-receivership contracts, however, but one governed by
16      this Court's jurisdiction over receivership property
        based on the TRO and Amended Preliminary Injunction.  The
17      Receiver does not claim that the funds must be turned
        over according to, or by adopting, a contract signed
18      between Integretel and Access One/Network One.  The
        Receiver is seeking to recover the reserve funds pursuant
19      to the Court's in rem jurisdiction over receivership
        property, as memorialized in the TRO and the Amended
20      Preliminary Injunction.

21  Omnibus Order at 4.  In response to Integretel's argument that the

22  TRO and Preliminary Injunction would be invalid if those orders

23  permitted the Florida Court to determine Integretel's ownership

24  interest -- or lack thereof -- in the Commingled Funds without a

25  new, separate legal proceeding, the Florida Court stated: "[i]ssues

26  concerning entitlement to disputed receivership property, in fact,

27  are the types of issues typically determined via summary

28  proceedings in the federal court equity receivership context."

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    9

1    <u>Id.</u> at 5.   The Florida Court rejected Integretel's arguments that

2    Integretel was deprived of due process when the Florida Court

3    issued the TRO and Preliminary Injunction and also rejected

4    Integretel's various arguments that those orders are invalid.   The

5    Florida Court also denied Integretel's request to modify those

6    orders.   Finally the Florida Court:

7         ORDERED AND ADJUDGED that the Receiver's Revised
     Motion for Order to Show Cause Why Integretel Should Not
8    Be Held in Contempt of Court, filed October 16, 2006 **[DE
     246]**, is GRANTED.   Integretel shall show cause in writing
9    within 10 days of the date of this Order why it should
     not be held in contempt for failure to turn over the
10   reserves.   In addition, Integretel shall provide a sworn
     statement identifying the amount of reserves as of the
11   issuance of the TRO.   The Court further orders that these
     funds shall be placed in a segregated Receivership
12   account.   It is further

13        ORDERED AND ADJUDGED that Integretel's Motion to
     Modify Prior Injunctive Orders, filed October 30, 2006
14   **[DE 294]**, is DENIED.   It is further

15        ORDERED AND ADJUDGED that Integretel's Motion to
     Stay Contract Claims, filed December 29, 2006 **[DE 363]**,
16   is DENIED. . . .

17   Omnibus Order at 10.   On September 16, 2007, promptly after

18   receiving the Omnibus Order, Integretel filed its bankruptcy

19   petition.

20        Debtor is one of seventeen defendants in the Florida Action.

21   Other than two pending motions regarding depositions, discovery is

22   complete in the Enforcement Action.[6]   Dispositive motions are

23   scheduled to be filed very soon -- by November 6, 2007, with

24   opposition to those motions to be filed by December 4, 2007, and

25   replies due by December 18, 2007.   Debtor asserts that Debtor will

26

27   _____

28       [6] Integretel filed a motion to continue one deposition and another billing aggregator
     defendant filed a motion requesting ten additional depositions.  The FTC opposed both motions and
     the Florida Court had not ruled on those motions as of October 15, 2007.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  not be filing any dispositive motions, but anticipates having to

2  respond to dispositive motions filed by other parties.  The FTC has

3  stated that the FTC will seek summary judgment against Debtor.

4  Debtor asserts that a two- to four-week trial is set to commence in

5  the Florida Action on February 25, 2008.  The FTC predicts that the

6  FTC will prevail on the liability aspect in summary judgment and if

7  not, the FTC estimates that the trial will be no more than nine

8  days, and other defendants contend that the trial will take ten to

9  fifteen days at most.  The FTC does not contend that a preliminary

10  injunction against Debtor interferes with the FTC from proceeding

11  with the Enforcement Action against any of the other sixteen

12  defendants.

13      Debtor anticipates having to spend $821,600 in litigation

14  costs over the next six months related to depositions, discovery

15  motions, dispositive motions, other motions, pre-trial submissions

16  and trial.[7]  Debtor does not break out the estimated fees into the

17  various subcategories.  Debtor estimates that in addition to those

18  fees there will be an estimated $10,000 in fees for local counsel

19  and an estimated $50,000 to $75,000 in costs.[8]  In addition to

20  these estimated fees and costs, Debtor estimates that Debtor will

21  incur an additional $50,000 to $150,000 in fees related to

22  Receiver's request for turnover of the Commingled Funds.[9]

23

24

25

26  [7] Declaration of Neal Goldfarb in Support of Emergency Motion for Temporary Restraining
Order and Preliminary Injunction filed on September 24, 2007 ("Goldfarb Dec.") at ¶¶ 5-6.

27  [8] Goldfarb Dec. at ¶ 7.

28  [9] Goldfarb Dec. at ¶ 8.

C. **Events since Debtor Filed Its Bankruptcy Petition**

As noted above, Debtor filed this chapter 11 bankruptcy case on September 16, 2007. On September 17, 2007, Debtor filed a Notice of Bankruptcy in the Florida Action. On September 18, 2007, this Court generated a Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines setting, _inter alia_, a meeting of creditors for October 17, 2007 and a deadline for filing a proof of claim for non-governmental units of January 15, 2008 and for governmental units of March 14, 2008. On September 20, 2007, the Florida Court issued an order stating that the Florida Action was stayed by the automatic stay.

On September 21, 2007, the FTC filed an emergency motion for clarification that the automatic stay did not apply to the Enforcement Action and the contempt proceedings. On the same day, without granting Debtor an opportunity to respond to the FTC's emergency motion either in writing or orally, the Florida Court issued its Order Granting Motion for Clarification as to Scope of Stay ("Clarification Order"). In the Clarification Order, the Florida Court stated that in the Omnibus Order the Florida Court had "ruled that the reserve funds are the property of the receivership estate and ordered Integretel to pay the current reserve funds, amounting to $1,762,762.56, immediately to the Receiver." Clarification Order at 1.

Furthermore, the Florida Court held that Bankruptcy Code section 362(b)(4)[10] did not stay the Enforcement Action. The

---

[10] Unless otherwise noted, all statutory references are to Title 11, United States Code, as amended in 2005 ("Bankruptcy Code").

1  Florida Court also stated with respect to the contempt proceedings

2  brought by the Receiver:

3           Nor is the contempt proceeding stayed.  First, the
   automatic stay applies only to protect property of the
4  bankruptcy estate or property of the debtor.  See
   11 U.S.C. § 362(a)(2).  The Court has already ruled that
5  the reserve funds are neither the property of the
   "bankruptcy estate" nor Integretel.  Second, the
6  11 U.S.C. § 362(b)(4) exception also applies to civil
   contempt proceedings brought by a governmental unit in
7  the exercise of its police or regulatory powers.  See SEC
   v. Bilzerian, 131 F. Supp. 2d 10, 14 (D.D.C. 2001)(civil
8  contempt proceeding falls within the exception;
   incarceration of debtor subsequent to failure to provide
9  financial information as required by purgation provision
   in prior disgorgement order).  Finally, the bankruptcy
10 filing does not deprive this Court of its inherent power
   to enforce the integrity of its orders.  "[C]ontempt
11 orders to uphold the dignity of the court are excepted
   from the automatic stay." NRLB v. Sawulski, 158 B.R.
12 971, 975 (E.D. Mich. 1993).

13 Clarification Order at 4.  Thus, even though the newly extant

14 bankruptcy estate had no opportunity to respond to the FTC's

15 emergency motion, the Florida Court granted the FTC's emergency

16 motion.  The Florida Court stated that the commencement of Debtor's

17 bankruptcy case did not stay the contempt proceedings against

18 Debtor or FTC's prosecution of the Enforcement Action and the

19 Florida Court vacated the September 20, 2007 order staying

20 proceedings against Debtor.

21      Also on September 21, 2007, this Court held a hearing on

22 Debtor's emergency motion for interim use of cash collateral and

23 Debtor's request for authority to maintain Debtor's pre-petition

24 bank accounts.  In its motion for interim use of cash collateral,

25 Debtor requested court authority to use cash collateral pursuant to

26 a stipulation with its secured creditor PaymentOne.  Debtor

27 asserted that PaymentOne was a secured creditor based on more than

28 $6.4 million PaymentOne had loaned to Debtor between October 18,

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.              13

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  2006 and the petition date (the "new value" provided by PaymentOne,

2  in bankruptcy parlance).  The motion for authority to maintain

3  Debtor's pre-petition bank accounts was granted and the motion on

4  the interim use of cash collateral was continued to September 26,

5  2007.

6       Prior to the September 26, 2007 hearing, seven objections were

7  filed in opposition to Debtor's motion for interim use of cash

8  collateral.  Some of the oppositions raised questions regarding

9  Debtor's viability and ability to operate successfully as a going

10 concern.  Prior to and at the hearing, Debtor obtained the consent

11 of all parties to Debtor's use of cash collateral.  In particular,

12 Debtor and Receiver agreed to set up the Blocked Account whereby

13 Debtor agreed to deposit $1,762,762.56 of its commingled funds into

14 a blocked account and Debtor and Receiver agreed that the

15 establishment of the Blocked Account did not in any way affect the

16 merits of either parties' rights, claims or defenses with respect

17 to the funds in the Blocked Account.  Based in part on the consent

18 of all parties, this Court granted Debtor interim use of cash

19 collateral through October 15, 2007 and set a further hearing on

20 the use of cash collateral for that day.

21      In papers relating to the September 26, 2007 hearing and at

22 that hearing, Debtor informed this Court that negotiations were

23 underway for a possible sale of PaymentOne to a third party.

24 Debtor also requested the expedited appointment of the unsecured

25 creditors' committee so that Debtor would have an entity with which

26 Debtor could talk on a confidential basis with, and obtain the

27 opinions regarding, possible reorganization scenarios, including

28 the possible sale of PaymentOne.  On October 1, 2007, the United

1  States Trustee filed a notice that a committee of seven unsecured
2  creditors of Debtor had been appointed.  Two days later the
3  Committee selected the law firm of Pachulski Stang Ziehl & Jones
4  LLP as its counsel, subject to approval of this Court.  Within a
5  week, Debtor and the Committee executed a confidentiality
6  agreement; Debtor provided the Committee with various documents and
7  information requested by the Committee; and the Committee began the
8  process of analyzing that information.

9       On October 10, 2007, the Committee and Debtor participated in
10 a five hour face-to-face meeting.  Discussions at that meeting
11 included Debtor's financial information -- including projections,
12 claims against Debtor, Debtor's plan for post-petition pre-payment
13 to Debtor's pre-petition customers, Debtor's relationship with the
14 LECs, the status of the Florida Action, as well as plan of
15 reorganization issues.  At that meeting, the Committee agreed to
16 consent to Debtor's continued use of cash collateral through
17 November 2.  Debtor committed to negotiate with the Committee a
18 term sheet for a plan of reorganization contemplating a
19 continuation of Debtor's business operations with the goal of
20 allowing Debtor to exit bankruptcy as quickly as possible, while
21 maximizing the value to unsecured creditors.  The Committee stated
22 its intention to use the time between October 10 and November 2 to
23 conduct further due diligence on Debtor's assets, liabilities and
24 financial affairs in an effort to be in a better position to
25 evaluate an exit strategy for Debtor from bankruptcy.

26      On October 15, 2007, this Court held a second hearing on
27 Debtor's interim use of cash collateral.  In support of Debtor's
28 continued use of such cash collateral, Debtor submitted budgets

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    showing Debtor's actual and projected post-petition finances.
2    Debtor submitted one budget assuming that Debtor could use the
3    funds in the Blocked Account as well as the assumption that the
4    Enforcement Action and related proceedings were stayed.  Debtor
5    also submitted another budget without those assumptions.  Regarding
6    the projected $1 million in litigation expenses related to the
7    Florida Action, Debtor projected incurring $333,333 for the weeks
8    ending November 2, 2007, December 7, 2007, and January 4, 2008.
9    Debtor asserted at that hearing, and continues to assert, that
10   Debtor needs the funds in the Blocked Account and that without the
11   ability to use the funds in the Blocked Account, Debtor will not
12   have sufficient cash flow as of mid-December 2007.

13        Debtor's continued use of cash collateral again drew seven
14   objections, but the primary concern of the objecting creditors was
15   with respect to the alleged secured nature of their respective
16   claims, and not on Debtor's ability to stay in business.  In
17   addition, as noted above, Debtor's continued use of cash collateral
18   had the support of the Committee.  On October 16, 2007, this Court
19   granted Debtor's continued interim use of cash collateral.  A
20   hearing for final authority for Debtor to use cash collateral is
21   set for November 2, 2007.

22        Meanwhile, on October 1, 2007, Debtor requested additional
23   time -- until November 15, 2007 -- to file its schedules of assets
24   and liabilities ("Schedules") and statement of financial affairs
25   ("Statement").  In its application, Debtor noted the size and
26   complexity of Debtor's business operations, coupled with the
27   limited number of employees, who, in addition to their regular
28   duties, were capable of preparing the Statement and Schedules.  On

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  October 23, 2007, this Court granted Debtor's request.  Debtor's

2  Schedules and Statement are currently due on November 15, 2007.

3      On October 2, 2007, Debtor sought a temporary restraining

4  order from this Court enjoining the Enforcement Action and seeking

5  an order to show cause for the issuance of a preliminary

6  injunction.  At that hearing, this Court denied Debtor's request

7  for a temporary restraining order of the Enforcement Action on the

8  basis that for the period from October 2, 2007 through October 17,

9  2007, Debtor had not demonstrated that the threatened injury to

10  Debtor outweighed the harms of a temporary restraining order

11  against the FTC.[11]  However, the Court found that there was cause to

12  issue the OSC and the OSC was issued as to why a preliminary

13  injunction should not issue.

14      On October 11, 2007, Debtor filed in the Eleventh Circuit a

15  motion for an immediate interim stay of the Clarification Order in

16  as far as that order held that the Florida Action -- other than the

17  Enforcement Action -- was not automatically stayed.  On October 17,

18  2007, the Eleventh Circuit temporarily granted Debtor's motion

19  pending further order of the court ("Stay Order").

20

21                              II.

22                        APPLICABLE LAW

23          In the non-bankruptcy context, [the Ninth Circuit
           has] consistently required trial courts deciding
24         preliminary injunction motions to balance the moving
           party's likelihood of success on the merits and the
25

26  _____

27      [11]  While Debtor originally sought a temporary restraining order against Receiver's continued
    enforcement of the Omnibus Order, the stipulation at the September 26 cash collateral hearing that
28  resulted in the temporary establishment of the Blocked Account resolved that need to both parties'
    satisfaction.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.          17

relative hardship of the parties.  The moving party must show:

> (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). Alternatively, a court may grant the injunction if the plaintiff demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor.

> As we have said many times regarding the two alternative formulations of the preliminary injunction test:  These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.  They are not separate tests but rather outer reaches of a single continuum.

Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1120 (9th Cir. 2005) (citations and internal quotation marks omitted).

Solidus Networks, Inc. v. Excel Innovations, Inc., (In re Excel Innovations, Inc.), --- F.3d ---, 2007 WL 2555941 at *5 (9th Cir. Sept. 7, 2007) (emphasis in original).  The usual preliminary injunction standard applies to stays of proceedings under 11 U.S.C. § 105(a) ("Section 105").  Excel, 2007 WL 2555941 at *7.  In Excel, a reorganization case, the Ninth Circuit stated that in granting or denying an injunction under Section 105, "a bankruptcy court must consider whether the debtor has a reasonable likelihood of a successful reorganization, the relative hardship of the parties, and any public interest concerns if relevant."  Excel, 2007 WL 2555941 at *7.

III.

ANALYSIS

**A.  Reasonable Likelihood of a Successful Reorganization**

In a reorganization context, a debtor seeking a stay against a non-debtor must show a reasonable likelihood of a successful reorganization.  Excel, 2007 WL 2555941 at *7.  This is not a high burden, id. at *8, and a strong showing on the likelihood of a successful reorganization lowers the burden to show irreparable harm.  Id. at *11.

The FTC argues that the Committee's unwillingness to consent to a final cash collateral order speaks volumes about Debtor's prospects -- or lack thereof -- of successfully reorganizing and that it remains to be seen whether this will be a "real" reorganization case.  Citing general statistics, the FTC asserts it is more likely that Debtor's case will fall into the 90% or more of chapter 11 cases that are converted to liquidations or dismissed.  The FTC argues that overall the record at this point demonstrates that Debtor's fate hangs precariously in the balance and a liquidation scenario is more, or at least as likely as, a successful reorganization and Debtor has not shown by a preponderance of the evidence a likelihood of success on the merits.[12]

Receiver asserts that Debtor has not shown a likelihood of success on the merits on the basis that Debtor's support by the Committee fails to address the numerous objections by creditors

---

[12] A bankruptcy case may have an excellent result for creditors, even in a liquidation context. For example, a successful sale of a debtor's business and subsequent liquidation of that debtor's assets in a chapter 11 or a chapter 7 may result in a substantial distribution to creditors.

MEMORANDUM DECISION RE
   ORDER TO SHOW CAUSE, ETC.                19

1  claiming a security interest in Debtor's assets to Debtor's

2  continued use of cash collateral.  In addition, Debtor's strategy

3  over the near-term presupposes Debtor will be able to use the

4  Commingled Funds to fund Debtor's business operations, so Debtor

5  cannot show a likelihood of success on the merits.

6      The Court disagrees with the FTC and Receiver.  The Court

7  finds that, at this juncture, Debtor has made a strong showing that

8  Debtor has a reasonable likelihood of a successful reorganization.

9  It is very early in Debtor's bankruptcy case -- Debtor's bankruptcy

10  case is only six weeks old.  In that short period of time, Debtor

11  has obtained the confidence of its creditors that Debtor is a

12  viable business and has a reasonable likelihood of reorganizing

13  successfully.  This is demonstrated in several ways.  First,

14  following strenuous initial objections, Debtor's creditors

15  consented to Debtor's first interim use of cash collateral as soon

16  as Debtor demonstrated its viability to the objecting creditors.

17  Second, the LECs have for the most part continued to forward funds

18  to Debtor.  Third, in an effort to retain customers, Debtor is

19  negotiating with its customers to provide a 50% pre-payment of the

20  transferred accounts receivables at the time of transfer rather

21  than having the customers wait 90 days, as those customers did pre-

22  petition.  Debtor has obtained the Committee's support of that

23  plan.  Fourth, the Committee is confident enough in Debtor's

24  prospects of reorganization that the Committee supported Debtor's

25  continued use of cash collateral for an additional three weeks to

26  enable the Committee and Debtor to work together on the terms of a

27  plan of reorganization.

28

1    In addition, Debtor and Debtor's 97%-owned subsidiary

2 PaymentOne are diligently exploring both a reorganization with

3 Debtor and a sale of PaymentOne's business to prospective

4 purchasers.  The proceeds of such a sale could help Debtor fund a

5 plan of reorganization.  Alternatively, Debtor is exploring the

6 possibility of a pot plan providing a pro-rata distribution to

7 unsecured creditors or a plan that would have Debtor continue its

8 operations and issue new stock in exchange for Debtor's unsecured

9 debt.

10    At this early stage of Debtor's bankruptcy case, Debtor's

11 reasonable likelihood of a successful reorganization is evident

12 from the support of Debtor's creditors and the Committee, Debtor's

13 clear pursuit of several viable avenues of possible reorganization,

14 Debtor's projections of positive cash flow for the next six months,

15 Debtor's retention of its customers and the continued success of

16 Debtor's business.  Thus, Debtor has met its burden of showing a

17 reasonable likelihood of a successful reorganization.[13]

18 **B.    The FTC's Enforcement Action**

19    The parties do not dispute for the purposes of the current

20 dispute that, under Bankruptcy Code section 362(b)(4), the

21 automatic stay does not stay the Enforcement Action.[14]  However, the

---

22

23    [13] Although the issue is not presented here, a court might appropriately enjoin an
enforcement action, like the FTC's, against a chapter 7 estate. The chapter 7 trustee might well
24 convince the court not to allow the enforcement action to proceed until the trustee and the court
knew what assets and liabilities there were in the estate. There would be no point, for example, in
25 allowing an enforcement action seeking a monetary judgment to proceed if the estate did not have
any money in it above the amount needed to pay administrative claims. There also might be no
26 purpose in enjoining a chapter 7 debtor from engaging in certain business practices, if that debtor
27 was out of business.

28    [14] While the Clarification Order in which the District Court held that Bankruptcy Code

(continued...)

1    FTC argues that this Court does not have authority to stay that
2    litigation against Debtor under Section 105.  This Court disagrees.
3    Under In re First Alliance Mortg. Co., 264 B.R. 634 (C.D. Cal.
4    2001) ("FAMCO") and the myriad of authorities cited therein, this
5    Court has the legal authority to enjoin prosecution of governmental
6    actions against a debtor that falls within the regulatory and
7    police powers exception of Bankruptcy Code section 362(b)(4).
8    FAMCO, 264 B.R. at 652 n.18.
9        This Court may enjoin the prosecution of the Enforcement
10    Action under Section 105 if the Enforcement Action "threatens" the
11    assets of the bankruptcy estate.  FAMCO, 264 B.R. at 652.  Under
12    FAMCO, a Section 105 injunction could be appropriate against a
13    regulatory action in two types of situations.

14        First, a governmental action that seeks actual
15    physical control over the assets of the debtor's estate
     threatens the bankruptcy court's exclusive jurisdiction
16    over the res of the debtor's estate and therefore can be
     enjoined. . . .

17        Second, a § 105 injunction of a regulatory or police
18    powers action could be appropriate in other circumstances
     that severely threaten the integrity of the bankruptcy
19    process.  A few courts have enjoined regulatory or police
     powers actions on the grounds that the costs of defending
20    the actions at issue, both in terms of money spent on
     lawyers' fees and time taken away from focusing on
21    reorganization, were so high in comparison to the assets
     of the estate that allowing the actions to continue
22    constituted a "threat" to the estate.  E.g., NLRB v.
     Superior Forwarding, Inc., 762 F.2d 695, 698-99 (8th Cir.
23    1985).  Because the bankruptcy court has the obligation
     to protect and marshal the estate's assets, a severe
24    enough threat to the assets of the estate constitutes a
     threat to the bankruptcy process.

25
26   _____
27    [14](...continued)
     section 362(b)(4) did not apply to the Florida Action is on appeal, in that appeal, Debtor has not
28    challenged that Order insofar as the Clarification Order holds that the Enforcement Action is not
     automatically stayed.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    22

1  <u>Id.</u> at 655.  In balancing the hardships between the parties, "[a]

2  bankruptcy court must 'identify the harms which a preliminary

3  injunction might cause to defendants and ... weigh these against

4  plaintiff's threatened injury.'  <u>Caribbean Marine Servs. Co. v.</u>

5  <u>Baldridge</u>, 844 F.2d 668, 676 (9th Cir. 1988)(citation omitted)."

6  <u>Excel</u>, 2007 WL 2555941 at *9.

7      **1.    Harms to FTC**

8      The FTC articulates that the FTC would be harmed by the

9  granting of a preliminary injunction because the FTC only seeks

10  what the FTC terms as "equitable" relief in the Enforcement Action

11  and this Court cannot grant all of the relief requested by the

12  FTC.[15]  But there is no doubt that the FTC seeks to collect monies

13  from Debtor.  Specifically, the FTC seeks monetary injunctive

14  relief in the form of disgorgement of monies received from

15  consumers and restitution to the consumers.  In addition, the FTC

16  seeks a permanent injunction halting Debtor's allegedly unlawful

17  practices, rescission of contracts and a claims procedure to

18  provide restitution to the consumers who allegedly paid for

19  unauthorized charges on their phone bills.

20      The FTC also asserts that being enjoined from proceeding in

21  its chosen forum -- the Florida Court -- would harm the FTC in

22  other critical ways.  The FTC quotes extensively from <u>FAMCO</u> which

23  states in this regard:

24          [T]he hardship to the governmental units of not being
25          allowed to proceed with their actions in their chosen
           forums includes harms different in character from the

26  _____

27      [15] While this Court does not necessarily agree with the FTC that this Court could not grant

28  all equitable relief requested by the FTC in the Enforcement Action, due to the limited nature of the
   preliminary injunction being granted at this time, there is no reason for this Court to address the
   FTC's assertion.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    23

harms normally considered on motions for injunctions under § 105.  Being able to have a claim determined by the bankruptcy court is qualitatively different from proceeding with a lawsuit in home forums.  As Congress recognized when it created the regulatory and police powers exception, the goals of public policy, punishment, and deterrence may sometimes conflict with the goals of maximizing an individual estate's assets and efficiently processing claims.  It is the former goals, which are difficult if not impossible to measure in dollars and cents, that are impaired when a governmental unit loses the ability to enforce its laws in its own forum.

Considering deterrence in particular, the harm to the governmental units must be measured with a broader perspective in mind than these parties alone.  The bankruptcy court and First Alliance are undoubtedly correct that there will be more money to distribute to borrowers in this case if the separate actions are not allowed to proceed.  However, the governmental units are entitled to make the choice that, over time, similarly situated borrowers and consumers benefit more when companies do not violate the law in part because they know that bankruptcy will not provide a way out when their wrongs are discovered.  In any given case, reasonable minds could disagree about the marginal costs and the marginal benefits of different approaches and which will maximize the wealth and happiness of the greatest number of people.  The point is that it is the governmental units charged with enforcing consumer protection laws, governmental units that are responsive to the political will of the people, that should be the ones to make the choice, not the bankruptcy court.

FAMCO, 264 B.R. at 659.

The FTC asserts that the FTC's need for permanent injunctive relief is particularly acute here because the FTC needs permanent injunctive relief from the Florida Court barring Debtor's allegedly unlawful business practices.  The FTC asserts that the FTC's pursuit of phone billing aggregators such as Debtor is a vital enforcement strategy that the FTC has pursued to curb the allegedly insidious and unlawful practice of placing unauthorized charges on consumers' phone bills.  During the past nine years, the FTC has filed numerous actions against telephone billing aggregators and has obtained injunctive and monetary equitable relief.  The FTC

1 notes that this is not the first time that the FTC has sued Debtor

2 (the previous suit was settled) and some of Debtor's current

3 customers were recently prosecuted by state attorneys general for

4 placing unauthorized charges on consumers' phone bills and other

5 alleged deceptive trade practices.

6     **2.   Harms to Debtor**

7     Debtor has filed a chapter 11 bankruptcy petition. "The

8 purpose of title 11 protection is to allow an entity to

9 'restructure ... finances' and enter a plan of reorganization so

10 that it is able to 'continue to operate, provide its employees with

11 jobs, pay its creditors, and produce a fair return for its

12 stockholders.'" <u>CFTC v. NRG Energy, Inc.</u>, 457 F.3d 776, 779 (8th

13 Cir. 2006) (internal citation omitted). Said a different way,

14 "[t]he purpose of Chapter 11 reorganization is to assist

15 financially distressed business enterprises by providing them with

16 breathing space in which to return to a viable state." <u>In re</u>

17 <u>Little Creek Dev. Co.</u>, 779 F.2d 1068, 1073 (5th Cir. 1986) (quoting

18 <u>In re Winshall Settlor's Trust</u>, 785 F.2d 1136, 1137 (6th Cir.

19 1985)). Here "Debtor 'is a real company with real debt, real

20 creditors and a compelling need to reorganize in order to meet

21 these obligations' and is therefore, exactly the type of debtor for

22 which chapter 11 was enacted." <u>In re Dow Corning Corp.</u>, 244 B.R.

23 673, 677 (Bankr. E.D. Mich. 1999), <u>aff'd</u>, 255 B.R. 445 (E.D. Mich.

24 2000) (internal citation omitted). In determining irreparable

25 injury to Debtor, this Court must consider the impact of permitting

26 the Enforcement Action to proceed against Debtor at this point in

27 Debtor's bankruptcy case.

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    Debtor raises two main harms that would cause irreparable
2  injury should this Court not preliminarily enjoin the Enforcement
3  Action.  First, Debtor anticipates having to spend over $900,000 in
4  fees and costs over the next six months in the Enforcement Action.
5  Debtor estimates it will incur $821,600 in litigation fees related
6  to depositions, discovery motions, dispositive motions, other
7  motions, pre-trial submissions and trial.  In addition, Debtor
8  estimates that there will be an estimated $10,000 in fees for local
9  counsel and an estimated $50,000 to $70,000 in costs.  Debtor's
10  budgets show that Debtor will not be able to operate on an
11  administratively solvent[16] basis if Debtor is forced to incur these
12  substantial fees over the next six months.
13    The FTC argues that Debtor overestimates its costs to defend
14  against the Enforcement Action.  The FTC asserts that the
15  declaration of Neal Goldfarb submitted by Debtor in support of its
16  request lacks sufficient detail to support Debtor's proposed
17  estimate.  Moreover, the FTC argues that the estimate overstates
18  the amount of estimated trial time and fails to consider that some
19  of the issues in the Enforcement Action will be narrowed, if not
20  eliminated, by summary judgment since the FTC's position is that
21  the uncontested facts establish Debtor's liability.
22    The FTC further contends that the relevant comparison under
23  FAMCO is not between Debtor's costs of defending itself against the
24

25    [16] In a chapter 11 bankruptcy case, all post-petition obligations have administrative priority
26  status. This means that those claims are paid prior to most other claims in a bankruptcy estate,
   namely other priority claims and pre-petition unsecured claims. In addition, those claims must be
27  paid in full on the effective date of a confirmed plan of reorganization. The effective date is usually
   30 days after an order confirming a plan of reorganization is entered, but can be in as few as eleven
28  days. To stay administratively solvent, a debtor would insure that debtor retains sufficient cash
   reserves on hand to pay all administrative claims in full on the effective date of a plan.

1  FTC in the Florida Court or not defending itself at all, but rather

2  between Debtor defending itself in the Florida Court and defending

3  itself in this Court.  According to the FTC, unless the Enforcement

4  Action is concluded as to Debtor, the same facts will have to be

5  litigated in this Court to establish a bankruptcy claim against

6  Debtor.[17]  Moreover, under the recently enacted changes to the

7  Bankruptcy Code, the FTC can pursue a non-dischargeability action

8  against Debtor for the FTC's monetary claim.  Finally, the FTC

9  alleges that it would pursue the <u>non-monetary</u> aspects of the

10 Enforcement Action after confirmation of Debtor's plan.  <u>NRG</u>

11 <u>Energy</u>, 457 F.3d at 780-81 (holding that a bankruptcy court has no

12 authority to enjoin a government agency from bringing a post-

13 confirmation enforcement action against a reorganized debtor for

14 injunctive relief against future law violations).[18]

15     The FTC does not address the second harm raised by Debtor: the

16 impact of the continuation of the Enforcement Action on Debtor's

17 reorganization efforts.  Debtor has relatively few employees and

18 Debtor's president, Mr. Dawson -- one of the founders of Debtor --

19 is and will continue to be very closely involved in Debtor's

20 defense in the Enforcement Action.  Mr. Dawson is also the main

21 contact for all of Debtor's reorganization efforts in addition to

22

23  [17] This argument is incorrect, or at least premature, because the Court is only enjoining the
Enforcement Action for a few months and has not determined whether the Enforcement Action will

24 be adjudicated in the Florida Court or in this Court, if it ultimately needs to be adjudicated at all.  It
might well settle in the bankruptcy context in connection with a plan of reorganization or otherwise.

25 In this connection, the desire of the post-petition Debtor and the FTC to resolve their disputes may
be significantly greater than the situation before Debtor filed for bankruptcy.

26      Furthermore, even if the matter were tried in the bankruptcy court, this Court would

27 determine when the trial should take place.

28  [18] However, as noted, Debtor and the FTC may well settle those disputes in the context of
Debtor's plan of reorganization or otherwise.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.          27

1    his duties overseeing normal operational issues.  The bankruptcy

2    filing unsettled Debtor's customers and Debtor is working on a

3    proposed pre-payment plan whereby Debtor would pay 50% of the

4    receivables represented by post-petition billing submissions.

5    Because this is a new program, the program will be time-consuming

6    to implement and monitor.  In addition, Mr. Dawson needs to be

7    available to work with Debtor's reorganization counsel, the various

8    secured and unsecured creditors, the Committee and the United

9    States Trustee.

10       Further, the Committee supports Debtor's use of cash

11   collateral through November 2, 2007.  In exchange, Debtor has

12   committed to negotiate with the Committee a term sheet for a plan

13   of reorganization contemplating a continuation of Debtor's business

14   operations with the goal of allowing Debtor to exit bankruptcy as

15   quickly as possible.  Debtor is also monitoring the possible sale

16   of PaymentOne to a third party.

17       Finally, upon Debtor filing its chapter 11 bankruptcy

18   petition, Debtor became a "debtor-in-possession."  As a debtor-in-

19   possession, Debtor acts as a fiduciary to the bankruptcy estate and

20   owes a duty of care and loyalty to the bankruptcy estate's

21   creditors.  In re McConville, 110 F.3d 47, 50 (9th Cir. 1997).

22   Thus, Debtor thus is a new entity with different and additional

23   responsibilities, concerns and pressures than it had when Debtor

24   operated solely as Integretel.  Debtor, the Committee and Debtor's

25   other creditors need time to evaluate the merits and strengths of

26   the FTC's positions and decide whether the bankruptcy estate should

27   try to settle the Enforcement Action with the FTC.  Giving Debtor

28   and Debtor's creditors a few months to do that is critical at this

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    28

1  juncture -- particularly in the context of negotiating a plan of

2  reorganization.

3      **3.    Balancing of the Harms and the Public Interest**

4      Based on the unique facts of this case and in consideration

5  of the relative hardship of the parties and the public interest

6  concerns, the Court finds that continued prosecution of the

7  Enforcement Action severely threatens the integrity of the

8  bankruptcy process and Debtor's prospects for reorganization and a

9  preliminary injunction of the Enforcement Action against Debtor

10 through March 14, 2008 is warranted.  On March 7, 2008 at

11 1:00 p.m., the Court will hold a further hearing on whether the

12 preliminary injunction of the Enforcement Action should be

13 continued beyond March 14, 2008.  Either the FTC or Debtor may

14 request that the preliminary injunction be lifted before March 7,

15 2008 for good cause based on facts that are not currently before

16 this Court.

17     The FTC is concerned that this Court's granting of a

18 preliminary injunction against the Enforcement Action will set a

19 precedent that a defendant can escape prosecution for committing

20 deceptive and unfair trade practices by simply filing for

21 bankruptcy.  The Court is keenly aware of the FTC's concern and

22 that is not what this Court intends.  Rather, it is the unusual

23 convergence -- almost a perfect storm -- of the trial schedule in

24 the Enforcement Action and the critical first few months of a

25 viable chapter 11 bankruptcy case that warrant a limited

26 preliminary injunction at this time.

27     First, the next several months are a critical time for Debtor

28 in its effort to reorganize, and the immediate continuation of the

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    29

1  Enforcement Action seriously threatens Debtor's ability to
2  reorganize.  Debtor has only 37 employees to service its 58 pre-
3  petition customers and manage Debtor's relations with over 1400
4  LECs.  Moreover, Debtor's president, Mr. Dawson, is and will
5  continue to be closely involved in Debtor's defense in the
6  Enforcement Action.  If the Enforcement Action is not temporarily
7  stayed, Mr. Dawson would be required to divert his time and
8  attention from Debtor's reorganization between November 6 and
9  December 4, 2007 to assist Debtor's counsel in the Enforcement
10 Action in preparing an opposition to a motion for summary judgment
11 that the FTC has stated it will file against Debtor.  There may
12 also be eleven or more additional depositions in which Debtor will
13 need to participate if the Florida Court grants the pending motions
14 requesting additional discovery.  In addition, Mr. Dawson will be
15 required to fly to Florida during February 2008 to prepare for and
16 participate in the trial in the Enforcement Action scheduled to
17 commence on February 25, 2008.[19]  The diversion of Debtor's
18 management -- and Mr. Dawson in particular -- in defending the
19 Enforcement Action during the next few months seriously threatens
20 Debtor's reorganization.
21        Mr. Dawson is the main contact for all of Debtor's
22 reorganization efforts in addition to his duties overseeing normal
23 operational issues.  Debtor's reorganization efforts -- especially
24 at this early stage of Debtor's bankruptcy case -- are time-
25 consuming.  First, under the Bankruptcy Code, Debtor is required to
26
27 ────────────────────
28        [19] The trial situation could possibly change if FTC does file a summary judgment motion and
   it is granted in part or in full.  However, Debtor will still need to prepare for trial because Debtor
   cannot know in advance what the result will be of any as yet to be filed FTC motions.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    30

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  obtain court approval for the use of its cash collateral post-
2  petition.  This is a marked difference from how Debtor operated
3  pre-petition.  Pre-petition Debtor could use any cash that came
4  into Debtor's accounts subject only to claims of various creditors.
5  Post-petition, however, Debtor must obtain the consent of all
6  creditors who have an interest in that cash collateral or court
7  approval for the use of that cash collateral.  In this instance,
8  the Court has approved Debtor's use of cash collateral on an
9  interim basis at three-week intervals.  Debtor has scheduled a
10  final hearing for use of cash collateral for November 2, which
11  depending on the status of its negotiations with its creditors,
12  Debtor may or may not change to another interim request for use of
13  cash collateral.

14      It is not unusual in a chapter 11 bankruptcy case for a debtor
15  to seek multiple interim requests for use of cash collateral while
16  a debtor negotiates with secured and unsecured creditors for final
17  consent to a debtor's use of cash collateral.  In the early stages
18  of a bankruptcy case, creditors are getting up to speed regarding a
19  debtor's business operations and the relative likelihood of
20  recoveries for creditors pursuant to various reorganization
21  proposals.  During this time, creditors, debtors and the bankruptcy
22  court strike a balance among the parties' interests and grant
23  limited permission for a debtor to use post-petition cash
24  collateral until the parties are comfortable with a debtor's plans
25  to operate and can resolve a debtor's use of cash collateral on a
26  final basis.  The early, limited permission to use cash collateral
27  is in part why a chapter 11 bankruptcy case is so time-intensive
28  for a debtor, and indeed all parties in the early stages.

1    Second, the bankruptcy filing unsettled Debtor's customers and

2  Debtor is actively working on a proposed pre-payment plan whereby

3  Debtor would pay 50% of the receivables represented by post-

4  petition billing submissions.  This is a marked change from

5  Debtor's pre-petition operations where Debtor paid its customers

6  approximately 90 days after the billing transactions were submitted

7  to Debtor.  Because the pre-payment program is new, Mr. Dawson and

8  Debtor's other employees will have to spend a great deal of time

9  implementing and monitoring the new program.

10    Further, the Committee was appointed on October 1, 2007 and on

11  October 10, 2007, the Committee had a five hour face-to-face

12  meeting with Debtor.  At that meeting the Committee supported

13  Debtor's use of cash collateral through November 2, 2007 and in

14  exchange Debtor has committed to negotiate with the Committee a

15  term sheet for a plan of reorganization contemplating a

16  continuation of Debtor's business operations with the goal of

17  allowing Debtor to exit bankruptcy as quickly as possible.  Debtor

18  is also monitoring the possible sale of PaymentOne to a third

19  party.  Mr. Dawson is a, and probably _the_, critical participant in

20  those discussions and negotiations.

21    Finally, Debtor has complex business operations and over 1,200

22  creditors on its creditor matrix.  Due to the size and complexity

23  of Debtor's business operations, Debtor requires -- and has been

24  granted -- additional time to complete its Schedules and Statement

25  of Financial Affairs.  Those documents are currently due on

26  November 15, 2007.  The Schedules consist of seven separate

27  schedules that require Debtor to: (a)  list in detail all real and

28  personal property, the value of each piece or category of property,

1  and the security interest held against that property; (b) provide

2  separate lists of Debtor's creditors -- secured creditors, priority

3  unsecured creditors and unsecured creditors that includes an

4  address for each creditor, information regarding when the claim was

5  incurred and consideration for the claim, whether the claim is

6  contingent, unliquidated or disputed, and the amount of the claim;

7  (c) provide a detailed list of all executory contracts and

8  unexpired leases; and (d) provide a list of all entities that are

9  co-debtors with Debtor.  The Statement requires Debtor to answer

10 twenty-five questions in detail regarding Debtor's financial

11 affairs.  The questions require Debtor to detail, _inter alia_, all

12 payments or transfers Debtor made in the 90 days immediately

13 preceding the commencement of the case that aggregate more than

14 $5,475 to any creditor, and all payments or transfers Debtor made

15 within one year immediately preceding the commencement of the case

16 to any creditor that is an insider (all of the majority-owned

17 subsidiaries of Debtor are considered to be insiders).

18     Based on these projected activities, Debtor's management --

19 and Mr. Dawson in particular -- will spend the next few months

20 dealing with Debtor's customers and creditors, completing Debtor's

21 Schedules and Statement, negotiating with the Committee over the

22 terms for a plan of reorganization and, if successful, most of

23 November and early December will be spent negotiating a draft plan

24 of reorganization and overseeing the preparation of a proposed

25 disclosure statement.  Both of these documents will require

26 substantial amounts of time on the part of Mr. Dawson and Debtor's

27 other personnel.  The plan of reorganization is Debtor's contract

28 with its creditors as to how Debtor intends to restructure itself

1   using the Bankruptcy Code.  In addition, the proposed disclosure
2   statement is similar to a prospectus and will require, _inter_ _alia_,
3   a description of Debtor's background, the events that caused Debtor
4   to file its bankruptcy case, what has changed such that Debtor will
5   be able to complete its proposed plan of reorganization, a
6   description of the proposed plan, and financial projections in
7   support of the plan if Debtor proposes to present a plan that
8   permits Debtor to operate as a going concern.  Debtor must submit
9   its proposed disclosure statement to this Court for approval.  11
10  U.S.C. § 1125(b).  Such activities will consume a huge portion of
11  the available time of Debtor's management over the next few months.
12          However, should Debtor be required to proceed to trial in the
13  Enforcement Action at the end of February 2008, Mr. Dawson and
14  other of Debtor's personnel will be required to travel to Florida
15  and spend many days -- if not weeks in the case of Mr. Dawson --
16  preparing for and participating in the trial in the Enforcement
17  Action.  This activity will take place at a critical juncture of
18  Debtor's bankruptcy case where Debtor should instead be seeking
19  confirmation of a plan of reorganization.  Debtor is committed to
20  proposing a plan of reorganization on an expeditious basis.  Under
21  the notice requirements of the Bankruptcy Code and Rules, it is
22  highly likely that Debtor will seek approval of a disclosure
23  statement during January 2008, and could set a confirmation hearing
24  on a proposed plan of reorganization during February or March 2008.
25          Confirmation of a chapter 11 plan requires an enormous amount
26  of work for both a debtor and its counsel.  In addition to
27  resolving and addressing any objections by any parties to approval
28  of a disclosure statement and confirmation of a plan, this Court

1   has an independent duty to ensure that a disclosure statement
2   contains adequate information, In re Main Street AC, Inc., 234 B.R.
3   771, 774 (Bankr. N.D. Cal. 1999), and an affirmative duty to ensure
4   that a plan satisfies all sixteen requirements of Bankruptcy Code
5   section 1129 for confirmation.  In re Ambanc La Mesa Ltd. P'ship.,
6   115 F.3d 650, 653 (9th Cir. 1997).  Just one of the requirements is
7   that this Court must determine that confirmation of Debtor's plan
8   will not likely be followed by the liquidation or further financial
9   reorganization.  11. U.S.C. § 1129(a)(11).  Mr. Dawson will almost
10  certainly be required to testify before this Court as to Debtor's
11  plan and the financial projections on which it is based, as well as
12  other evidence this Court requires to confirm any proposed plan
13  submitted for confirmation by Debtor.
14      In addition to the impact of the Enforcement Action on
15  Debtor's president and other personnel, it would be highly
16  injurious to Debtor and Debtor's prospects for reorganization if
17  Debtor had to spend the bulk of the estimated $1 million in legal
18  fees and costs associated with the Enforcement Action during this
19  same critical period.  Such an outlay of funds at a critical time
20  of confirmation would seriously impair, if not strike a death
21  knell, to Debtor's prospects for a reorganization.  Debtor is
22  required under the Bankruptcy Code to pay all administrative claims
23  as of the effective date of a confirmed plan.  11 U.S.C.
24  § 1129(a)(9)(A).  Debtor may well not have sufficient funds to both
25  pay the litigation costs of defending the Enforcement Action and
26  pay administrative claims on the effective date of a confirmed
27  plan.
28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    The FTC likely holds only a pre-petition unsecured claim
2    against Debtor in the Enforcement Action.  Any monetary claims FTC
3    asserts against Debtor arise only from Debtor's alleged pre-
4    petition placing of unauthorized collect call charges onto
5    consumers' telephone bills.  There is no showing that at this point
6    there is any reason for Debtor to spend $1 million litigating an
7    unsecured claim in the next five months.  First, at this juncture
8    it is unclear what unsecured creditors will receive in Debtor's
9    reorganization and it is unknown if spending $1 million to defend
10   against the FTC's claims makes sense, especially in this case where
11   secured and other unsecured creditors desperately need for all
12   resources to be devoted to Debtor's reorganization efforts.
13   Second, over the next five months Debtor may negotiate a resolution
14   of the FTC's claims without the need for litigation.  This Court is
15   not determining at this juncture where the FTC's claims will be
16   liquidated.  Rather, this Court is merely delaying briefly the
17   Enforcement Action against Debtor only.[20]  It is this Court's
18   experience that in chapter 11 cases such as Debtor's, a debtor
19   typically negotiates with the various creditors to reach a
20   consensus as to the structure of a plan of reorganization.  It is
21   generally less expensive and easier if a debtor can negotiate a
22   plan of reorganization than if a debtor has to confirm a plan of
23   reorganization over the objections of numerous creditors.  At the
24   early stages of Debtor's case and under the facts of this case, a
25   preliminary injunction of limited duration is warranted.

---

27    [20]This Court's decision stays the Enforcement Action against Debtor for a few months.  This
28   decision does <u>not</u> determine whether (1) the FTC may recommence the Enforcement Action in the
     Florida Court after those few months, or (2) whether the FTC should be required to pursue Debtor by
     filing a claim with, and litigating that claim in, the bankruptcy court.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                36

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    By limiting the duration of the preliminary injunction and
2  requiring Debtor to provide further updated evidence in mid-
3  February 2008 to support the continued injunction of the
4  Enforcement Action, this Court eliminates or at least reduces
5  substantially the alleged harms of the FTC.  The FTC cites three
6  harms from a possible injunction of the Enforcement Action: (1) the
7  inability of the FTC to obtain the non-monetary equitable relief it
8  seeks against Debtor; (2) the inability of the FTC to pursue the
9  claims in the Enforcement Action against Debtor in the Florida
10  Court; and (3) the public interest in permitting the FTC to pursue
11  a vital enforcement strategy to curb the unlawful practice of
12  placing unauthorized charges on consumers' phone bills.  However,
13  this Court has not eliminated, and is not eliminating, the
14  possibility that at a later date this Court would permit the FTC to
15  prosecute the Enforcement Action in the Florida Court, including
16  the ability of the FTC to obtain the non-monetary equitable relief
17  it seeks against Debtor.  The FTC itself notes that it will seek
18  such relief against Debtor post-confirmation.  This Court is merely
19  delaying for a few months the FTC's prosecution of the Enforcement
20  Action against Debtor.  No decision has yet been made as to where
21  the FTC's claims will be litigated if indeed those claims need to
22  be litigated at all.

23    Granting a preliminary injunction of limited duration also
24  renders premature the FTC's argument that this Court must consider
25  Debtor's costs of Debtor defending itself in the Florida Court and
26  defending itself in this Court rather than Debtor's costs of
27  defending itself against the FTC in the Florida Court or not
28  defending itself at all.  First, Debtor will not likely be

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                37

1  prosecuting an objection to the FTC's claim in the next few months.

2  Indeed, March 14, 2008 is the claims bar date for governmental

3  units in Debtor's bankruptcy case.  Thus, for this limited duration

4  preliminary injunction, Debtor almost certainly will not incur any

5  costs defending itself in this Court against the FTC's claims.[21]

6  **C.  Contempt Proceedings and Turnover Action**

7  　　**1.  Debtor's Ability to Sue the Receiver**

8  　　　　Receiver argues that this Court lacks subject matter

9  jurisdiction over this adversary proceeding as to Receiver because

10 Debtor has not obtained permission from the Florida Court to bring

11 this action -- or any action -- against Receiver.  Receiver asserts

12 that for over 100 years, legal authority holds that a litigant must

13 obtain permission from the court appointing a receiver before

14 bringing an action against that receiver.  Carter v. Rodgers, 220

15 F.3d 1249, 1252 (11th Cir. 2000) (holding that under Barton v.

16 Barbour, 104 U.S. 126 (1881), a debtor must obtain leave from the

17 bankruptcy court before the debtor can initiate an action in

18 district court against a bankruptcy-court appointed trustee for

19 breach of fiduciary duties); In re Crown Vantage, Inc., 421 F.3d

20 963, 970 (9th Cir. 2005) (a bankruptcy-court appointed trustee of a

21 liquidating trust cannot be sued in a foreign jurisdiction for

22 violating a settlement agreement without the permission of the

23 court appointing the trustee).

24 　　　　Debtor asserts that the Barton doctrine applies only if Debtor

25 were suing Receiver for dereliction of duties, which Debtor is not

26 doing in this adversary proceeding.  Moreover, Debtor argues that

27 Crown Vantage stands for the proposition that Debtor does not need

28

　　　[21] See footnote 17, supra.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  leave from the Florida Court to sue Receiver in this instance

2  because this Court has exclusive in rem jurisdiction to determine

3  the property of Debtor's bankruptcy estate and the injunctive

4  relief requested by Debtor is a stay specifically designed to

5  protect the assets of the bankruptcy estate, so the Barton doctrine

6  is not invoked

7      This Court agrees with Debtor that once Debtor filed its

8  bankruptcy petition on September 16, 2007, this Court obtained

9  exclusive in rem jurisdiction over the property in Debtor's

10  bankruptcy estate, and particularly over any legal and equitable

11  interest Debtor held in the Commingled Funds as of the commencement

12  of the case.  While none of the parties or this Court have found

13  any cases directly on point, the Court finds Gilchrist v. General

14  Elec. Capital Corp., 262 F.3d 295 (4th Cir. 2001), particularly

15  instructive.

16      In Gilchrist, Spartan International, Incorporated and its

17  subsidiaries (collectively, "Spartan") closed their doors for

18  business.  Spartan's major creditor ("GE") commenced a state law

19  debt-collection action invoking the diversity jurisdiction of the

20  district court of South Carolina ("South Carolina Court").  To

21  facilitate the foreclosure of the creditor's lien, the South

22  Carolina Court appointed a federal receiver for all of Spartan's

23  assets ("Receiver Order").  The Receiver Order enjoined all persons

24  from commencing or prosecuting any action, suit or proceeding that

25  affected the receivership estate or Spartan.  Gilchrist, 262 F.3d

26  at 297-98.

27      One week later and with actual notice of the Receiver Order,

28  50 creditors ("Georgia Creditors") filed an involuntary bankruptcy

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.            39

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  petition in the bankruptcy court in the Southern District of
2  Georgia ("Georgia Court") and a request for the appointment of an
3  interim bankruptcy trustee.  GE objected to the appointment of an
4  interim bankruptcy trustee and filed a motion to dismiss the
5  involuntary bankruptcy petition or transfer venue to the district
6  of South Carolina.  The receiver filed a similar motion.  Following
7  a hearing, the Georgia Court overruled the objections, denied the
8  motions and appointed an interim bankruptcy trustee.  _Gilchrist_,
9  262 F.3d at 298.

10      While that hearing was in progress, the receiver obtained a
11  temporary restraining order from the South Carolina Court enjoining
12  38 of the Georgia Creditors from undertaking any action in
13  furtherance of the involuntary bankruptcy petition.  Four days
14  later the South Carolina Court found the Georgia Creditors in
15  contempt of the Receiver Order and allowed the Georgia Creditors to
16  purge their contempt by withdrawing the bankruptcy petition.  The
17  interim bankruptcy trustee argued that the automatic stay precluded
18  the South Carolina Court's actions, but the South Carolina Court
19  refused to recognize the automatic stay of its proceedings.  The
20  South Carolina Court asserted that it had jurisdiction to determine
21  the scope of the automatic stay, and it had the authority to issue
22  an injunction to prevent the collateral attack of that court's
23  Receiver Order appointing the receiver.  In an effort to purge
24  their contempt, the Georgia Creditors subsequently filed a petition
25  in the Georgia Court to withdraw the involuntary petition, which
26  the Georgia Court denied.  The Georgia Court stayed further
27  proceedings pending a review of the South Carolina Court's orders
28  by the Fourth Circuit.  _Gilchrist_, 262 F.3d at 298-99.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    40

Entered on Docket
November 02, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

1    In reviewing the South Carolina Court's orders, the Fourth

2    Circuit noted that the South Carolina Court was within the scope of

3    that court's equitable powers in appointing the receiver and

4    asserting in rem jurisdiction over Spartan's assets, even those

5    located in other districts. Gilchrist, 262 F.3d at 302. However,

6    once the Georgia Creditors filed the involuntary bankruptcy

7    petition,

> [b]y virtue of the jurisdictional provisions of the
> United States Code, and the commencement of a bankruptcy
> case against Spartan, the bankruptcy court obtained
> "*exclusive* jurisdiction of all of the property, wherever
> located, of [Spartan] as of the commencement of such
> case, and of property of the estate." 28 U.S.C.
> § 1334(e) (emphasis added). In addition, the filing of
> the petition in bankruptcy "operates as a stay,
> applicable to all entities, of the ... continuation ...
> of a judicial, administrative, or other action or
> proceeding against the debtor that was commenced before"
> the bankruptcy petition. 11 U.S.C. § 362(a)(1). To give
> effect to its jurisdiction, the bankruptcy court is given
> broad equitable powers, *see* 11 U.S.C. § 105, with
> nationwide service of process, *see* Bankr. R. 7004(d).

Gilchrist, 262 F.3d at 303.

    The Fourth Circuit then found that the South Carolina Court

had properly determined that the South Carolina Court had

jurisdiction to determine its own jurisdiction and the scope of the

automatic stay. However, the Fourth Circuit stated that:

> The [South Carolina] court provided no explanation of
> why, as a matter of equity, the bankruptcy process was
> not superior to a receivership in the liquidation of a
> large business, with assets in several jurisdictions and
> with thousands of creditors, some of whom were claiming
> liens superior to the lien relied upon by GE when it
> initiated the receivership proceeding. More importantly,
> it provided no explanation of why the terms of § 362(a)
> were not applicable.
>
> Similarly, in their briefs and arguments presented
> to us, counsel for GE and the receiver advanced no
> exception to § 362(a) that would be applicable. Instead,
> they argued for a "first-filed" principle, urging that
> the court which first takes custody of assets for
> liquidation should be given priority.

We cannot agree.  Our examination of the Bankruptcy Code reveals that Congress intended that the bankruptcy process be favored in circumstances such as these. Section 1334(e) of title 28 is unequivocal in its grant of exclusive jurisdiction to the bankruptcy court, and § 362(a) imposes an automatic stay on all proceedings merely upon the filing of a bankruptcy petition.  If we were to frustrate these express provisions to further a first-filed policy, we would have to deny bankruptcy jurisdiction to every bankruptcy court in which foreclosure proceedings had already commenced against the debtor's property, on the grounds that the *in rem* nature of the foreclosure proceeding precludes the bankruptcy court from taking custody of the *res*.  Such a jurisdictional limitation on bankruptcy proceedings would severely limit the efficacy of bankruptcy.  In the absence of express language suggesting that Congress intended for bankruptcy jurisdiction to be so limited, we believe it would frustrate Congressional intent to imply such a limitation based solely on consideration of a first-filed policy.

Even if general equitable principles could modify the application of statutory jurisdictional grants, we do not believe that the equities favor the common-law receivership process over the highly developed and specific bankruptcy process.  The procedural requirements for liquidating a large corporation with thousands of creditors, many of whom might challenge the priority of liens and the adequacy of asset sales, present a task that would push the receivership process to its limits. *See* [In re Baldwin-United Corp. Litigation], 765 F.2d [343, 348 (2nd Cir. 1985)] ("[T]o whatever extent a conflict may arise between the authority of the Bankruptcy Court to administer this complex reorganization and the authority of the District Court to administer consolidated pretrial proceedings, the equities favor maintenance of the unfettered authority of the Bankruptcy Court").  In this case it can be seen, even from the initial transactions in the receivership, that the customized receivership mechanisms are wanting in comparison with established bankruptcy process.  For example, when the receiver in this case sold a mill in Georgia for $4.2 million, the creditors had no advance notice of the transaction, and some have challenged the adequacy of compensation, proffering evidence that the mill was worth over $20 million.  More important to the Georgia creditors in this case, the district court did not have in place a mechanism to adjudicate the relative priority of liens.  GE claims a first lien by reason of its perfected security interest in most of the assets of Spartan and proffered an order by which the proceeds of liquidation would be paid to it as the superior lien holder.  But Spartan's employees claim a prior statutory lien in assets produced by them at the manufacturing plants at which they worked, as created by state law.

MEMORANDUM DECISION RE
  ORDER TO SHOW CAUSE, ETC.                42

1        While they surely could file claims in the receivership,
2        the process for making and adjudicating such claims was
         not spelled out.

3  Gilchrist, 262 F.3d at 303-04.

4      While the facts in this case differ from those in Gilchrist --

5  the action in the Florida Court is an enforcement action rather

6  than an action to foreclose on collateral, and Debtor is not the

7  receivership entity as in Gilchrist, there are two primary

8  principles that apply here.  First, as noted in Gilchrist, once a

9  bankruptcy petition is filed, section 1334(e) of title 28 is

10 unequivocal in its grant of exclusive jurisdiction to the

11 bankruptcy court over all property, wherever located, of Debtor as

12 of the commencement of such case.  28 U.S.C. § 1334(e).  Property

13 of the bankruptcy estate includes all legal or equitable interests

14 of a debtor in property as of the commencement of the case.

15 11 U.S.C. § 541(a)(1).  Bankruptcy Code section 542 also provides

16 that entities -- other than custodians -- in possession, custody or

17 control of property that a debtor-in-possession may use, sell, or

18 lease under Bankruptcy Code section 363 shall deliver and account

19 for such property to that debtor, unless the property is of

20 inconsequential value or benefit to the estate.  11 U.S.C.

21 § 542(a).  Bankruptcy Code section 543 provides that a custodian

22 shall turn over property of the debtor unless excused by the

23 bankruptcy court.  11 U.S.C. §§ 543(b), (d).

24     Here Receiver asserts that because the Florida Court found in

25 the Omnibus Order that Integretel held "reserves" in the amount of

26 $1,762,762.56 on behalf of the Prior Customers as of June 30, 2007,

27 Integretel was required to turn over the Commingled Funds to

28 Receiver.  However, the Commingled Funds were nothing more than

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  Integretel's commingled funds and were not any particular or

2  identifiable *res*, and the Florida Court did not find that a *res*

3  existed.   In fact the Omnibus Order does not require Integretel to

4  pay any specific amount of funds to Receiver.  Rather, in order to

5  comply with the Omnibus Order, Debtor would have to pay Receiver

6  out of Debtor's general account the "reserves" the Florida Court

7  determined Integretel held on behalf of the Prior Customers (the

8  Florida Court described such "reserves" but did not quantify them).

9  Integretel did not turn over any commingled funds to Receiver pre-

10 petition and Debtor did not segregate any such funds in any fashion

11 pre-petition.  As of the petition date, Debtor retained an interest

12 in all of its commingled funds and Receiver asserted an interest in

13 some as yet unquantified portion of those funds.  On the petition

14 date, this Court obtained exclusive jurisdiction over all of the

15 commingled funds under section 1334(e) of title 28.  <u>Accord</u> <u>In re</u>

16 <u>Simon</u>, 153 F.3d 991, 996 (9th Cir. 1998).[22]

17      It is this exclusive grant of <u>in rem</u> jurisdiction that

18 precludes the application of the <u>Barton</u> doctrine in this particular

19 set of circumstances.   <u>Crown Vantage</u> points out that

20      [p]art of the rationale underlying <u>Barton</u> is that the
       court appointing the receiver has in rem subject matter
21     jurisdiction over the receivership property.  As the
       Supreme Court explained, allowing the unauthorized suit
22     to proceed "would have been a usurpation of the powers
       and duties which belonged exclusively to another court."
23     (Citations and footnote omitted).

24

─────────────────────────────

25 [22] Because there is no pre-petition *res*, it is difficult to understand how the Commingled
   Funds could <u>not</u> be property of the bankruptcy estate.  This Court is not reviewing the Florida
26 Court's decision in the Omnibus Order; that decision is on appeal to the Eleventh Circuit.  However,
   this Court is of the opinion that the bankruptcy court has exclusive jurisdiction over what constitutes
27 property of the estate.  <u>See</u> Section III.C.2 of this decision, <u>infra</u>.  In any event, the Court must
   consider Debtor's likelihood of success on the merits on this issue in considering the stay issues
28 currently before the Court.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    Crown Vantage, 421 F.3d at 971. It is the unique situation here --

2    where the exclusive in rem jurisdiction over the Commingled Funds

3    passed from the Florida Court to this Court upon Debtor filing its

4    bankruptcy petition -- that eliminates Debtor's need to request

5    leave from the Florida Court before suing Receiver in this

6    adversary proceeding.

7          The parties dispute the precise implication of the Omnibus

8    Order. Receiver and the FTC assert that the Omnibus Order

9    determined in a final appealable order that the Commingled Funds

10   were property of the receivership estate and Debtor had no interest

11   in the Commingled Funds at the time Debtor commenced this

12   bankruptcy case. Receiver bases this argument on the premise that

13   the Florida Court ordered the turnover of Commingled Funds.

14         Outside of bankruptcy, Receiver could perhaps compel adherence

15   to the Omnibus Order regardless of whether any actual, segregated

16   funds existed from which to make the payment ordered by the Florida

17   Court. However, once Debtor filed for bankruptcy protection, the

18   Omnibus Order command could only be enforced at the expense of all

19   other creditors of Debtor -- secured and unsecured -- other than

20   Receiver. This distinction is usually discussed in the context of

21   a constructive trust remedy, where courts have often expressed that

22   the "privileging of one unsecured claim over another clearly

23   thwarts the principle of ratable distribution underlying the

24   Bankruptcy Code." In re Flanagan, -- F.3d --, 2007 WL 2915812, *8

25   (2d Cir. Oct. 9, 2007).

26         The Ninth Circuit has recognized this distinction for more

27   than 40 years. In Elliot v. Bumb, 356 F.2d 749, 754-55 (9th Cir.

28   1966), the Ninth Circuit refused to allow state law to control

MEMORANDUM DECISION RE
 ORDER TO SHOW CAUSE, ETC.                45

1   whether a creditor would be entitled to claim that a trust existed

2   over a debtor's commingled funds because the state law yielded to

3   bankruptcy law and bankruptcy law requires tracing.  The Ninth

4   Circuit has followed that case in Matter of Esgro, Inc., 645 F.2d

5   794, 798 (9th Cir. 1981); In re North American Coin & Currency,

6   Ltd., 767 F.2d 1573, 1575 (9th Cir. 1985); and In re Advent

7   Management Corp., 178 B.R. 480, 488 (9th Cir. BAP 1995), aff'd,

8   104 F.3d 293 (9th Cir. 1997).  As noted in Flanagan, the "equities

9   in bankruptcy are not the equities of the common law."  Flanagan,

10  2007 WL 2915812 at *8 (quoting XL/Datacomp, Inc. v. Wilson (In re

11  Omegas Group, Inc.), 16 F.3d 1443, 1452 (9th Cir. 1994)).

12      Thus, the Omnibus Order is likely, at most, nothing more than

13  a money judgment determining Debtor's purported liability to the

14  receiver.[23]  While it is based on the concept that Receiver had a

15  property interest in Debtor's bank accounts as of the issuance of

16  the TRO, the Omnibus Order does not and could not call for the

17  turnover of any specific, identifiable property in Debtor's bank

18  accounts as of the TRO.  Rather the Omnibus Order merely directs

19  Debtor to pay over the amount of Debtor's "reserve" liability from

20  any funds Debtor has available to it.  Receiver never claimed that

21  Receiver can trace the funds received by Debtor from the Prior

22  Customers to an identifiable fund that still exists.  Rather,

23  Receiver correctly interprets the payment order as being a judgment

24  commanding the payment of an as yet unquantified amount of money.

25      Debtor filed its bankruptcy petition while the Commingled

26  Funds remained in Debtor's bank account.  Debtor has demonstrated a

27

28      [23] It is not 100 percent clear that the Florida Court has determined that Receiver has a fully
        liquidated final appealable judgment for money against Debtor.

1  very strong likelihood of success on the merits -- that whether

2  measured at the outset of the Florida Action or as of the date of

3  the petition, Debtor holds no specific identifiable funds that can

4  be traced from the Prior Customers to Debtor's existing bank

5  accounts.    The determination that Receiver held an interest in the

6  Commingled Funds did not eliminate any interest Debtor's bankruptcy

7  estate had in the same funds.

> To reclaim money or property from a bankruptcy estate on
> the basis that the property belongs to the reclaiming
> party and not to the debtor, the reclaiming party must be
> able to definitively trace its property.  Even when
> property is commingled, that property must be positively
> identified, or else the reclaiming party is relegated to
> the status of a general unsecured creditor, regardless of
> the equities.  The manner in which the debtor or the
> estate came into possession of the property is
> irrelevant. (Citations omitted.)

14  In re Graphics Technology, Inc., 306 B.R. 630, 635 (8th Cir. BAP),

15  aff'd, 113 Fed. Appx. 734 (8th Cir. 2004).  Thus, notwithstanding

16  any post-petition pronouncement by the Florida Court to the

17  contrary, the Commingled Funds are property of Debtor's bankruptcy

18  estate subject to whatever interest the Omnibus Order granted

19  Receiver in those funds -- along with the interests Debtor's other

20  secured and unsecured creditors assert in those funds.  Debtor can

21  sue Receiver without obtaining the permission of the Florida Court

22  here because any action by Receiver in furtherance of obtaining

23  possession of the Commingled Funds interferes with this Court's

24  exclusive in rem jurisdiction over those funds.

25      The second primary principle found in Gilchrist is that a

26  district court is limited in its ability to address competing

27  claims over the same assets.  As noted in Gilchrist, even where the

28  receiver held property of Spartan pursuant to the foreclosure

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  action initiated by GE, the South Carolina Court did not have in

2  place a mechanism to adjudicate the relative priority of liens

3  against that property.  In this case, the Florida Court had

4  jurisdiction only over part of Debtor's property pre-petition --

5  i.e., some portion of the commingled funds in Integretel's bank

6  account.  At the time that the Florida Court entered the Omnibus

7  Order, the only parties before that court with respect to the

8  Commingled Funds were Receiver, Integretel and possibly the FTC.

9  The Florida Court could not and did not adjudicate the competing

10 claims to the Commingled Funds asserted by Debtor's secured and

11 unsecured creditors.

12     **2.    Bankruptcy Court Jurisdiction Over Property of the Estate**

13     Receiver and the FTC assert that the Florida Court determined

14 that the Commingled Funds were not property of Debtor in the post-

15 petition Clarification Order.[24]  In particular, the Florida Court

16 stated with respect to its determination that there was no

17 automatic stay in place as to the contempt proceedings that:

18         First, the automatic stay applies only to protect
           property of the bankruptcy estate or property of the
19         debtor.  See 11 U.S.C. § 362(a)(2).  The Court has
           already ruled that the reserve funds are neither the
20         property of the "bankruptcy estate" nor Integretel.

21 Clarification Order at 4.  The issue of the Florida Court's

22 jurisdiction to determine the scope of the automatic stay is not

23 before this Court.  However, as discussed above, once Debtor filed

24 its bankruptcy petition, the bankruptcy court has exclusive

25

26     [24] The Clarification Order was issued post-petition. If this Court is correct, that the Florida
27 Court had no jurisdiction to determine post-petition what property constitutes property of the estate,
   then the Florida Court lacked jurisdiction to issue that aspect of the Clarification Order. The Court
28 considers this matter in the context of the stay issues before it, and not in review of the Florida
   Court.

1  jurisdiction to determine what is property of the estate.

2  Gilchrist, 262 F.3d at 303 (once a bankruptcy petition is filed,

3  section 1334(e) of title 28 is unequivocal in its grant of

4  exclusive jurisdiction to the bankruptcy court over all property,

5  wherever located, of a debtor as of the commencement of such case).

6  Moreover, the pre-petition determination that Receiver held an

7  interest in the Commingled Funds did not eliminate any interest

8  Debtor's bankruptcy estate had in the same funds, especially since

9  those funds were not part of a specific pre-petition res.[25]  See

10 Graphics Technology, 306 B.R. at 635.  Thus, the post-petition

11 assertion by the Florida Court in the Clarification Order that the

12 Commingled Funds are not property of Debtor's bankruptcy estate

13 exceeded the Florida Court's post-petition jurisdiction over

14 property of Debtor's estate.[26]

15    **3.    Harms to Receiver**

16       Receiver asserts that several harms would occur should this

17 Court enjoin Receiver from implementing or enforcing the Omnibus

18 Order and/or unblock the funds held in the Blocked Account.

19 Primarily, Receiver argues that Debtor is attempting to interfere

20 with the administration of the receivership in seeking to enjoin

21 the enforcement of the Omnibus Order.  The purpose of the

22 receivership is to marshal and preserve the assets of the

23 receivership entities in order to return those assets to the

24

---

25    [25] The creation of the Blocked Account post-petition also does not create a pre-petition *res*

26 since Debtor and Receiver agreed that the temporary establishment of the Blocked Account did not

   in any way affect the merits of either parties' rights, claims or defenses with respect to the funds in

27 the Blocked Account.

28    [26] The Clarification Order is currently on appeal to the Eleventh Circuit, but that does not
   change this Court's legal analysis of the jurisdiction of the bankruptcy court.  See footnote 24, supra.

1  victims of the fraud.  <u>Eller Industries, Inc. v. Indian Motorcycle</u>

2  <u>Manufacturing, Inc.</u>, 929 F. Supp. 369 (D. Colo. 1995); <u>Citibank,</u>

3  <u>N.A. v. Nyland (CF8) Ltd.</u>, 839 F.2d 93 (2d Cir. 1987).[27]  In some

4  federal governmental enforcement actions, a federal district court

5  may appoint a receiver and issue a temporary restraining order

6  and/or preliminary injunction to preserve the assets that result

7  from the actions of the receivership entities -- whether held by

8  parties or non-parties -- to provide redress for the legitimately-

9  defrauded investor.  <u>FTC v. Productive Marketing, Inc.</u>, 136 F.

---

[27]  Receiver asserts that <u>Eller Industries</u> (a Colorado district court decision which is distinguishable and not binding on this Court in any event) involves a strikingly similar set of facts. According to Receiver, the Colorado district court concluded that the Massachusetts bankruptcy court's injunction could not be effective against a receiver appointed by the Colorado district court because the bankruptcy court's injunction interfered with the Colorado district court's mandated obligations of the receiver -- who was a fiduciary of the Colorado district court and was responsible for locating and protecting the assets of the receivership estate.  The Colorado district court found that the purposes of the receivership can only be achieved by a stay of foreign equitable actions, including the Massachusetts adversary proceeding.

This Court disagrees.  The facts of <u>Eller Industries</u> are distinguishable and the legal proposition for which <u>Eller Industries</u> stands is not applicable to the instant case.  In <u>Eller Industries</u>, a chapter 7 trustee obtained a temporary restraining order against Indian Motorcycle Manufacturing, Inc. ("IMMI") precluding IMMI from soliciting funds by using a script "Indian" trademark.  The temporary restraining order enjoined IMMI from transferring, assigning, conveying, hypothecating or encumbering -- except in the ordinary course of business -- any and all of IMMI's assets.  Shortly thereafter, a federal receivership was established putting a receiver in as the only officer and director of IMMI.  After the federal receiver was appointed, the Massachusetts bankruptcy court converted the temporary restraining order into a preliminary injunction and the bankruptcy trustee asserted that the preliminary injunction applied to the receiver.  The Colorado district court held that the Colorado district court had exclusive jurisdiction over the assets and administration of the receivership imposed on IMMI, only the Colorado district court could authorize equitable actions against the receivership estate, and the bankruptcy court's preliminary injunction was not effective against the Colorado district court or the IMMI federal receivership.

In <u>Eller Industries</u> a bankruptcy trustee was enjoining a third party entity that itself was under federal receivership.  Such a pursuit was precluded by the federal receivership district court.  Here, this Court is enjoining Receiver from dissipating property of Debtor's bankruptcy estate.  Debtor is not in receivership.  As discussed in detail <u>supra</u>, once Debtor filed its bankruptcy petition, this Court obtained exclusive <u>in rem</u> jurisdiction over the Commingled Funds.  No such transfer from the bankruptcy estate to the IMMI federal receiver occurred in <u>Eller Industries</u>, and that case is distinguishable.

1  Supp. 2d 1096, 1104-06 (C.D. Cal. 2001) (where the district court

2  found that the non-party's failure to turn over receivership funds

3  disrupted the district court's power to enforce its injunction and

4  the receiver's right to obtain such funds).  The Florida Action is

5  an enforcement action in which the FTC seeks injunctive relief

6  against Debtor -- among others -- for consumer redress for

7  deceptive and unfair practices for unauthorized billing of charges

8  on phone bills in violation of the Federal Trade Commission Act.

9  The Florida Court appointed Receiver, issued the Preliminary

10 Injunction and ordered Receiver, as the Florida Court's agent, to

11 locate, marshal and preserve receivership property.  Receiver

12 argues that if this Court enjoins Receiver from performing

13 Receiver's duties, this Court will also be enjoining the Florida

14 Court.  Receiver asserts that such a ruling would create an

15 unworkable, unthinkable, and grave conflict between this Court's

16 injunction order and the previously-issued orders of the Florida

17 Court.  However, that is not correct.  Bankruptcy courts enjoin

18 <u>parties</u> from proceeding outside of the bankruptcy court; they do

19 not normally enjoin any other <u>courts</u> from taking any action.  This

20 Court is not enjoining the Florida Court.

21      Receiver also argues that Debtor is merely seeking to re-

22 litigate the parties' disputes over the Commingled Funds as set

23 forth in the Omnibus and Clarification Orders.  Such re-litigation

24 is barred by res judicata.  According to Receiver, a review of the

25 Omnibus Order and the Clarification Order reveals that those orders

26 were not merely an interim measure to preserve the Commingled

27 Funds.  Rather those orders adjudicated <u>ownership</u> of the Commingled

28 Funds.  Moreover, the ownership issue is not predicated on whether

MEMORANDUM DECISION RE
  ORDER TO SHOW CAUSE, ETC.          51

1  the FTC ultimately prevails in the Enforcement Action, and the
2  turnover provisions of the Omnibus Order and Clarification Order
3  are final, appealable orders.  The FTC contends that any issue that
4  Debtor has with those orders should be brought before the Eleventh
5  Circuit.  However, the bankruptcy court has exclusive in rem
6  jurisdiction post-petition over property of the estate, as well as
7  jurisdiction to determine what constitutes property of the estate,
8  so Debtor necessarily should be permitted to assert that position
9  in this Court.

10    Additionally, Receiver is concerned about the dissipation of
11  the Commingled Funds should the Blocked Account be unblocked.  If
12  Debtor were to spend the funds in the Blocked Account, the purpose
13  of the Omnibus Order will be thwarted.  Also, if this Court were to
14  enjoin Receiver and permit Debtor to use the Commingled Funds in
15  the operation of its business, this Court would be exercising
16  control over property under which the Florida Court has exclusive
17  in rem jurisdiction and this Court would effectively be determining
18  the interests in the Commingled Funds without a final order in an
19  adversary proceeding in contravention of Federal Rule of Bankruptcy
20  Procedure 7001(2).

21    Debtor contends that Receiver is adequately protected, even
22  assuming Receiver has a specific interest in the Commingled Funds.
23  Because this Court is not unblocking the Blocked Account at this
24  time, there is no need to address Debtor's argument that Receiver
25  is adequately protected by Debtor's total assets even if at a later
26  time Receiver were to demonstrate an interest in the Commingled
27  Funds and the Court were to consider whether to unblock all or some
28  of the funds in the Blocked Account.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

### 4.  Harms to Debtor

Debtor asserts that it will face irreparable injury if enforcement of the Omnibus Order is not enjoined[28] and if the Blocked Account is not unblocked.  First, Debtor's business will suffer very substantially and irreparably if Debtor is required to turn over $1,762,762.56 to Receiver under the Omnibus Order, particularly at this critical point in Debtor's reorganization efforts.  Debtor's estate will lose the over $1.7 million that appears to be property of the estate.  Those funds will not be available to Debtor or its creditors if they are turned over to Receiver.

Second, Debtor asserts that it needs those funds to maintain adequate cash reserves relating to its post-petition operations. This in part is due to a shift in Debtor's actions with respect to "unremitted" funds.  Specifically, under Debtor's pre-petition settlement process, when Debtor received payments from the LECs, Debtor would settle Debtor's obligations with its customers. Debtor had the right to retain some portion of those proceeds under the service contracts and pay the unremitted portion to the customer at a later time.  When Debtor withheld funds during the pre-petition settlement process, Debtor used those funds for its general operating expenses.  Post-petition, Debtor believes it is prudent for Debtor to retain sufficient cash to cover Debtor's possible administrative obligations to its customers to remit withheld funds to those customers, should Debtor have to remit those funds in the future.  Under its new post-petition policy to retain sufficient cash to cover the unremitted funds, Debtor

---

[28] Debtor asserted this argument prior to obtaining the Stay Order.

1 requires additional excess cash to ensure the unremitted funds are
2 available to customers for billing transactions submitted post-
3 petition.

4     Receiver and the FTC both argue that based on Debtor's own
5 budgets, Debtor does not currently need the use of the funds in the
6 Blocked Account, at this time, so there is no basis for this Court
7 to release those funds.  Receiver and the FTC argue that Debtor has
8 made no attempt to supply any foundation for the financial figures.
9 Also, the budgets indicate that Debtor is never left without cash.
10 The total cash balance even during the monthly shortfalls never
11 falls below $3 million.  The question then arises as to whether the
12 claimed monthly shortfall in mid-December results from the
13 unsubstantiated legal costs related to the Enforcement Action, the
14 unexplained one-time drop in revenue in December, and/or the
15 unusual and questionable post-petition pre-payment arrangement.

16     In addition, as Debtor points out, such a turnover by Debtor
17 to Receiver of the funds in the Blocked Account would be a
18 preference of one unsecured creditor -- Receiver -- over all
19 similarly situated unsecured creditors.  The portion of the Omnibus
20 Order that requires Debtor to pay over the Commingled Funds likely
21 represents, at most, an ordinary judgment against Debtor which is
22 an unsecured claim in this bankruptcy estate.  From the issuance of
23 the TRO and Preliminary Injunction in the Florida Court to the
24 filing of Debtor's bankruptcy case, no money was set aside for
25 Receiver's claim.  The Omnibus Order requiring Debtor to pay over
26 to Receiver an amount denominated on Debtor's books as "reserves"
27 cannot create a property interest where none exists.  Debtor has
28 "reserve" amounts for each of Debtor's past and current customers,

1  and none of those customers are being afforded the right to invade

2  Debtor's bank account to retrieve funds that those customers might

3  wish to claim as their own.  Receiver's claim is not superior to

4  that of any other creditor, except that Receiver has obtained the

5  Omnibus Order from the Florida Court, which is currently on appeal

6  to the Eleventh Circuit.

7      In an effort to counter this alleged harm of Debtor, the FTC

8  argues that the Florida Court ruled in the Omnibus Order that the

9  Commingled Funds are property of the receivership estate and not

10 property of Integretel.  Moreover, Debtor's purported inability to

11 turn over the funds is a complete defense to contempt under FTC v.

12 Affordable Media, LLC, 179 F.3d 1228, 1239 (9th Cir. 1999), if that

13 defense can be established.  FTC argues that if Debtor prevails on

14 the inability to pay defense, Debtor will not have to turn over the

15 Commingled Funds and Debtor will not have the irreparable harm

16 Debtor alleges.  Alternatively, if Receiver ultimately prevails,

17 then there is also no cognizable irreparable harm because the

18 property of the receivership estate will have been rightly restored

19 to the receivership at no cost to Debtor's estate.

20     The FTC further argues that Debtor's claim for irreparable

21 harm rings especially hollow given that Debtor only has itself to

22 blame for any predicament in which Debtor now finds itself.  Debtor

23 was served with the TRO in March 2006 and had 18 months to organize

24 its financial affairs in order to comply with the TRO.  Debtor had

25 ample opportunity to seek clarification of the Florida Court TRO

26 and Preliminary Injunction, secure a letter of credit, borrow from

27 one of Debtor's affiliated companies, cut costs, or put money into

28 savings.  Instead, Debtor allegedly chose to ignore the TRO and

1   Preliminary Injunction, and Debtor should not now be heard to

2   complain about a harm that is in essence, self-inflicted.

3        Finally, Debtor will be harmed by incurring legal fees and

4   costs if enforcement of the Omnibus Order is not enjoined, as well

5   as the diversion of Debtor's management from the reorganization

6   process.  Debtor estimates that Debtor will incur an additional

7   $50,000 to $150,000 in fees related to Receiver's request for the

8   turnover of the Commingled Funds.  Receiver argues that the

9   contempt proceedings are largely complete and the orders are self-

10  executing.  However, the Omnibus Order is now on appeal.  If the

11  enforcement of the Omnibus Order is not enjoined, Debtor will have

12  to comply with the order to turn over the funds or show cause why

13  Debtor should not be held in contempt.

14       **5.   Balancing of the Harms and the Public Interest**

15       Even if the contempt proceeding is properly subject to the

16  exemption from the automatic stay under Bankruptcy Code

17  section 362(b)(4), this Court may enjoin the prosecution of the

18  contempt proceeding under Section 105 if the contempt proceeding

19  "threatens" the assets of the bankruptcy estate.  FAMCO, 264 B.R.

20  at 653.  A proceeding "that seeks actual physical control over the

21  assets of the debtor's estate threatens the bankruptcy court's

22  exclusive jurisdiction over the res of the debtor's estate and

23  therefore can be enjoined."  FAMCO, 264 B.R. at 655.[29]

24

25       [29] This Court is not reviewing the Florida Court's decision in the Clarification Order that the

26  contempt proceeding is exempt from the automatic stay under Bankruptcy Code section 362(b)(4);
    that is on appeal to the Eleventh Circuit.  The Florida Court determined that the contempt proceeding

27  was an exercise of the government's police or regulatory power, and therefore exempt from the
    automatic stay pursuant to Bankruptcy Code section 362(b)(4).  However, as this Court understands

28  the situation, neither the FTC nor any other government agency is a party to Receiver's contempt

                                                                    (continued...)

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    56

### a. Enjoining Enforcement of the Omnibus Order

1  Once Debtor filed its bankruptcy petition a bankruptcy estate
2  came into being.  Debtor is a debtor-in-possession and is a
3  fiduciary to all of Debtor's creditors -- *inter alia*, secured
4  creditors, unsecured creditors, customers, the FTC and Receiver.
5  Receiver certainly does not represent all creditors of Debtor's
6  estate.  At most Receiver represents the receivership estates of
7  the Prior Customers and the FTC.  Receiver does not seek to have
8  the Commingled Funds turned over to him to protect those funds for
9  all creditors of Debtor's bankruptcy estate.  Rather, Receiver
10 seeks possession of those funds for the benefit of the receivership
11 estates of the Prior Customers, to the exclusion of Debtor's other
12 secured and unsecured creditors.

13 Although the Florida Court issued the Omnibus Order, Receiver
14 -- in the shoes of the Prior Customers -- is no different from
15 nearly all of Debtor's customers.  The typical service contract
16 provides for Debtor to maintain certain reserves for disputes, fees
17 and other adjustments.  These "reserves" on behalf of the Prior
18 Customers were the "reserves" that were the subject of the Omnibus
19 Order.  It is undisputed that the "reserves" were held as
20 bookkeeping entries and not as segregated funds.  Permitting
21 Receiver to implement the Omnibus Order would irreparably harm
22 Debtor's bankruptcy estate by preferring one creditor -- Receiver -
23 - over other similarly situated creditors of Debtor, since most if
24 not all service contracts provide for the same "reserves."

---

[29](...continued)
proceeding.

1    Moreover, Debtor asserts that it needs the Commingled Funds to
2    operate post-petition.  This Court should not destroy Debtor's
3    business to "protect" a creditor that is likely an unsecured
4    creditor, and in the same position as Debtor's other customer
5    creditors.

6        As far as this Court knows, enforcement of the Omnibus Order
7    is presently stayed under the Stay Order.  This is so because on
8    September 20, 2007, the Florida Court issued an order staying
9    proceedings against Debtor.  The Clarification Order vacated the
10   September 20, 2007 order.  The Stay Order stays the Clarification
11   Order, so the end result is that the Stay Order reinstated the
12   September 20, 2007 order that stays, <u>inter alia</u>, enforcement of the
13   Omnibus Order.  At this point, this Court is not inclined to issue
14   a stay that is duplicative of the stay of the Eleventh Circuit.
15   Should there currently be no such stay or should the status of a
16   stay of the enforcement of the Omnibus Order change, any party may
17   request further relief from this Court for good cause based on
18   facts that are not currently before this Court.

19       **b.  Unblocking the Blocked Account**

20       Based on the record before the Court, Debtor's request for
21   authority to unblock the Blocked Account is denied through
22   December 14, 2007.  On December 7, 2007 at 10:00 a.m., the Court
23   will hold a further hearing on whether to unblock the Blocked
24   Account as of December 14, 2007.  Any party may request that the
25   Blocked Account be unblocked prior to that time for good cause
26   based on facts that are not currently before this Court.

27       Debtor concedes that pursuant to Debtor's projected budgets,
28   Debtor does not need to use the funds in the Blocked Account until

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    58

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    December 14, 2007.  In reviewing Debtor's budget, Debtor projects

2    incurring litigation expenses related to the Florida Action, in the

3    amount of $333,333 for each week ending November 2, 2007,

4    December 7, 2007, and January 4, 2008.  This Court has stayed the

5    Enforcement Action against FTC through March 14, 2008, and the

6    Eleventh Circuit has stayed the Clarification Order.  The Eleventh

7    Circuit Stay Order effectively reinstates the Florida Court's

8    September 20, 2007 order stating that the automatic stay applies to

9    all aspects of the Florida Action, and so the Stay Order stays all

10   other proceedings against Debtor in the Florida Action.  Thus,

11   unless this Court's order is overturned, the $666,666 that Debtor

12   projects to spend in legal fees for the Florida Action between

13   November 2, 2007 and December 7, 2007 is moot.  Adding those funds

14   back into Debtor's budget means that Debtor should have sufficient

15   cash flow until the week ending December 21, 2007.

16        However, that is not the end of the analysis.  It is this

17   Court's understanding that part of the reason that Debtor's budget

18   indicates that Debtor will have insufficient cash flow as of the

19   week ending December 21, 2007 is based on Debtor's new post-

20   petition practice of holding funds equivalent to post-petition

21   collected and unremitted funds owed to customers.  Adding the

22   projected legal fees back into Debtor's pre-petition settlement

23   cash balance and retaining all other assumptions, Debtor will have

24   a deficit of $167,962 in funds held related to Debtor's obligations

25   to customers for collected and unremitted funds for the week ending

26   December 21, 2007 and a deficit of $185,556 in such funds for the

27   week ending December 28, 2007.  After that time, Debtor's

28   projections indicate that Debtor will have sufficient funds to

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    59

1   cover Debtor's new post-petition practice of holding such funds.

2   If this Court's understanding is incorrect or Debtor needs to use

3   those funds, Debtor can always request further relief from this

4   Court for good cause based on facts that are not currently before

5   this Court or if Debtor believes the Court misunderstands the facts

6   before it.

7       The Court acknowledges Debtor's new commitment to addressing

8   an issue that resulted in Debtor's bankruptcy filing, namely

9   Debtor's pre-petition use of funds withheld during the settlement

10  process for Debtor's general operating expenses.  Thus, on the

11  balance sheet it appears that Debtor would have a deficit.

12  However, it appears possible that Debtor would for two weeks have a

13  deficit of less than $200,000 in an account that holds funds to be

14  paid to customers at a later time.  If that were true, would there

15  be a sufficient basis for this Court to unblock the over $1.7

16  million in funds held in the Blocked Account to provide a reserve

17  of less than $200,000 in case Debtor were required to remit

18  unremitted funds to customers?  By December 7, 2007, the Court and

19  all parties will have several more weeks of actual post-petition

20  financial information from Debtor, so a more accurate assessment of

21  Debtor's actual need for the funds in the Blocked Account can be

22  made.  In any event, as noted above, should Debtor need the partial

23  or full use of the funds in the Blocked Account for a period of

24  time, the Court will consider such a request at the December 7,

25  2007 hearing.  Moreover, should Debtor need use of the funds in the

26  Blocked Account prior to the December 7, 2007 hearing, Debtor may

27  request such relief before that hearing.

28

CONCLUSION

For the foregoing reasons, the Enforcement Action against Debtor is enjoined through March 14, 2008. On March 7, 2008 at 1:00 p.m., the Court will hold a further hearing on whether the preliminary injunction of the Enforcement Action should be continued beyond March 14, 2008. Any supplemental papers in support of continuing the preliminary injunction of the Enforcement Action after March 14, 2008 shall be filed and served by February 22, 2008. Any opposition shall be filed by February 29, 2008. Either FTC or Debtor may request that the preliminary injunction be lifted before March 7, 2008 for good cause based on facts that are not currently before this Court.

Based on the Stay Order, this Court will deny without prejudice Debtor's request for a preliminary injunction of the enforcement of the Omnibus Order. Should there currently be no such stay or should the status of a stay of the enforcement of the Omnibus Order change, any party may request further relief from this Court for good cause based on facts that are not currently before this Court.

Debtor's request for authority to unblock the Blocked Account is denied through December 14, 2007. On December 7, 2007 at 10:00 a.m., the Court will hold a further hearing on whether to unblock the Blocked Account as of December 14, 2007. Any supplemental papers in support of unblocking the Blocked Account at that time shall be filed and served by November 27, 2007. Any opposition shall be filed by December 3, 2007. Any party may request that the Blocked Account be unblocked prior to that time

1  for good cause based on facts that are not currently before this

2  Court.

3      Counsel for Debtor shall submit a form of order consistent

4  with this decision after review by FTC and Receiver as to form.

5

6  Dated:  November 2, 2007

7

8

9  _____

ARTHUR S. WEISSBRODT

10  UNITED STATES BANKRUPTCY JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    62

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   Court Service List

2   The Billing Resource
    5883 Rue Ferrari
3   San Jose, CA 95138

4   Michael Ahrens, Esq.
    Steven B. Sacks, Esq.
5   Jeffrey K. Rehfeld, Esq.
    Sheppard, Mullin, Richter and Hampton
6   4 Embarcadero Center 17th Fl.
    San Francisco, CA 94111
7
    David R Chase
8   c/o Tew Cardenas LLP
    Attention Jeffrey C. Schneider
9   Four Seasons Tower, 15th Floor
    1441 Brickell Avenue
10  Miami, FL 33131-3407

11  Jeffrey Schneider, Esq.
    Tew Cardenas LLP
12  Four Seasons Tower, 15th Floor
    1441 Brickell Avenue
13  Miami, FL 33131-3407

14  Steven J. Schwartz, Esq.
    Danning, Gill, Diamond and Kollitz
15  2029 Century Park E 3rd Fl.
    Los Angeles, CA 90067
16
    Federal Trade Commission
17  c/o Laura Kim
    600 Pennsylvania Ave., N.W.
18  Room H-238
    Washington, DC 20580
19
    Julie A. Mack, Esq.
20  Michael Mora, Esq.
    Collot Guerard, Esq.
21  Richard McKuen, Esq.
    Federal Trade Commission
22  600 Pennsylvania Ave. N.W.
    Washington, DC 20580
23
    Kathryn S. Diemer, Esq.
24  Diemer Whitman & Cardosi, LLP
    75 East Santa Clara Street, Suite 290
25  San Jose, CA 95113-1806

26  Walter K. Oetzell, Esq.
    Danning, Gill, Diamond & Kollitz, Llp
27  2029 Century Park East, Third Floor
    Los Angeles, CA 90067-2904
28

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    63

John D. Fiero, Esq.
Pachulski Stang Ziehl Young & Jones
3 Embarcadero Center, Suite 1020
San Francisco, CA 94111-5994

Jeff Garfinkle, Esq.
Buchalter Nemer
333 Market Street, 25th Floor
San Francisco, CA 94105-2130

Steven H. Warren, Esq.
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, Ca 90071-2899

James Pardo, Jr., Esq.
King & Spalding
1180 Peachtree Street, N.E.
Atlanta, GA 30309

Felton Parrish, Esq.
King & Spalding
1180 Peachtree Street, N.E.
Atlanta, GA 30309

Ken Dawson
5883 Rue Ferrari
San Jose, CA 95138

U.S. Trustee
Office of the U.S. Trustee
U.S. Federal Bldg.
280 S 1st St. #268
San Jose, CA 95113-3004

John S. Wesolowski, Esq.
Office of the United States Trustee
280 S 1st St. #268
San Jose, CA 95113-0002

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.

64