WILLIAM BLUMENTHAL
General Counsel

JOHN F. DALY
Deputy General Counsel - Litigation

JOHN ANDREW SINGER
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
Telephone: (202) 326-3234
Facsimile: (202) 326-2447
Email: jsinger@ftc.gov

ATTORNEY FOR FEDERAL
TRADE COMMISSION

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| THE BILLING RESOURCE d/b/a INTEGRETEL, <br><br> Debtor-Plaintiff-Appellee, <br><br> v. <br><br> FEDERAL TRADE COMMISSION et al., <br><br> Defendant-Appellant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) No. 5:07-CIV-5758-RMW <br> ) <br> ) <br> ) <br> ) <br> ) |

On Appeal from the United States Bankruptcy Court for
the Northern District of California, No. 07-52890, Adversary
Proceeding No. 07-5156 (Weissbrodt)

**REVISED EXHIBIT 25 TO
DEFENDANT-APPELLANT FEDERAL TRADE COMMISSION'S
COMBINED MOTIONS FOR STAY PENDING APPEAL
AND FOR CHANGE OF VENUE PURSUANT TO 28 U.S.C. § 1412**

Entered on Docket
**November 02, 2007**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

FILED

NOV 0 2 2007

CLERK
United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:                                    ]    Case No. 07-52890-ASW
                                          ]
THE BILLING RESOURCE, dba                 ]    Chapter 11
INTEGRETEL, a California                  ]
corporation,                             ]
                                          ]
                    Debtor.               ]
_____]
THE BILLING RESOURCE, dba                 ]    Adversary No. 07-5156
INTEGRETEL, a California                  ]
corporation,                             ]
                                          ]
                    Plaintiff,            ]
vs.                                       ]
                                          ]
FEDERAL TRADE COMMISSION, et al.,         ]
                                          ]
                    Defendants.           ]
_____]

MEMORANDUM DECISION RE ORDER TO SHOW CAUSE
REGARDING PRELIMINARY INJUNCTION

Before the Court is an Order to Show Cause ("OSC") why a

preliminary injunction should not issue enjoining the Federal Trade

Commission ("FTC") and David R. Chase ("Receiver"), not

individually, but solely in his capacity as receiver for Access One

Communications, Inc. ("Access One") and Network One Services, Inc.

("Network One")[1] from taking actions against The Billing Resource,

_____

[1] In addition to these two entities, Receiver is also the receiver for several other entities in
(continued...)

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.

1  dba Integretel ("Integretel" or "Debtor")[2] in the action captioned

2  Federal Trade Commission v. Nationwide Connections, Inc., et al.,

3  Case No. 06-80180-Civ-Ryskamp ("Florida Action") pending in the

4  United States District Court for the Southern District of Florida

5  ("Florida Court").  Debtor seeks to enjoin the FTC from prosecuting

6  the enforcement aspect of the Florida Action ("Enforcement Action")

7  against Debtor (and not against the other defendants in that

8  action) as well as enjoining the Receiver from implementing or

9  enforcing the Omnibus Order entered in the Florida Action on

10  September 14, 2007 ("Omnibus Order") (as it relates solely to

11  Debtor, and not to any other defendants).  Debtor also seeks to

12  unblock $1,762,762.56 currently held by Debtor in a blocked account

13  ("Blocked Account").  These funds were taken from Debtor's general

14  commingled funds and placed temporarily in the Blocked Account

15  pursuant to a stipulation between Debtor and Receiver -- at the

16  suggestion of the Court -- entered into at the September 26, 2007

17  hearing on Debtor's interim motion for use of cash collateral.

18      A hearing on the OSC was held on October 17, 2007 and the

19  matter has been submitted for decision.  Debtor is represented by

20  Michael H. Ahrens, Esq. and Steven B. Sacks, Esq. of Sheppard,

21  Mullin, Richter & Hampton, LLP.  FTC is represented by Michael P.

22  Mora, Esq. and Collot Guerard, Esq.  Receiver is represented by

23  Walter K. Oetzell, Esq. of Danning, Gill, Diamond & Kollitz, LLP

24  and Jeffrey C. Schneider, Esq. of Tew Cardenas LLP.  The Official

---

26  [1](...continued)
the litigation brought by FTC in which Receiver was appointed.  The only two receivership entities
27  that are relevant to these proceedings are Access One and Network One.

28      [2] This Court will use Integretel to differentiate actions taken by or events related to Debtor
that occurred pre-petition.

1  Committee of Unsecured Creditors ("Committee") is represented by

2  John D. Fiero, Esq. of Pachulski Stang Ziehl & Jones LLP.  Creditor

3  POL, Inc. is represented by Kathryn S. Diemer, Esq. of Diemer,

4  Whitman & Cardosi, LLP.  Creditor PaymentOne Corporation

5  ("PaymentOne") is represented by Stephen H. Warren, Esq. of

6  O'Melveny & Myers LLP.  Creditor United Online, Inc. is represented

7  by Jeffrey K. Garfinkle, Esq. of Buchalter Nemer.  BSG Billing

8  Solutions is represented by James A. Pardo, Jr., Esq. and Felton E.

9  Parrish, Esq. of King & Spalding LLP.

10      This Memorandum Decision constitutes the Court's findings of

11  fact and conclusions of law, pursuant to Rule 7052 of the Federal

12  Rules of Bankruptcy Procedure.

13

14                              I.

15                            FACTS

16  **A.   Debtor's Business**[3]

17      Debtor provides billing-related and other services for smaller

18  private telecommunications companies that compete with large local

19  exchange carriers ("LECs") in niche areas such as public pay

20  phones, hotels and prisons ("Alternative Operator Services").

21  Private telecommunications companies that provide Alternative

22  Operator Services have difficulty billing for "collect" and other

23  types of calls, since most individuals do not pay invoices from

24  these unknown companies and those companies cannot bill the

25  individuals through the individual's normal telephone bill.  Debtor

26

27

28      [3] While "Debtor" refers to the post-petition business entity and "Integretel"refers to the pre-petition business entity, the Court uses Debtor in the following section rather than Integretel because the section describes Debtor's business both pre- and post-petition.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  was created in 1988 to address this void in the marketplace.

2  Debtor has billing and collection agreements with an estimated

3  1,400 LECs -- both major local exchange companies and numerous

4  independents.  Debtor's infrastructure permits private

5  telecommunications providers to incorporate such providers' charges

6  into the phone bills of more than 90% of business and residential

7  consumers throughout the United States and Canada.

8      The typical service contract between Debtor and its service

9  provider customers provides that the customer submits to Debtor the

10  customer's billing transaction in a data format acceptable to

11  Debtor.  In the typical service contract, the customers acknowledge

12  that these billing transactions are structured as a purchase of

13  accounts receivable.  Debtor contends that its customers have no

14  ownership interest in the proceeds of the billing transaction after

15  the billing transactions are submitted to Debtor and its customers

16  hold only an unsecured claim against the distributions payable by

17  Debtor to the customer under the service contracts -- usually in 90

18  or so days.  The service contracts provide detailed formulas for

19  computing the amounts Debtor owes to its customers.  Debtor

20  maintains certain reserves for disputes, fees and other adjustments

21  as bookkeeping entries only.

22      The service contracts provide that each week Debtor transfer

23  by wire to its customers' bank accounts the net proceeds identified

24  in the prior week as defined by the service contracts.  This amount

25  is forwarded approximately 90 days after the submission of the

26  billing transaction.  Once Debtor receives a billing transaction,

27  Debtor submits the billing information to the LECs and the LECs in

28  turn bill the end user.  At varying intervals, the LECs make

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.          4

1  payments into Debtor's "wire in" account based on the billing

2  transactions previously submitted to the LEC.  Funds are

3  transferred into this account every day throughout the day.

4      Once a week -- typically on a Thursday -- Debtor settles its

5  accounts with its customers.  To settle accounts, Debtor disburses

6  funds from the "wire in" account to the "wire out" account.  The

7  "wire out" account is a zero balance account meaning that all funds

8  transferred into that account are generally transferred out to

9  several other accounts on the same day.  It is from these other

10  accounts that Debtor: (1) pays its vendors, employees and other

11  operating expenses; (2) collects taxes that Debtor is required to

12  collect in connection with Debtor's business; (3) makes payments to

13  LEC end users that are entitled to a cash voucher for a refund;[4]

14  and (4) holds excess funds, if any, from weekly settlements to

15  cover subsequent operating shortfalls including settlement

16  obligations that exceed available funds in the "wire in" account.

17      Debtor has approximately thirty-seven employees.  In 2000,

18  Debtor formed PaymentOne as a subsidiary to address the specialized

19  billing and support requirements of the internet.  Debtor owns 97%

20  of PaymentOne.  In 2002, Debtor formed another majority-owned

21  subsidiary known as Inmate Calling Solutions, LLC to target the

22  correctional industry and in 2004, Debtor formed yet another

23  majority-owned subsidiary known as Information Services 900 LLC to

24  target 900 call traffic.

25

26      [4] Certain individual or business consumers are occasionally entitled to a refund or a credit.

27  This results, inter alia, from an error in billing.  Debtor asserts that 95% of these cases are corrected
electronically through an automated credit transaction.  In the 5% of errors handled through the

28  issuance of a voucher to the consumer, the voucher -- redeemable for cash -- is drawn from the
voucher account.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    5

**B.  Florida Action**

On February 27, 2006, the FTC commenced the Florida Action in the Florida Court against three Alternative Operator Services providers as well as their principals (not Integretel or its principals) for alleged deceptive and unfair practices for unauthorized billing of charges on phone bills in violation of the Federal Trade Commission Act.  The FTC alleged that these defendants had defrauded consumers throughout the United States of more than $30 million by placing unauthorized collect call charges onto consumers' telephone bills.  At the request of the FTC, the Florida Court entered an *ex parte* temporary restraining order ("TRO") that shut down the defendants' alleged unlawful operation, froze the defendants' personal and corporate assets and appointed Receiver as temporary receiver for the corporate defendants.  Two of the corporate defendants -- Access One and Network One -- were prior customers of Integretel (collectively, "Prior Customers").  On March 8, 2006, a preliminary injunction was entered ("Preliminary Injunction") and Receiver was permanently appointed.

Both the TRO and the Preliminary Injunction provided, <u>inter alia</u>, that any business entity served with a copy of the TRO or Preliminary Injunction

> that holds, controls, or maintains custody of any account or asset of any Defendant, or has held, controlled or maintained custody of any such account or asset at any time since the date of entry of this Order, shall:
>
> A.  Hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, encumbrance, disbursement, dissipation, conversion, sale, or other disposal of any such asset except by further order of the Court;
>
> . . .

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   TRO at page 8; Preliminary Injunction at page 9.  The FTC asserts

2   that the FTC served Integretel with the TRO within days of the

3   entry of the TRO.

4        On March 6, 2006, Integretel's president, Ken Dawson,

5   submitted a letter to the FTC stating in relevant part that:

6   (a) Integretel had service contracts with the Prior Customers;

7   (b) pursuant to the service contract with the respective Prior

8   Customer, each Prior Customer was entitled to certain proceeds from

9   billing transactions; however (c) each Prior Customer was in

10  default under the service contract and no amounts were currently

11  due and owing.  Mr. Dawson noted that Integretel had not processed

12  any billing for Access One since May 2005 nor for Network One since

13  June 2003.  With respect to each Prior Customer, Mr. Dawson stated:

14  "[t]o the extent proceeds become due to [Prior Customer] in the

15  future, we will establish a separate bank account into which such

16  funds will be deposited and notify your office accordingly."[5]  Pre-

17  petition Integretel did not establish any such separate bank

18  account.

19       On September 21, 2006, the FTC filed an amended complaint

20  asserting claims against Integretel for Integretel's collection of

21  alleged fraudulent charges.  Specifically, the complaint asserts

22  that Integretel deceptively billed consumers for collect calls that

23  were never made, received or authorized.  In its complaint, the FTC

24  seeks a monetary judgment as well as multiple forms of non-monetary

25  relief such as a permanent injunction against pertinent law

26

27
_____
28  [5] Letter dated March 6, 2006 from Ken Dawson to Roberto Menjivar, Attachment B to Declaration of Laura Kim in Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction filed on October 1, 2007.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.              7

1  violations, "fencing-in" injunctive relief, rescission of contracts

2  and a claims procedure for consumer redress.  Integretel filed an

3  answer denying the FTC's allegations.  Integretel's principals were

4  not named in the amended complaint.

5      On October 16, 2006, Receiver filed a motion in the Florida

6  Court seeking to hold Integretel in contempt of court for

7  Integretel's alleged failure to turn over to the Receiver on behalf

8  of the Prior Customers certain "reserves" under the service

9  contracts with the Prior Customers in an alleged amount in excess

10  of $1.4 million.  Integretel opposed the motion on various grounds,

11  including: (a) Integretel did not hold any such reserves in a

12  separate account; (b) the service contracts in place with the Prior

13  Customers permitted Integretel to withhold certain monies owed to

14  the Prior Customers as "reserves"; and (c) Integretel was not

15  obligated to turn over those funds under the respective service

16  contracts.  Integretel also filed its own motions to modify the

17  Florida Court's injunctive orders and to stay the contract claims

18  pending arbitration.  A hearing on these motions was held on

19  April 12, 2007.

20      On September 14, 2007, the Florida Court entered the Omnibus

21  Order.  In the Omnibus Order, the Florida Court found that

22  Integretel held reserves in the amount of $1,762,762.56 on behalf

23  of the Prior Customers as of June 30, 2007 ("Commingled Funds").

24  The Florida Court stated that Integretel's assertion that the

25  "reserves" were not held as segregated funds but rather were kept

26  in a pooled account and tracked via an internal accounting entry

27  was "a distinction without a difference, since the TRO captures

28  funds 'held on behalf of, or for the benefit of, a Defendant.'"

1  Omnibus Order at 3.  The Florida Court noted that "[a]n entity need

2  not be an agent, partner, joint venturer, trustee, fiduciary, or

3  legal representative to possess funds that one is holding 'on

4  behalf of' another person or entity..."    Id.    The Florida Court

5  also rejected Integretel's arguments that Integretel could retain

6  the "Commingled Funds" to fund Integretel's assertion of an

7  indemnity claim or liquidated damages for breach of contract

8  against the Prior Customers.  Id. at 4.

9      Regarding Integretel's motions, the Florida Court denied

10  Integretel's request to stay the contract claims pending

11  arbitration of those claims pursuant to the service contract

12  arbitration clause, since the Florida Court concluded that Receiver

13  was not bound by the those clauses.  The Florida Court stated in

14  particular:

15      The Receiver's claim is not a claim at law governed by
pre-receivership contracts, however, but one governed by

16      this Court's jurisdiction over receivership property
based on the TRO and Amended Preliminary Injunction.  The

17      Receiver does not claim that the funds must be turned
over according to, or by adopting, a contract signed

18      between Integretel and Access One/Network One.  The
Receiver is seeking to recover the reserve funds pursuant

19      to the Court's in rem jurisdiction over receivership
property, as memorialized in the TRO and the Amended

20      Preliminary Injunction.

21  Omnibus Order at 4.  In response to Integretel's argument that the

22  TRO and Preliminary Injunction would be invalid if those orders

23  permitted the Florida Court to determine Integretel's ownership

24  interest -- or lack thereof -- in the Commingled Funds without a

25  new, separate legal proceeding, the Florida Court stated: "[i]ssues

26  concerning entitlement to disputed receivership property, in fact,

27  are the types of issues typically determined via summary

28  proceedings in the federal court equity receivership context."

1    Id. at 5.   The Florida Court rejected Integretel's arguments that

2    Integretel was deprived of due process when the Florida Court

3    issued the TRO and Preliminary Injunction and also rejected

4    Integretel's various arguments that those orders are invalid.   The

5    Florida Court also denied Integretel's request to modify those

6    orders.   Finally the Florida Court:

7           ORDERED AND ADJUDGED that the Receiver's Revised
       Motion for Order to Show Cause Why Integretel Should Not
8      Be Held in Contempt of Court, filed October 16, 2006 **[DE
       246]**, is GRANTED.   Integretel shall show cause in writing
9      within 10 days of the date of this Order why it should
       not be held in contempt for failure to turn over the
10     reserves.   In addition, Integretel shall provide a sworn
       statement identifying the amount of reserves as of the
11     issuance of the TRO.   The Court further orders that these
       funds shall be placed in a segregated Receivership
12     account.   It is further

13          ORDERED AND ADJUDGED that Integretel's Motion to
       Modify Prior Injunctive Orders, filed October 30, 2006
14     **[DE 294]**, is DENIED.   It is further

15          ORDERED AND ADJUDGED that Integretel's Motion to
       Stay Contract Claims, filed December 29, 2006 **[DE 363]**,
16     is DENIED. . . .

17   Omnibus Order at 10.   On September 16, 2007, promptly after

18   receiving the Omnibus Order, Integretel filed its bankruptcy

19   petition.

20        Debtor is one of seventeen defendants in the Florida Action.

21   Other than two pending motions regarding depositions, discovery is

22   complete in the Enforcement Action.[6]   Dispositive motions are

23   scheduled to be filed very soon -- by November 6, 2007, with

24   opposition to those motions to be filed by December 4, 2007, and

25   replies due by December 18, 2007.   Debtor asserts that Debtor will

26

27   ─────────────────

28     [6] Integretel filed a motion to continue one deposition and another billing aggregator
     defendant filed a motion requesting ten additional depositions.  The FTC opposed both motions and
     the Florida Court had not ruled on those motions as of October 15, 2007.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  not be filing any dispositive motions, but anticipates having to
2  respond to dispositive motions filed by other parties.  The FTC has
3  stated that the FTC _will_ seek summary judgment against Debtor.
4  Debtor asserts that a two- to four-week trial is set to commence in
5  the Florida Action on February 25, 2008.  The FTC predicts that the
6  FTC will prevail on the liability aspect in summary judgment and if
7  not, the FTC estimates that the trial will be no more than nine
8  days, and other defendants contend that the trial will take ten to
9  fifteen days at most.  The FTC does not contend that a preliminary
10 injunction against Debtor interferes with the FTC from proceeding
11 with the Enforcement Action against any of the other sixteen
12 defendants.

13      Debtor anticipates having to spend $821,600 in litigation
14 costs over the next six months related to depositions, discovery
15 motions, dispositive motions, other motions, pre-trial submissions
16 and trial.[7]  Debtor does not break out the estimated fees into the
17 various subcategories.  Debtor estimates that in addition to those
18 fees there will be an estimated $10,000 in fees for local counsel
19 and an estimated $50,000 to $75,000 in costs.[8]  In addition to
20 these estimated fees and costs, Debtor estimates that Debtor will
21 incur an additional $50,000 to $150,000 in fees related to
22 Receiver's request for turnover of the Commingled Funds.[9]

23
24
25
26      [7] Declaration of Neal Goldfarb in Support of Emergency Motion for Temporary Restraining
   Order and Preliminary Injunction filed on September 24, 2007 ("Goldfarb Dec.") at ¶¶ 5-6.
27
28      [8] Goldfarb Dec. at ¶ 7.

        [9] Goldfarb Dec. at ¶ 8.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.            11

**C.    Events since Debtor Filed Its Bankruptcy Petition**

As noted above, Debtor filed this chapter 11 bankruptcy case on September 16, 2007.  On September 17, 2007, Debtor filed a Notice of Bankruptcy in the Florida Action.  On September 18, 2007, this Court generated a Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines setting, <u>inter alia</u>, a meeting of creditors for October 17, 2007 and a deadline for filing a proof of claim for non-governmental units of January 15, 2008 and for governmental units of March 14, 2008.  On September 20, 2007, the Florida Court issued an order stating that the Florida Action was stayed by the automatic stay.

On September 21, 2007, the FTC filed an emergency motion for clarification that the automatic stay did not apply to the Enforcement Action and the contempt proceedings.  On the same day, without granting Debtor an opportunity to respond to the FTC's emergency motion either in writing or orally, the Florida Court issued its Order Granting Motion for Clarification as to Scope of Stay ("Clarification Order").  In the Clarification Order, the Florida Court stated that in the Omnibus Order the Florida Court had "ruled that the reserve funds are the property of the receivership estate and ordered Integretel to pay the current reserve funds, amounting to $1,762,762.56, immediately to the Receiver."  Clarification Order at 1.

Furthermore, the Florida Court held that Bankruptcy Code section 362(b)(4)[10] did not stay the Enforcement Action.  The

---

[10] Unless otherwise noted, all statutory references are to Title 11, United States Code, as amended in 2005 ("Bankruptcy Code").

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  Florida Court also stated with respect to the contempt proceedings

2  brought by the Receiver:

> Nor is the contempt proceeding stayed.  First, the
> automatic stay applies only to protect property of the
> bankruptcy estate or property of the debtor.  See
> 11 U.S.C. § 362(a)(2).  The Court has already ruled that
> the reserve funds are neither the property of the
> "bankruptcy estate" nor Integretel.  Second, the
> 11 U.S.C. § 362(b)(4) exception also applies to civil
> contempt proceedings brought by a governmental unit in
> the exercise of its police or regulatory powers.  See SEC
> v. Bilzerian, 131 F. Supp. 2d 10, 14 (D.D.C. 2001)(civil
> contempt proceeding falls within the exception;
> incarceration of debtor subsequent to failure to provide
> financial information as required by purgation provision
> in prior disgorgement order).  Finally, the bankruptcy
> filing does not deprive this Court of its inherent power
> to enforce the integrity of its orders.  "[C]ontempt
> orders to uphold the dignity of the court are excepted
> from the automatic stay."  NRLB v. Sawulski, 158 B.R.
> 971, 975 (E.D. Mich. 1993).

13  Clarification Order at 4.  Thus, even though the newly extant

14  bankruptcy estate had no opportunity to respond to the FTC's

15  emergency motion, the Florida Court granted the FTC's emergency

16  motion.  The Florida Court stated that the commencement of Debtor's

17  bankruptcy case did not stay the contempt proceedings against

18  Debtor or FTC's prosecution of the Enforcement Action and the

19  Florida Court vacated the September 20, 2007 order staying

20  proceedings against Debtor.

21      Also on September 21, 2007, this Court held a hearing on

22  Debtor's emergency motion for interim use of cash collateral and

23  Debtor's request for authority to maintain Debtor's pre-petition

24  bank accounts.  In its motion for interim use of cash collateral,

25  Debtor requested court authority to use cash collateral pursuant to

26  a stipulation with its secured creditor PaymentOne.  Debtor

27  asserted that PaymentOne was a secured creditor based on more than

28  $6.4 million PaymentOne had loaned to Debtor between October 18,

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  2006 and the petition date (the "new value" provided by PaymentOne,

2  in bankruptcy parlance).  The motion for authority to maintain

3  Debtor's pre-petition bank accounts was granted and the motion on

4  the interim use of cash collateral was continued to September 26,

5  2007.

6    Prior to the September 26, 2007 hearing, seven objections were

7  filed in opposition to Debtor's motion for interim use of cash

8  collateral.  Some of the oppositions raised questions regarding

9  Debtor's viability and ability to operate successfully as a going

10  concern.  Prior to and at the hearing, Debtor obtained the consent

11  of all parties to Debtor's use of cash collateral.  In particular,

12  Debtor and Receiver agreed to set up the Blocked Account whereby

13  Debtor agreed to deposit $1,762,762.56 of its commingled funds into

14  a blocked account and Debtor and Receiver agreed that the

15  establishment of the Blocked Account did not in any way affect the

16  merits of either parties' rights, claims or defenses with respect

17  to the funds in the Blocked Account.  Based in part on the consent

18  of all parties, this Court granted Debtor interim use of cash

19  collateral through October 15, 2007 and set a further hearing on

20  the use of cash collateral for that day.

21    In papers relating to the September 26, 2007 hearing and at

22  that hearing, Debtor informed this Court that negotiations were

23  underway for a possible sale of PaymentOne to a third party.

24  Debtor also requested the expedited appointment of the unsecured

25  creditors' committee so that Debtor would have an entity with which

26  Debtor could talk on a confidential basis with, and obtain the

27  opinions regarding, possible reorganization scenarios, including

28  the possible sale of PaymentOne.  On October 1, 2007, the United

1  States Trustee filed a notice that a committee of seven unsecured

2  creditors of Debtor had been appointed.  Two days later the

3  Committee selected the law firm of Pachulski Stang Ziehl & Jones

4  LLP as its counsel, subject to approval of this Court.  Within a

5  week, Debtor and the Committee executed a confidentiality

6  agreement; Debtor provided the Committee with various documents and

7  information requested by the Committee; and the Committee began the

8  process of analyzing that information.

9       On October 10, 2007, the Committee and Debtor participated in

10 a five hour face-to-face meeting.  Discussions at that meeting

11 included Debtor's financial information -- including projections,

12 claims against Debtor, Debtor's plan for post-petition pre-payment

13 to Debtor's pre-petition customers, Debtor's relationship with the

14 LECs, the status of the Florida Action, as well as plan of

15 reorganization issues.  At that meeting, the Committee agreed to

16 consent to Debtor's continued use of cash collateral through

17 November 2.  Debtor committed to negotiate with the Committee a

18 term sheet for a plan of reorganization contemplating a

19 continuation of Debtor's business operations with the goal of

20 allowing Debtor to exit bankruptcy as quickly as possible, while

21 maximizing the value to unsecured creditors.  The Committee stated

22 its intention to use the time between October 10 and November 2 to

23 conduct further due diligence on Debtor's assets, liabilities and

24 financial affairs in an effort to be in a better position to

25 evaluate an exit strategy for Debtor from bankruptcy.

26      On October 15, 2007, this Court held a second hearing on

27 Debtor's interim use of cash collateral.  In support of Debtor's

28 continued use of such cash collateral, Debtor submitted budgets

1    showing Debtor's actual and projected post-petition finances.

2    Debtor submitted one budget assuming that Debtor could use the

3    funds in the Blocked Account as well as the assumption that the

4    Enforcement Action and related proceedings were stayed.  Debtor

5    also submitted another budget without those assumptions.  Regarding

6    the projected $1 million in litigation expenses related to the

7    Florida Action, Debtor projected incurring $333,333 for the weeks

8    ending November 2, 2007, December 7, 2007, and January 4, 2008.

9    Debtor asserted at that hearing, and continues to assert, that

10   Debtor needs the funds in the Blocked Account and that without the

11   ability to use the funds in the Blocked Account, Debtor will not

12   have sufficient cash flow as of mid-December 2007.

13       Debtor's continued use of cash collateral again drew seven

14   objections, but the primary concern of the objecting creditors was

15   with respect to the alleged secured nature of their respective

16   claims, and not on Debtor's ability to stay in business.  In

17   addition, as noted above, Debtor's continued use of cash collateral

18   had the support of the Committee.  On October 16, 2007, this Court

19   granted Debtor's continued interim use of cash collateral.  A

20   hearing for final authority for Debtor to use cash collateral is

21   set for November 2, 2007.

22       Meanwhile, on October 1, 2007, Debtor requested additional

23   time -- until November 15, 2007 -- to file its schedules of assets

24   and liabilities ("Schedules") and statement of financial affairs

25   ("Statement").  In its application, Debtor noted the size and

26   complexity of Debtor's business operations, coupled with the

27   limited number of employees, who, in addition to their regular

28   duties, were capable of preparing the Statement and Schedules.  On

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1　October 23, 2007, this Court granted Debtor's request.  Debtor's

2　Schedules and Statement are currently due on November 15, 2007.

3　　　On October 2, 2007, Debtor sought a temporary restraining

4　order from this Court enjoining the Enforcement Action and seeking

5　an order to show cause for the issuance of a preliminary

6　injunction.  At that hearing, this Court denied Debtor's request

7　for a temporary restraining order of the Enforcement Action on the

8　basis that for the period from October 2, 2007 through October 17,

9　2007, Debtor had not demonstrated that the threatened injury to

10　Debtor outweighed the harms of a temporary restraining order

11　against the FTC.[11]  However, the Court found that there was cause to

12　issue the OSC and the OSC was issued as to why a preliminary

13　injunction should not issue.

14　　　On October 11, 2007, Debtor filed in the Eleventh Circuit a

15　motion for an immediate interim stay of the Clarification Order in

16　as far as that order held that the Florida Action -- other than the

17　Enforcement Action -- was not automatically stayed.  On October 17,

18　2007, the Eleventh Circuit temporarily granted Debtor's motion

19　pending further order of the court ("Stay Order").

20

21　　　　　　　　　　　II.

22　　　　　　　　　APPLICABLE LAW

23　　　　In the non-bankruptcy context, [the Ninth Circuit
24　has] consistently required trial courts deciding
　　preliminary injunction motions to balance the moving
25　party's likelihood of success on the merits and the

26　_____

27　　　[11] While Debtor originally sought a temporary restraining order against Receiver's continued
　　enforcement of the Omnibus Order, the stipulation at the September 26 cash collateral hearing that
28　resulted in the temporary establishment of the Blocked Account resolved that need to both parties'
　　satisfaction.

relative hardship of the parties.   The moving party must show:

> (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). Alternatively, a court may grant the injunction if the plaintiff demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor.

> As we have said many times regarding the two alternative formulations of the preliminary injunction test:   These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.   They are not separate tests but rather outer reaches of a single continuum.

<u>Save Our Sonoran, Inc. v. Flowers</u>, 408 F.3d 1113, 1120 (9th Cir. 2005) (citations and internal quotation marks omitted).

<u>Solidus Networks, Inc. v. Excel Innovations, Inc., (In re Excel Innovations, Inc.)</u>, --- F.3d ---, 2007 WL 2555941 at *5 (9th Cir. Sept. 7, 2007) (emphasis in original).   The usual preliminary injunction standard applies to stays of proceedings under 11 U.S.C. § 105(a) ("Section 105").   <u>Excel</u>, 2007 WL 2555941 at *7.   In <u>Excel</u>, a reorganization case, the Ninth Circuit stated that in granting or denying an injunction under Section 105, "a bankruptcy court must consider whether the debtor has a reasonable likelihood of a successful reorganization, the relative hardship of the parties, and any public interest concerns if relevant."   <u>Excel</u>, 2007 WL 2555941 at *7.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

III.

ANALYSIS

## A.   Reasonable Likelihood of a Successful Reorganization

In a reorganization context, a debtor seeking a stay against a non-debtor must show a reasonable likelihood of a successful reorganization.  Excel, 2007 WL 2555941 at *7.  This is not a high burden, id. at *8, and a strong showing on the likelihood of a successful reorganization lowers the burden to show irreparable harm.  Id. at *11.

The FTC argues that the Committee's unwillingness to consent to a final cash collateral order speaks volumes about Debtor's prospects -- or lack thereof -- of successfully reorganizing and that it remains to be seen whether this will be a "real" reorganization case.  Citing general statistics, the FTC asserts it is more likely that Debtor's case will fall into the 90% or more of chapter 11 cases that are converted to liquidations or dismissed. The FTC argues that overall the record at this point demonstrates that Debtor's fate hangs precariously in the balance and a liquidation scenario is more, or at least as likely as, a successful reorganization and Debtor has not shown by a preponderance of the evidence a likelihood of success on the merits.[12]

Receiver asserts that Debtor has not shown a likelihood of success on the merits on the basis that Debtor's support by the Committee fails to address the numerous objections by creditors

---

[12] A bankruptcy case may have an excellent result for creditors, even in a liquidation context. For example, a successful sale of a debtor's business and subsequent liquidation of that debtor's assets in a chapter 11 or a chapter 7 may result in a substantial distribution to creditors.

MEMORANDUM DECISION RE
    ORDER TO SHOW CAUSE, ETC.          19

1   claiming a security interest in Debtor's assets to Debtor's
2   continued use of cash collateral.  In addition, Debtor's strategy
3   over the near-term presupposes Debtor will be able to use the
4   Commingled Funds to fund Debtor's business operations, so Debtor
5   cannot show a likelihood of success on the merits.

6        The Court disagrees with the FTC and Receiver.  The Court
7   finds that, at this juncture, Debtor has made a strong showing that
8   Debtor has a reasonable likelihood of a successful reorganization.
9   It is very early in Debtor's bankruptcy case -- Debtor's bankruptcy
10  case is only six weeks old.  In that short period of time, Debtor
11  has obtained the confidence of its creditors that Debtor is a
12  viable business and has a reasonable likelihood of reorganizing
13  successfully.  This is demonstrated in several ways.  First,
14  following strenuous initial objections, Debtor's creditors
15  consented to Debtor's first interim use of cash collateral as soon
16  as Debtor demonstrated its viability to the objecting creditors.
17  Second, the LECs have for the most part continued to forward funds
18  to Debtor.  Third, in an effort to retain customers, Debtor is
19  negotiating with its customers to provide a 50% pre-payment of the
20  transferred accounts receivables at the time of transfer rather
21  than having the customers wait 90 days, as those customers did pre-
22  petition.  Debtor has obtained the Committee's support of that
23  plan.  Fourth, the Committee is confident enough in Debtor's
24  prospects of reorganization that the Committee supported Debtor's
25  continued use of cash collateral for an additional three weeks to
26  enable the Committee and Debtor to work together on the terms of a
27  plan of reorganization.
28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    In addition, Debtor and Debtor's 97%-owned subsidiary

2  PaymentOne are diligently exploring both a reorganization with

3  Debtor and a sale of PaymentOne's business to prospective

4  purchasers.  The proceeds of such a sale could help Debtor fund a

5  plan of reorganization.  Alternatively, Debtor is exploring the

6  possibility of a pot plan providing a pro-rata distribution to

7  unsecured creditors or a plan that would have Debtor continue its

8  operations and issue new stock in exchange for Debtor's unsecured

9  debt.

10    At this early stage of Debtor's bankruptcy case, Debtor's

11  reasonable likelihood of a successful reorganization is evident

12  from the support of Debtor's creditors and the Committee, Debtor's

13  clear pursuit of several viable avenues of possible reorganization,

14  Debtor's projections of positive cash flow for the next six months,

15  Debtor's retention of its customers and the continued success of

16  Debtor's business.  Thus, Debtor has met its burden of showing a

17  reasonable likelihood of a successful reorganization.[13]

18  **B.    The FTC's Enforcement Action**

19    The parties do not dispute for the purposes of the current

20  dispute that, under Bankruptcy Code section 362(b)(4), the

21  automatic stay does not stay the Enforcement Action.[14]  However, the

22

[13] Although the issue is not presented here, a court might appropriately enjoin an enforcement action, like the FTC's, against a chapter 7 estate. The chapter 7 trustee might well convince the court not to allow the enforcement action to proceed until the trustee and the court knew what assets and liabilities there were in the estate. There would be no point, for example, in allowing an enforcement action seeking a monetary judgment to proceed if the estate did not have any money in it above the amount needed to pay administrative claims. There also might be no purpose in enjoining a chapter 7 debtor from engaging in certain business practices, if that debtor was out of business.

[14] While the Clarification Order in which the District Court held that Bankruptcy Code

(continued...)

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   FTC argues that this Court does not have authority to stay that

2   litigation against Debtor under Section 105. This Court disagrees.

3   Under In re First Alliance Mortg. Co., 264 B.R. 634 (C.D. Cal.

4   2001) ("FAMCO") and the myriad of authorities cited therein, this

5   Court has the legal authority to enjoin prosecution of governmental

6   actions against a debtor that falls within the regulatory and

7   police powers exception of Bankruptcy Code section 362(b)(4).

8   FAMCO, 264 B.R. at 652 n.18.

9        This Court may enjoin the prosecution of the Enforcement

10  Action under Section 105 if the Enforcement Action "threatens" the

11  assets of the bankruptcy estate. FAMCO, 264 B.R. at 652. Under

12  FAMCO, a Section 105 injunction could be appropriate against a

13  regulatory action in two types of situations.

14       First, a governmental action that seeks actual
         physical control over the assets of the debtor's estate
15       threatens the bankruptcy court's exclusive jurisdiction
         over the res of the debtor's estate and therefore can be
16       enjoined. . . .

17       Second, a § 105 injunction of a regulatory or police
         powers action could be appropriate in other circumstances
18       that severely threaten the integrity of the bankruptcy
         process. A few courts have enjoined regulatory or police
19       powers actions on the grounds that the costs of defending
         the actions at issue, both in terms of money spent on
20       lawyers' fees and time taken away from focusing on
         reorganization, were so high in comparison to the assets
21       of the estate that allowing the actions to continue
         constituted a "threat" to the estate. E.g., NLRB v.
22       Superior Forwarding, Inc., 762 F.2d 695, 698-99 (8th Cir.
         1985). Because the bankruptcy court has the obligation
23       to protect and marshal the estate's assets, a severe
         enough threat to the assets of the estate constitutes a
24       threat to the bankruptcy process.

25

26  _____

27  [14](...continued)
    section 362(b)(4) did not apply to the Florida Action is on appeal, in that appeal, Debtor has not
28  challenged that Order insofar as the Clarification Order holds that the Enforcement Action is not
    automatically stayed.

1  <u>Id.</u> at 655.  In balancing the hardships between the parties, "[a]

2  bankruptcy court must 'identify the harms which a preliminary

3  injunction might cause to defendants and ... weigh these against

4  plaintiff's threatened injury.'  <u>Caribbean Marine Servs. Co. v.</u>

5  <u>Baldridge</u>, 844 F.2d 668, 676 (9th Cir. 1988)(citation omitted)."

6  <u>Excel</u>, 2007 WL 2555941 at *9.

7      **1.   Harms to FTC**

8      The FTC articulates that the FTC would be harmed by the

9  granting of a preliminary injunction because the FTC only seeks

10 what the FTC terms as "equitable" relief in the Enforcement Action

11 and this Court cannot grant all of the relief requested by the

12 FTC.[15]  But there is no doubt that the FTC seeks to collect monies

13 from Debtor.  Specifically, the FTC seeks monetary injunctive

14 relief in the form of disgorgement of monies received from

15 consumers and restitution to the consumers.  In addition, the FTC

16 seeks a permanent injunction halting Debtor's allegedly unlawful

17 practices, rescission of contracts and a claims procedure to

18 provide restitution to the consumers who allegedly paid for

19 unauthorized charges on their phone bills.

20     The FTC also asserts that being enjoined from proceeding in

21 its chosen forum -- the Florida Court -- would harm the FTC in

22 other critical ways.  The FTC quotes extensively from <u>FAMCO</u> which

23 states in this regard:

24     [T]he hardship to the governmental units of not being
       allowed to proceed with their actions in their chosen
25     forums includes harms different in character from the

26 _____

27 [15] While this Court does not necessarily agree with the FTC that this Court could not grant
   all equitable relief requested by the FTC in the Enforcement Action, due to the limited nature of the
28 preliminary injunction being granted at this time, there is no reason for this Court to address the
   FTC's assertion.

1    harms normally considered on motions for injunctions
2    under § 105.  Being able to have a claim determined by
     the bankruptcy court is qualitatively different from
3    proceeding with a lawsuit in home forums.  As Congress
     recognized when it created the regulatory and police
4    powers exception, the goals of public policy, punishment,
     and deterrence may sometimes conflict with the goals of
5    maximizing an individual estate's assets and efficiently
     processing claims.  It is the former goals, which are
6    difficult if not impossible to measure in dollars and
     cents, that are impaired when a governmental unit loses
7    the ability to enforce its laws in its own forum.

8         Considering deterrence in particular, the harm to
     the governmental units must be measured with a broader
9    perspective in mind than these parties alone.  The
     bankruptcy court and First Alliance are undoubtedly
10   correct that there will be more money to distribute to
     borrowers in this case if the separate actions are not
11   allowed to proceed.  However, the governmental units are
     entitled to make the choice that, over time, similarly
12   situated borrowers and consumers benefit more when
     companies do not violate the law in part because they
13   know that bankruptcy will not provide a way out when
     their wrongs are discovered.  In any given case,
14   reasonable minds could disagree about the marginal costs
     and the marginal benefits of different approaches and
15   which will maximize the wealth and happiness of the
     greatest number of people.  The point is that it is the
16   governmental units charged with enforcing consumer
     protection laws, governmental units that are responsive
17   to the political will of the people, that should be the
     ones to make the choice, not the bankruptcy court.

18   FAMCO, 264 B.R. at 659.

19        The FTC asserts that the FTC's need for permanent injunctive

20   relief is particularly acute here because the FTC needs permanent

21   injunctive relief from the Florida Court barring Debtor's allegedly

22   unlawful business practices.  The FTC asserts that the FTC's

23   pursuit of phone billing aggregators such as Debtor is a vital

24   enforcement strategy that the FTC has pursued to curb the allegedly

25   insidious and unlawful practice of placing unauthorized charges on

26   consumers' phone bills.  During the past nine years, the FTC has

27   filed numerous actions against telephone billing aggregators and

28   has obtained injunctive and monetary equitable relief.  The FTC

1  notes that this is not the first time that the FTC has sued Debtor

2  (the previous suit was settled) and some of Debtor's current

3  customers were recently prosecuted by state attorneys general for

4  placing unauthorized charges on consumers' phone bills and other

5  alleged deceptive trade practices.

6      **2.   Harms to Debtor**

7      Debtor has filed a chapter 11 bankruptcy petition.  "The

8  purpose of title 11 protection is to allow an entity to

9  'restructure ... finances' and enter a plan of reorganization so

10  that it is able to 'continue to operate, provide its employees with

11  jobs, pay its creditors, and produce a fair return for its

12  stockholders.'"  <u>CFTC v. NRG Energy, Inc.</u>, 457 F.3d 776, 779 (8th

13  Cir. 2006) (internal citation omitted).  Said a different way,

14  "[t]he purpose of Chapter 11 reorganization is to assist

15  financially distressed business enterprises by providing them with

16  breathing space in which to return to a viable state."  <u>In re</u>

17  <u>Little Creek Dev. Co.</u>, 779 F.2d 1068, 1073 (5th Cir. 1986) (quoting

18  <u>In re Winshall Settlor's Trust</u>, 785 F.2d 1136, 1137 (6th Cir.

19  1985)).  Here "Debtor 'is a real company with real debt, real

20  creditors and a compelling need to reorganize in order to meet

21  these obligations' and is therefore, exactly the type of debtor for

22  which chapter 11 was enacted."  <u>In re Dow Corning Corp.</u>, 244 B.R.

23  673, 677 (Bankr. E.D. Mich. 1999), <u>aff'd</u>, 255 B.R. 445 (E.D. Mich.

24  2000) (internal citation omitted).  In determining irreparable

25  injury to Debtor, this Court must consider the impact of permitting

26  the Enforcement Action to proceed against Debtor at this point in

27  Debtor's bankruptcy case.

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   Debtor raises two main harms that would cause irreparable

2   injury should this Court not preliminarily enjoin the Enforcement

3   Action.  First, Debtor anticipates having to spend over $900,000 in

4   fees and costs over the next six months in the Enforcement Action.

5   Debtor estimates it will incur $821,600 in litigation fees related

6   to depositions, discovery motions, dispositive motions, other

7   motions, pre-trial submissions and trial.  In addition, Debtor

8   estimates that there will be an estimated $10,000 in fees for local

9   counsel and an estimated $50,000 to $70,000 in costs.  Debtor's

10  budgets show that Debtor will not be able to operate on an

11  administratively solvent[16] basis if Debtor is forced to incur these

12  substantial fees over the next six months.

13      The FTC argues that Debtor overestimates its costs to defend

14  against the Enforcement Action.  The FTC asserts that the

15  declaration of Neal Goldfarb submitted by Debtor in support of its

16  request lacks sufficient detail to support Debtor's proposed

17  estimate.  Moreover, the FTC argues that the estimate overstates

18  the amount of estimated trial time and fails to consider that some

19  of the issues in the Enforcement Action will be narrowed, if not

20  eliminated, by summary judgment since the FTC's position is that

21  the uncontested facts establish Debtor's liability.

22      The FTC further contends that the relevant comparison under

23  FAMCO is not between Debtor's costs of defending itself against the

24

---

25      [16] In a chapter 11 bankruptcy case, all post-petition obligations have administrative priority

26  status. This means that those claims are paid prior to most other claims in a bankruptcy estate,
    namely other priority claims and pre-petition unsecured claims. In addition, those claims must be

27  paid in full on the effective date of a confirmed plan of reorganization. The effective date is usually
    30 days after an order confirming a plan of reorganization is entered, but can be in as few as eleven

28  days. To stay administratively solvent, a debtor would insure that debtor retains sufficient cash
    reserves on hand to pay all administrative claims in full on the effective date of a plan.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    26

1  FTC in the Florida Court or not defending itself at all, but rather

2  between Debtor defending itself in the Florida Court and defending

3  itself in this Court.  According to the FTC, unless the Enforcement

4  Action is concluded as to Debtor, the same facts will have to be

5  litigated in this Court to establish a bankruptcy claim against

6  Debtor.[17]  Moreover, under the recently enacted changes to the

7  Bankruptcy Code, the FTC can pursue a non-dischargeability action

8  against Debtor for the FTC's monetary claim.  Finally, the FTC

9  alleges that it would pursue the <u>non-monetary</u> aspects of the

10  Enforcement Action after confirmation of Debtor's plan.  <u>NRG</u>

11  <u>Energy</u>, 457 F.3d at 780-81 (holding that a bankruptcy court has no

12  authority to enjoin a government agency from bringing a post-

13  confirmation enforcement action against a reorganized debtor for

14  injunctive relief against future law violations).[18]

15      The FTC does not address the second harm raised by Debtor: the

16  impact of the continuation of the Enforcement Action on Debtor's

17  reorganization efforts.  Debtor has relatively few employees and

18  Debtor's president, Mr. Dawson -- one of the founders of Debtor --

19  is and will continue to be very closely involved in Debtor's

20  defense in the Enforcement Action.  Mr. Dawson is also the main

21  contact for all of Debtor's reorganization efforts in addition to

22

23  [17] This argument is incorrect, or at least premature, because the Court is only enjoining the
    Enforcement Action for a few months and has not determined whether the Enforcement Action will

24  be adjudicated in the Florida Court or in this Court, if it ultimately needs to be adjudicated at all.  It
    might well settle in the bankruptcy context in connection with a plan of reorganization or otherwise.

25  In this connection, the desire of the post-petition Debtor and the FTC to resolve their disputes may
    be significantly greater than the situation before Debtor filed for bankruptcy.

26      Furthermore, even if the matter were tried in the bankruptcy court, this Court would

27  determine when the trial should take place.

28  [18] However, as noted, Debtor and the FTC may well settle those disputes in the context of
    Debtor's plan of reorganization or otherwise.

1  his duties overseeing normal operational issues.  The bankruptcy

2  filing unsettled Debtor's customers and Debtor is working on a

3  proposed pre-payment plan whereby Debtor would pay 50% of the

4  receivables represented by post-petition billing submissions.

5  Because this is a new program, the program will be time-consuming

6  to implement and monitor.  In addition, Mr. Dawson needs to be

7  available to work with Debtor's reorganization counsel, the various

8  secured and unsecured creditors, the Committee and the United

9  States Trustee.

10      Further, the Committee supports Debtor's use of cash

11  collateral through November 2, 2007.  In exchange, Debtor has

12  committed to negotiate with the Committee a term sheet for a plan

13  of reorganization contemplating a continuation of Debtor's business

14  operations with the goal of allowing Debtor to exit bankruptcy as

15  quickly as possible.  Debtor is also monitoring the possible sale

16  of PaymentOne to a third party.

17      Finally, upon Debtor filing its chapter 11 bankruptcy

18  petition, Debtor became a "debtor-in-possession." As a debtor-in-

19  possession, Debtor acts as a fiduciary to the bankruptcy estate and

20  owes a duty of care and loyalty to the bankruptcy estate's

21  creditors.  In re McConville, 110 F.3d 47, 50 (9th Cir. 1997).

22  Thus, Debtor thus is a new entity with different and additional

23  responsibilities, concerns and pressures than it had when Debtor

24  operated solely as Integretel.  Debtor, the Committee and Debtor's

25  other creditors need time to evaluate the merits and strengths of

26  the FTC's positions and decide whether the bankruptcy estate should

27  try to settle the Enforcement Action with the FTC.  Giving Debtor

28  and Debtor's creditors a few months to do that is critical at this

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  juncture -- particularly in the context of negotiating a plan of

2  reorganization.

3      3.    **Balancing of the Harms and the Public Interest**

4      Based on the unique facts of this case and in consideration

5  of the relative hardship of the parties and the public interest

6  concerns, the Court finds that continued prosecution of the

7  Enforcement Action severely threatens the integrity of the

8  bankruptcy process and Debtor's prospects for reorganization and a

9  preliminary injunction of the Enforcement Action against Debtor

10 through March 14, 2008 is warranted.  On March 7, 2008 at

11 1:00 p.m., the Court will hold a further hearing on whether the

12 preliminary injunction of the Enforcement Action should be

13 continued beyond March 14, 2008.  Either the FTC or Debtor may

14 request that the preliminary injunction be lifted before March 7,

15 2008 for good cause based on facts that are not currently before

16 this Court.

17     The FTC is concerned that this Court's granting of a

18 preliminary injunction against the Enforcement Action will set a

19 precedent that a defendant can escape prosecution for committing

20 deceptive and unfair trade practices by simply filing for

21 bankruptcy.  The Court is keenly aware of the FTC's concern and

22 that is not what this Court intends.  Rather, it is the unusual

23 convergence -- almost a perfect storm -- of the trial schedule in

24 the Enforcement Action and the critical first few months of a

25 viable chapter 11 bankruptcy case that warrant a limited

26 preliminary injunction at this time.

27     First, the next several months are a critical time for Debtor

28 in its effort to reorganize, and the immediate continuation of the

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    29

1  Enforcement Action seriously threatens Debtor's ability to
2  reorganize.  Debtor has only 37 employees to service its 58 pre-
3  petition customers and manage Debtor's relations with over 1400
4  LECs.  Moreover, Debtor's president, Mr. Dawson, is and will
5  continue to be closely involved in Debtor's defense in the
6  Enforcement Action.  If the Enforcement Action is not temporarily
7  stayed, Mr. Dawson would be required to divert his time and
8  attention from Debtor's reorganization between November 6 and
9  December 4, 2007 to assist Debtor's counsel in the Enforcement
10  Action in preparing an opposition to a motion for summary judgment
11  that the FTC has stated it will file against Debtor.  There may
12  also be eleven or more additional depositions in which Debtor will
13  need to participate if the Florida Court grants the pending motions
14  requesting additional discovery.  In addition, Mr. Dawson will be
15  required to fly to Florida during February 2008 to prepare for and
16  participate in the trial in the Enforcement Action scheduled to
17  commence on February 25, 2008.[19]  The diversion of Debtor's
18  management -- and Mr. Dawson in particular -- in defending the
19  Enforcement Action during the next few months seriously threatens
20  Debtor's reorganization.

21      Mr. Dawson is the main contact for all of Debtor's
22  reorganization efforts in addition to his duties overseeing normal
23  operational issues.  Debtor's reorganization efforts -- especially
24  at this early stage of Debtor's bankruptcy case -- are time-
25  consuming.  First, under the Bankruptcy Code, Debtor is required to

---

[19] The trial situation could possibly change if FTC does file a summary judgment motion and it is granted in part or in full.  However, Debtor will still need to prepare for trial because Debtor cannot know in advance what the result will be of any as yet to be filed FTC motions.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  obtain court approval for the use of its cash collateral post-

2  petition.  This is a marked difference from how Debtor operated

3  pre-petition.  Pre-petition Debtor could use any cash that came

4  into Debtor's accounts subject only to claims of various creditors.

5  Post-petition, however, Debtor must obtain the consent of all

6  creditors who have an interest in that cash collateral or court

7  approval for the use of that cash collateral.  In this instance,

8  the Court has approved Debtor's use of cash collateral on an

9  interim basis at three-week intervals.  Debtor has scheduled a

10  final hearing for use of cash collateral for November 2, which

11  depending on the status of its negotiations with its creditors,

12  Debtor may or may not change to another interim request for use of

13  cash collateral.

14      It is not unusual in a chapter 11 bankruptcy case for a debtor

15  to seek multiple interim requests for use of cash collateral while

16  a debtor negotiates with secured and unsecured creditors for final

17  consent to a debtor's use of cash collateral.  In the early stages

18  of a bankruptcy case, creditors are getting up to speed regarding a

19  debtor's business operations and the relative likelihood of

20  recoveries for creditors pursuant to various reorganization

21  proposals.  During this time, creditors, debtors and the bankruptcy

22  court strike a balance among the parties' interests and grant

23  limited permission for a debtor to use post-petition cash

24  collateral until the parties are comfortable with a debtor's plans

25  to operate and can resolve a debtor's use of cash collateral on a

26  final basis.  The early, limited permission to use cash collateral

27  is in part why a chapter 11 bankruptcy case is so time-intensive

28  for a debtor, and indeed all parties in the early stages.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    31

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    Second, the bankruptcy filing unsettled Debtor's customers and
2  Debtor is actively working on a proposed pre-payment plan whereby
3  Debtor would pay 50% of the receivables represented by post-
4  petition billing submissions.  This is a marked change from
5  Debtor's pre-petition operations where Debtor paid its customers
6  approximately 90 days after the billing transactions were submitted
7  to Debtor.  Because the pre-payment program is new, Mr. Dawson and
8  Debtor's other employees will have to spend a great deal of time
9  implementing and monitoring the new program.

10    Further, the Committee was appointed on October 1, 2007 and on
11  October 10, 2007, the Committee had a five hour face-to-face
12  meeting with Debtor.  At that meeting the Committee supported
13  Debtor's use of cash collateral through November 2, 2007 and in
14  exchange Debtor has committed to negotiate with the Committee a
15  term sheet for a plan of reorganization contemplating a
16  continuation of Debtor's business operations with the goal of
17  allowing Debtor to exit bankruptcy as quickly as possible.  Debtor
18  is also monitoring the possible sale of PaymentOne to a third
19  party.  Mr. Dawson is a, and probably _the_, critical participant in
20  those discussions and negotiations.

21    Finally, Debtor has complex business operations and over 1,200
22  creditors on its creditor matrix.  Due to the size and complexity
23  of Debtor's business operations, Debtor requires -- and has been
24  granted -- additional time to complete its Schedules and Statement
25  of Financial Affairs.  Those documents are currently due on
26  November 15, 2007.  The Schedules consist of seven separate
27  schedules that require Debtor to: (a)  list in detail all real and
28  personal property, the value of each piece or category of property,

and the security interest held against that property; (b) provide
separate lists of Debtor's creditors -- secured creditors, priority
unsecured creditors and unsecured creditors that includes an
address for each creditor, information regarding when the claim was
incurred and consideration for the claim, whether the claim is
contingent, unliquidated or disputed, and the amount of the claim;
(c) provide a detailed list of all executory contracts and
unexpired leases; and (d) provide a list of all entities that are
co-debtors with Debtor.  The Statement requires Debtor to answer
twenty-five questions in detail regarding Debtor's financial
affairs.  The questions require Debtor to detail, _inter alia_, all
payments or transfers Debtor made in the 90 days immediately
preceding the commencement of the case that aggregate more than
$5,475 to any creditor, and all payments or transfers Debtor made
within one year immediately preceding the commencement of the case
to any creditor that is an insider (all of the majority-owned
subsidiaries of Debtor are considered to be insiders).

Based on these projected activities, Debtor's management --
and Mr. Dawson in particular -- will spend the next few months
dealing with Debtor's customers and creditors, completing Debtor's
Schedules and Statement, negotiating with the Committee over the
terms for a plan of reorganization and, if successful, most of
November and early December will be spent negotiating a draft plan
of reorganization and overseeing the preparation of a proposed
disclosure statement.  Both of these documents will require
substantial amounts of time on the part of Mr. Dawson and Debtor's
other personnel.  The plan of reorganization is Debtor's contract
with its creditors as to how Debtor intends to restructure itself

1  using the Bankruptcy Code.  In addition, the proposed disclosure

2  statement is similar to a prospectus and will require, <u>inter alia</u>,

3  a description of Debtor's background, the events that caused Debtor

4  to file its bankruptcy case, what has changed such that Debtor will

5  be able to complete its proposed plan of reorganization, a

6  description of the proposed plan, and financial projections in

7  support of the plan if Debtor proposes to present a plan that

8  permits Debtor to operate as a going concern.  Debtor must submit

9  its proposed disclosure statement to this Court for approval.  11

10  U.S.C. § 1125(b).  Such activities will consume a huge portion of

11  the available time of Debtor's management over the next few months.

12      However, should Debtor be required to proceed to trial in the

13  Enforcement Action at the end of February 2008, Mr. Dawson and

14  other of Debtor's personnel will be required to travel to Florida

15  and spend many days -- if not weeks in the case of Mr. Dawson --

16  preparing for and participating in the trial in the Enforcement

17  Action.  This activity will take place at a critical juncture of

18  Debtor's bankruptcy case where Debtor should instead be seeking

19  confirmation of a plan of reorganization.  Debtor is committed to

20  proposing a plan of reorganization on an expeditious basis.  Under

21  the notice requirements of the Bankruptcy Code and Rules, it is

22  highly likely that Debtor will seek approval of a disclosure

23  statement during January 2008, and could set a confirmation hearing

24  on a proposed plan of reorganization during February or March 2008.

25      Confirmation of a chapter 11 plan requires an enormous amount

26  of work for both a debtor and its counsel.  In addition to

27  resolving and addressing any objections by any parties to approval

28  of a disclosure statement and confirmation of a plan, this Court

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  has an independent duty to ensure that a disclosure statement

2  contains adequate information, In re Main Street AC, Inc., 234 B.R.

3  771, 774 (Bankr. N.D. Cal. 1999), and an affirmative duty to ensure

4  that a plan satisfies all sixteen requirements of Bankruptcy Code

5  section 1129 for confirmation.  In re Ambanc La Mesa Ltd. P'ship.,

6  115 F.3d 650, 653 (9th Cir. 1997).  Just one of the requirements is

7  that this Court must determine that confirmation of Debtor's plan

8  will not likely be followed by the liquidation or further financial

9  reorganization. 11. U.S.C. § 1129(a)(11).  Mr. Dawson will almost

10 certainly be required to testify before this Court as to Debtor's

11 plan and the financial projections on which it is based, as well as

12 other evidence this Court requires to confirm any proposed plan

13 submitted for confirmation by Debtor.

14      In addition to the impact of the Enforcement Action on

15 Debtor's president and other personnel, it would be highly

16 injurious to Debtor and Debtor's prospects for reorganization if

17 Debtor had to spend the bulk of the estimated $1 million in legal

18 fees and costs associated with the Enforcement Action during this

19 same critical period.  Such an outlay of funds at a critical time

20 of confirmation would seriously impair, if not strike a death

21 knell, to Debtor's prospects for a reorganization.  Debtor is

22 required under the Bankruptcy Code to pay all administrative claims

23 as of the effective date of a confirmed plan. 11 U.S.C.

24 § 1129(a)(9)(A).  Debtor may well not have sufficient funds to both

25 pay the litigation costs of defending the Enforcement Action and

26 pay administrative claims on the effective date of a confirmed

27 plan.

28

1    The FTC likely holds only a pre-petition unsecured claim
2  against Debtor in the Enforcement Action.  Any monetary claims FTC
3  asserts against Debtor arise only from Debtor's alleged pre-
4  petition placing of unauthorized collect call charges onto
5  consumers' telephone bills.  There is no showing that at this point
6  there is any reason for Debtor to spend $1 million litigating an
7  unsecured claim in the next five months.  First, at this juncture
8  it is unclear what unsecured creditors will receive in Debtor's
9  reorganization and it is unknown if spending $1 million to defend
10 against the FTC's claims makes sense, especially in this case where
11 secured and other unsecured creditors desperately need for all
12 resources to be devoted to Debtor's reorganization efforts.
13 Second, over the next five months Debtor may negotiate a resolution
14 of the FTC's claims without the need for litigation.  This Court is
15 not determining at this juncture where the FTC's claims will be
16 liquidated.  Rather, this Court is merely delaying briefly the
17 Enforcement Action against Debtor only.[20]  It is this Court's
18 experience that in chapter 11 cases such as Debtor's, a debtor
19 typically negotiates with the various creditors to reach a
20 consensus as to the structure of a plan of reorganization.  It is
21 generally less expensive and easier if a debtor can negotiate a
22 plan of reorganization than if a debtor has to confirm a plan of
23 reorganization over the objections of numerous creditors.  At the
24 early stages of Debtor's case and under the facts of this case, a
25 preliminary injunction of limited duration is warranted.
26
27    [20]This Court's decision stays the Enforcement Action against Debtor for a few months.  This
28 decision does <u>not</u> determine whether (1) the FTC may recommence the Enforcement Action in the
Florida Court after those few months, or (2) whether the FTC should be required to pursue Debtor by
filing a claim with, and litigating that claim in, the bankruptcy court.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    36

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    By limiting the duration of the preliminary injunction and
2  requiring Debtor to provide further updated evidence in mid-
3  February 2008 to support the continued injunction of the
4  Enforcement Action, this Court eliminates or at least reduces
5  substantially the alleged harms of the FTC.  The FTC cites three
6  harms from a possible injunction of the Enforcement Action: (1) the
7  inability of the FTC to obtain the non-monetary equitable relief it
8  seeks against Debtor; (2) the inability of the FTC to pursue the
9  claims in the Enforcement Action against Debtor in the Florida
10  Court; and (3) the public interest in permitting the FTC to pursue
11  a vital enforcement strategy to curb the unlawful practice of
12  placing unauthorized charges on consumers' phone bills.  However,
13  this Court has not eliminated, and is not eliminating, the
14  possibility that at a later date this Court would permit the FTC to
15  prosecute the Enforcement Action in the Florida Court, including
16  the ability of the FTC to obtain the non-monetary equitable relief
17  it seeks against Debtor.  The FTC itself notes that it will seek
18  such relief against Debtor post-confirmation.  This Court is merely
19  delaying for a few months the FTC's prosecution of the Enforcement
20  Action against Debtor.  No decision has yet been made as to where
21  the FTC's claims will be litigated if indeed those claims need to
22  be litigated at all.

23    Granting a preliminary injunction of limited duration also
24  renders premature the FTC's argument that this Court must consider
25  Debtor's costs of Debtor defending itself in the Florida Court and
26  defending itself in this Court rather than Debtor's costs of
27  defending itself against the FTC in the Florida Court or not
28  defending itself at all.  First, Debtor will not likely be

1    prosecuting an objection to the FTC's claim in the next few months.

2    Indeed, March 14, 2008 is the claims bar date for governmental

3    units in Debtor's bankruptcy case. Thus, for this limited duration

4    preliminary injunction, Debtor almost certainly will not incur any

5    costs defending itself in this Court against the FTC's claims.[21]

6    **C.    Contempt Proceedings and Turnover Action**

7        **1. Debtor's Ability to Sue the Receiver**

8        Receiver argues that this Court lacks subject matter

9    jurisdiction over this adversary proceeding as to Receiver because

10   Debtor has not obtained permission from the Florida Court to bring

11   this action -- or any action -- against Receiver. Receiver asserts

12   that for over 100 years, legal authority holds that a litigant must

13   obtain permission from the court appointing a receiver before

14   bringing an action against that receiver. Carter v. Rodgers, 220

15   F.3d 1249, 1252 (11th Cir. 2000) (holding that under Barton v.

16   Barbour, 104 U.S. 126 (1881), a debtor must obtain leave from the

17   bankruptcy court before the debtor can initiate an action in

18   district court against a bankruptcy-court appointed trustee for

19   breach of fiduciary duties); In re Crown Vantage, Inc., 421 F.3d

20   963, 970 (9th Cir. 2005) (a bankruptcy-court appointed trustee of a

21   liquidating trust cannot be sued in a foreign jurisdiction for

22   violating a settlement agreement without the permission of the

23   court appointing the trustee).

24       Debtor asserts that the Barton doctrine applies only if Debtor

25   were suing Receiver for dereliction of duties, which Debtor is not

26   doing in this adversary proceeding. Moreover, Debtor argues that

27   Crown Vantage stands for the proposition that Debtor does not need

28

    [21] See footnote 17, supra.

1  leave from the Florida Court to sue Receiver in this instance

2  because this Court has exclusive in rem jurisdiction to determine

3  the property of Debtor's bankruptcy estate and the injunctive

4  relief requested by Debtor is a stay specifically designed to

5  protect the assets of the bankruptcy estate, so the Barton doctrine

6  is not invoked.

7        This Court agrees with Debtor that once Debtor filed its

8  bankruptcy petition on September 16, 2007, this Court obtained

9  exclusive in rem jurisdiction over the property in Debtor's

10 bankruptcy estate, and particularly over any legal and equitable

11 interest Debtor held in the Commingled Funds as of the commencement

12 of the case.  While none of the parties or this Court have found

13 any cases directly on point, the Court finds Gilchrist v. General

14 Elec. Capital Corp., 262 F.3d 295 (4th Cir. 2001), particularly

15 instructive.

16       In Gilchrist, Spartan International, Incorporated and its

17 subsidiaries (collectively, "Spartan") closed their doors for

18 business.  Spartan's major creditor ("GE") commenced a state law

19 debt-collection action invoking the diversity jurisdiction of the

20 district court of South Carolina ("South Carolina Court").  To

21 facilitate the foreclosure of the creditor's lien, the South

22 Carolina Court appointed a federal receiver for all of Spartan's

23 assets ("Receiver Order").  The Receiver Order enjoined all persons

24 from commencing or prosecuting any action, suit or proceeding that

25 affected the receivership estate or Spartan.  Gilchrist, 262 F.3d

26 at 297-98.

27       One week later and with actual notice of the Receiver Order,

28 50 creditors ("Georgia Creditors") filed an involuntary bankruptcy

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  petition in the bankruptcy court in the Southern District of
2  Georgia ("Georgia Court") and a request for the appointment of an
3  interim bankruptcy trustee.  GE objected to the appointment of an
4  interim bankruptcy trustee and filed a motion to dismiss the
5  involuntary bankruptcy petition or transfer venue to the district
6  of South Carolina.  The receiver filed a similar motion.  Following
7  a hearing, the Georgia Court overruled the objections, denied the
8  motions and appointed an interim bankruptcy trustee.  Gilchrist,
9  262 F.3d at 298.

10      While that hearing was in progress, the receiver obtained a
11  temporary restraining order from the South Carolina Court enjoining
12  38 of the Georgia Creditors from undertaking any action in
13  furtherance of the involuntary bankruptcy petition.  Four days
14  later the South Carolina Court found the Georgia Creditors in
15  contempt of the Receiver Order and allowed the Georgia Creditors to
16  purge their contempt by withdrawing the bankruptcy petition.  The
17  interim bankruptcy trustee argued that the automatic stay precluded
18  the South Carolina Court's actions, but the South Carolina Court
19  refused to recognize the automatic stay of its proceedings.  The
20  South Carolina Court asserted that it had jurisdiction to determine
21  the scope of the automatic stay, and it had the authority to issue
22  an injunction to prevent the collateral attack of that court's
23  Receiver Order appointing the receiver.  In an effort to purge
24  their contempt, the Georgia Creditors subsequently filed a petition
25  in the Georgia Court to withdraw the involuntary petition, which
26  the Georgia Court denied.  The Georgia Court stayed further
27  proceedings pending a review of the South Carolina Court's orders
28  by the Fourth Circuit.  Gilchrist, 262 F.3d at 298-99.

Entered on Docket
November 02, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    In reviewing the South Carolina Court's orders, the Fourth

2  Circuit noted that the South Carolina Court was within the scope of

3  that court's equitable powers in appointing the receiver and

4  asserting in rem jurisdiction over Spartan's assets, even those

5  located in other districts.  Gilchrist, 262 F.3d at 302.  However,

6  once the Georgia Creditors filed the involuntary bankruptcy

7  petition,

8        [b]y virtue of the jurisdictional provisions of the
        United States Code, and the commencement of a bankruptcy
9        case against Spartan, the bankruptcy court obtained
        "exclusive jurisdiction of all of the property, wherever
10       located, of [Spartan] as of the commencement of such
        case, and of property of the estate."  28 U.S.C.
11       § 1334(e) (emphasis added).  In addition, the filing of
        the petition in bankruptcy "operates as a stay,
12       applicable to all entities, of the ... continuation ...
        of a judicial, administrative, or other action or
13       proceeding against the debtor that was commenced before"
        the bankruptcy petition.  11 U.S.C. § 362(a)(1).  To give
14       effect to its jurisdiction, the bankruptcy court is given
        broad equitable powers, see 11 U.S.C. § 105, with
15       nationwide service of process, see Bankr. R. 7004(d).

16  Gilchrist, 262 F.3d at 303.

17       The Fourth Circuit then found that the South Carolina Court

18  had properly determined that the South Carolina Court had

19  jurisdiction to determine its own jurisdiction and the scope of the

20  automatic stay.  However, the Fourth Circuit stated that:

21       The [South Carolina] court provided no explanation of
        why, as a matter of equity, the bankruptcy process was
22       not superior to a receivership in the liquidation of a
        large business, with assets in several jurisdictions and
23       with thousands of creditors, some of whom were claiming
        liens superior to the lien relied upon by GE when it
24       initiated the receivership proceeding.  More importantly,
        it provided no explanation of why the terms of § 362(a)
25       were not applicable.

26       Similarly, in their briefs and arguments presented
        to us, counsel for GE and the receiver advanced no
27       exception to § 362(a) that would be applicable.  Instead,
        they argued for a "first-filed" principle, urging that
28       the court which first takes custody of assets for
        liquidation should be given priority.

We cannot agree.  Our examination of the Bankruptcy Code reveals that Congress intended that the bankruptcy process be favored in circumstances such as these.  Section 1334(e) of title 28 is unequivocal in its grant of exclusive jurisdiction to the bankruptcy court, and § 362(a) imposes an automatic stay on all proceedings merely upon the filing of a bankruptcy petition.  If we were to frustrate these express provisions to further a first-filed policy, we would have to deny bankruptcy jurisdiction to every bankruptcy court in which foreclosure proceedings had already commenced against the debtor's property, on the grounds that the *in rem* nature of the foreclosure proceeding precludes the bankruptcy court from taking custody of the *res*.  Such a jurisdictional limitation on bankruptcy proceedings would severely limit the efficacy of bankruptcy.  In the absence of express language suggesting that Congress intended for bankruptcy jurisdiction to be so limited, we believe it would frustrate Congressional intent to imply such a limitation based solely on consideration of a first-filed policy.

Even if general equitable principles could modify the application of statutory jurisdictional grants, we do not believe that the equities favor the common-law receivership process over the highly developed and specific bankruptcy process.  The procedural requirements for liquidating a large corporation with thousands of creditors, many of whom might challenge the priority of liens and the adequacy of asset sales, present a task that would push the receivership process to its limits.  *See* [In re Baldwin-United Corp. Litigation], 765 F.2d [343, 348 (2nd Cir. 1985)] ("[T]o whatever extent a conflict may arise between the authority of the Bankruptcy Court to administer this complex reorganization and the authority of the District Court to administer consolidated pretrial proceedings, the equities favor maintenance of the unfettered authority of the Bankruptcy Court").  In this case it can be seen, even from the initial transactions in the receivership, that the customized receivership mechanisms are wanting in comparison with established bankruptcy process.  For example, when the receiver in this case sold a mill in Georgia for $4.2 million, the creditors had no advance notice of the transaction, and some have challenged the adequacy of compensation, proffering evidence that the mill was worth over $20 million.  More important to the Georgia creditors in this case, the district court did not have in place a mechanism to adjudicate the relative priority of liens.  GE claims a first lien by reason of its perfected security interest in most of the assets of Spartan and proffered an order by which the proceeds of liquidation would be paid to it as the superior lien holder.  But Spartan's employees claim a prior statutory lien in assets produced by them at the manufacturing plants at which they worked, as created by state law.

1    While they surely could file claims in the receivership,
2    the process for making and adjudicating such claims was
     not spelled out.

3    Gilchrist, 262 F.3d at 303-04.

4        While the facts in this case differ from those in Gilchrist --

5    the action in the Florida Court is an enforcement action rather

6    than an action to foreclose on collateral, and Debtor is not the

7    receivership entity as in Gilchrist, there are two primary

8    principles that apply here.  First, as noted in Gilchrist, once a

9    bankruptcy petition is filed, section 1334(e) of title 28 is

10   unequivocal in its grant of exclusive jurisdiction to the

11   bankruptcy court over all property, wherever located, of Debtor as

12   of the commencement of such case.  28 U.S.C. § 1334(e).  Property

13   of the bankruptcy estate includes all legal or equitable interests

14   of a debtor in property as of the commencement of the case.

15   11 U.S.C. § 541(a)(1).  Bankruptcy Code section 542 also provides

16   that entities -- other than custodians -- in possession, custody or

17   control of property that a debtor-in-possession may use, sell, or

18   lease under Bankruptcy Code section 363 shall deliver and account

19   for such property to that debtor, unless the property is of

20   inconsequential value or benefit to the estate.  11 U.S.C.

21   § 542(a).  Bankruptcy Code section 543 provides that a custodian

22   shall turn over property of the debtor unless excused by the

23   bankruptcy court.  11 U.S.C. §§ 543(b), (d).

24       Here Receiver asserts that because the Florida Court found in

25   the Omnibus Order that Integretel held "reserves" in the amount of

26   $1,762,762.56 on behalf of the Prior Customers as of June 30, 2007,

27   Integretel was required to turn over the Commingled Funds to

28   Receiver.  However, the Commingled Funds were nothing more than

1  Integretel's commingled funds and were not any particular or

2  identifiable *res*, and the Florida Court did not find that a *res*

3  existed.   In fact the Omnibus Order does not require Integretel to

4  pay any specific amount of funds to Receiver.  Rather, in order to

5  comply with the Omnibus Order, Debtor would have to pay Receiver

6  out of Debtor's general account the "reserves" the Florida Court

7  determined Integretel held on behalf of the Prior Customers (the

8  Florida Court described such "reserves" but did not quantify them).

9  Integretel did not turn over any commingled funds to Receiver pre-

10 petition and Debtor did not segregate any such funds in any fashion

11 pre-petition.  As of the petition date, Debtor retained an interest

12 in all of its commingled funds and Receiver asserted an interest in

13 some as yet unquantified portion of those funds.   On the petition

14 date, this Court obtained exclusive jurisdiction over all of the

15 commingled funds under section 1334(e) of title 28.   Accord In re

16 Simon, 153 F.3d 991, 996 (9th Cir. 1998).[22]

17       It is this exclusive grant of in rem jurisdiction that

18 precludes the application of the Barton doctrine in this particular

19 set of circumstances.   Crown Vantage points out that

> [p]art of the rationale underlying Barton is that the
> court appointing the receiver has in rem subject matter
> jurisdiction over the receivership property.  As the
> Supreme Court explained, allowing the unauthorized suit
> to proceed "would have been a usurpation of the powers
> and duties which belonged exclusively to another court."
> (Citations and footnote omitted).

---

[22] Because there is no pre-petition *res*, it is difficult to understand how the Commingled Funds could not be property of the bankruptcy estate.  This Court is not reviewing the Florida Court's decision in the Omnibus Order; that decision is on appeal to the Eleventh Circuit. However, this Court is of the opinion that the bankruptcy court has exclusive jurisdiction over what constitutes property of the estate.  See Section III.C.2 of this decision, infra.  In any event, the Court must consider Debtor's likelihood of success on the merits on this issue in considering the stay issues currently before the Court.

1    Crown Vantage, 421 F.3d at 971. It is the unique situation here --

2    where the exclusive in rem jurisdiction over the Commingled Funds

3    passed from the Florida Court to this Court upon Debtor filing its

4    bankruptcy petition -- that eliminates Debtor's need to request

5    leave from the Florida Court before suing Receiver in this

6    adversary proceeding.

7    　　　The parties dispute the precise implication of the Omnibus

8    Order. Receiver and the FTC assert that the Omnibus Order

9    determined in a final appealable order that the Commingled Funds

10   were property of the receivership estate and Debtor had no interest

11   in the Commingled Funds at the time Debtor commenced this

12   bankruptcy case. Receiver bases this argument on the premise that

13   the Florida Court ordered the turnover of Commingled Funds.

14   　　　Outside of bankruptcy, Receiver could perhaps compel adherence

15   to the Omnibus Order regardless of whether any actual, segregated

16   funds existed from which to make the payment ordered by the Florida

17   Court. However, once Debtor filed for bankruptcy protection, the

18   Omnibus Order command could only be enforced at the expense of all

19   other creditors of Debtor -- secured and unsecured -- other than

20   Receiver. This distinction is usually discussed in the context of

21   a constructive trust remedy, where courts have often expressed that

22   the "privileging of one unsecured claim over another clearly

23   thwarts the principle of ratable distribution underlying the

24   Bankruptcy Code." In re Flanagan, -- F.3d --, 2007 WL 2915812, *8

25   (2d Cir. Oct. 9, 2007).

26   　　　The Ninth Circuit has recognized this distinction for more

27   than 40 years. In Elliot v. Bumb, 356 F.2d 749, 754-55 (9th Cir.

28   1966), the Ninth Circuit refused to allow state law to control

MEMORANDUM DECISION RE
 ORDER TO SHOW CAUSE, ETC.                45

1  whether a creditor would be entitled to claim that a trust existed

2  over a debtor's commingled funds because the state law yielded to

3  bankruptcy law and bankruptcy law requires tracing.  The Ninth

4  Circuit has followed that case in Matter of Esgro, Inc., 645 F.2d

5  794, 798 (9th Cir. 1981); In re North American Coin & Currency,

6  Ltd., 767 F.2d 1573, 1575 (9th Cir. 1985); and In re Advent

7  Management Corp., 178 B.R. 480, 488 (9th Cir. BAP 1995), aff'd,

8  104 F.3d 293 (9th Cir. 1997).  As noted in Flanagan, the "equities

9  in bankruptcy are not the equities of the common law."  Flanagan,

10  2007 WL 2915812 at *8 (quoting XL/Datacomp, Inc. v. Wilson (In re

11  Omegas Group, Inc.), 16 F.3d 1443, 1452 (9th Cir. 1994)).

12      Thus, the Omnibus Order is likely, at most, nothing more than

13  a money judgment determining Debtor's purported liability to the

14  receiver.[23]  While it is based on the concept that Receiver had a

15  property interest in Debtor's bank accounts as of the issuance of

16  the TRO, the Omnibus Order does not and could not call for the

17  turnover of any specific, identifiable property in Debtor's bank

18  accounts as of the TRO.  Rather the Omnibus Order merely directs

19  Debtor to pay over the amount of Debtor's "reserve" liability from

20  any funds Debtor has available to it.  Receiver never claimed that

21  Receiver can trace the funds received by Debtor from the Prior

22  Customers to an identifiable fund that still exists.  Rather,

23  Receiver correctly interprets the payment order as being a judgment

24  commanding the payment of an as yet unquantified amount of money.

25      Debtor filed its bankruptcy petition while the Commingled

26  Funds remained in Debtor's bank account.  Debtor has demonstrated a

27

28      [23] It is not 100 percent clear that the Florida Court has determined that Receiver has a fully
liquidated final appealable judgment for money against Debtor.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    46

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   very strong likelihood of success on the merits -- that whether

2   measured at the outset of the Florida Action or as of the date of

3   the petition, Debtor holds no specific identifiable funds that can

4   be traced from the Prior Customers to Debtor's existing bank

5   accounts.   The determination that Receiver held an interest in the

6   Commingled Funds did not eliminate any interest Debtor's bankruptcy

7   estate had in the same funds.

8       To reclaim money or property from a bankruptcy estate on
        the basis that the property belongs to the reclaiming
9       party and not to the debtor, the reclaiming party must be
        able to definitively trace its property.  Even when
10      property is commingled, that property must be positively
        identified, or else the reclaiming party is relegated to
11      the status of a general unsecured creditor, regardless of
        the equities.  The manner in which the debtor or the
12      estate came into possession of the property is
        irrelevant. (Citations omitted.)
13

14  In re Graphics Technology, Inc., 306 B.R. 630, 635 (8th Cir. BAP),

15  aff'd, 113 Fed. Appx. 734 (8th Cir. 2004).  Thus, notwithstanding

16  any post-petition pronouncement by the Florida Court to the

17  contrary, the Commingled Funds are property of Debtor's bankruptcy

18  estate subject to whatever interest the Omnibus Order granted

19  Receiver in those funds -- along with the interests Debtor's other

20  secured and unsecured creditors assert in those funds.  Debtor can

21  sue Receiver without obtaining the permission of the Florida Court

22  here because any action by Receiver in furtherance of obtaining

23  possession of the Commingled Funds interferes with this Court's

24  exclusive in rem jurisdiction over those funds.

25      The second primary principle found in Gilchrist is that a

26  district court is limited in its ability to address competing

27  claims over the same assets.  As noted in Gilchrist, even where the

28  receiver held property of Spartan pursuant to the foreclosure

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.              47

1  action initiated by GE, the South Carolina Court did not have in

2  place a mechanism to adjudicate the relative priority of liens

3  against that property.  In this case, the Florida Court had

4  jurisdiction only over part of Debtor's property pre-petition --

5  i.e., some portion of the commingled funds in Integretel's bank

6  account.  At the time that the Florida Court entered the Omnibus

7  Order, the only parties before that court with respect to the

8  Commingled Funds were Receiver, Integretel and possibly the FTC.

9  The Florida Court could not and did not adjudicate the competing

10 claims to the Commingled Funds asserted by Debtor's secured and

11 unsecured creditors.

12    **2.    Bankruptcy Court Jurisdiction Over Property of the Estate**

13        Receiver and the FTC assert that the Florida Court determined

14 that the Commingled Funds were not property of Debtor in the post-

15 petition Clarification Order.[24]  In particular, the Florida Court

16 stated with respect to its determination that there was no

17 automatic stay in place as to the contempt proceedings that:

18        First, the automatic stay applies only to protect
          property of the bankruptcy estate or property of the
19        debtor.  See 11 U.S.C. § 362(a)(2).  The Court has
          already ruled that the reserve funds are neither the
20        property of the "bankruptcy estate" nor Integretel.

21 Clarification Order at 4.  The issue of the Florida Court's

22 jurisdiction to determine the scope of the automatic stay is not

23 before this Court.  However, as discussed above, once Debtor filed

24 its bankruptcy petition, the bankruptcy court has exclusive

25 _____

26     [24] The Clarification Order was issued post-petition.  If this Court is correct, that the Florida

27 Court had no jurisdiction to determine post-petition what property constitutes property of the estate,
   then the Florida Court lacked jurisdiction to issue that aspect of the Clarification Order.  The Court

28 considers this matter in the context of the stay issues before it, and not in review of the Florida
   Court.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    48

1  jurisdiction to determine what is property of the estate.

2  Gilchrist, 262 F.3d at 303 (once a bankruptcy petition is filed,

3  section 1334(e) of title 28 is unequivocal in its grant of

4  exclusive jurisdiction to the bankruptcy court over all property,

5  wherever located, of a debtor as of the commencement of such case).

6  Moreover, the pre-petition determination that Receiver held an

7  interest in the Commingled Funds did not eliminate any interest

8  Debtor's bankruptcy estate had in the same funds, especially since

9  those funds were not part of a specific pre-petition res.[25]  See

10  Graphics Technology, 306 B.R. at 635.  Thus, the post-petition

11  assertion by the Florida Court in the Clarification Order that the

12  Commingled Funds are not property of Debtor's bankruptcy estate

13  exceeded the Florida Court's post-petition jurisdiction over

14  property of Debtor's estate.[26]

15      **3.    Harms to Receiver**

16      Receiver asserts that several harms would occur should this

17  Court enjoin Receiver from implementing or enforcing the Omnibus

18  Order and/or unblock the funds held in the Blocked Account.

19  Primarily, Receiver argues that Debtor is attempting to interfere

20  with the administration of the receivership in seeking to enjoin

21  the enforcement of the Omnibus Order.  The purpose of the

22  receivership is to marshal and preserve the assets of the

23  receivership entities in order to return those assets to the

24

25      [25] The creation of the Blocked Account post-petition also does not create a pre-petition res
26  since Debtor and Receiver agreed that the temporary establishment of the Blocked Account did not
    in any way affect the merits of either parties' rights, claims or defenses with respect to the funds in
27  the Blocked Account.

28      [26] The Clarification Order is currently on appeal to the Eleventh Circuit, but that does not
    change this Court's legal analysis of the jurisdiction of the bankruptcy court.  See footnote 24, supra.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.              49

1  victims of the fraud. <u>Eller Industries, Inc. v. Indian Motorcycle</u>

2  <u>Manufacturing, Inc.</u>, 929 F. Supp. 369 (D. Colo. 1995); <u>Citibank,</u>

3  <u>N.A. v. Nyland (CF8) Ltd.</u>, 839 F.2d 93 (2d Cir. 1987).[27] In some

4  federal governmental enforcement actions, a federal district court

5  may appoint a receiver and issue a temporary restraining order

6  and/or preliminary injunction to preserve the assets that result

7  from the actions of the receivership entities -- whether held by

8  parties or non-parties -- to provide redress for the legitimately-

9  defrauded investor. <u>FTC v. Productive Marketing, Inc.</u>, 136 F.

10

11    [27] Receiver asserts that <u>Eller Industries</u> (a Colorado district court decision which is
12  distinguishable and not binding on this Court in any event) involves a stri[n]gingly similar set of facts.
   According to Receiver, the Colorado district court concluded that the Massachusetts bankruptcy
13  court's injunction could not be effective against a receiver appointed by the Colorado district court
   because the bankruptcy court's injunction interfered with the Colorado district court's mandated
14  obligations of the receiver -- who was a fiduciary of the Colorado district court and was responsible
15  for locating and protecting the assets of the receivership estate. The Colorado district court found
   that the purposes of the receivership can only be achieved by a stay of foreign equitable actions,
16  including the Massachusetts adversary proceeding.
17       This Court disagrees. The facts of <u>Eller Industries</u> are distinguishable and the legal
   proposition for which <u>Eller Industries</u> stands is not applicable to the instant case. In <u>Eller Industries</u>,
18  a chapter 7 trustee obtained a temporary restraining order against Indian Motorcycle Manufacturing,
   Inc. ("IMMI") precluding IMMI from soliciting funds by using a script "Indian" trademark. The
19  temporary restraining order enjoined IMMI from transferring, assigning, conveying, hypothecating or
20  encumbering -- except in the ordinary course of business -- any and all of IMMI's assets. Shortly
   thereafter, a federal receivership was established putting a receiver in as the only officer and director
21  of IMMI. After the federal receiver was appointed, the Massachusetts bankruptcy court converted
   the temporary restraining order into a preliminary injunction and the bankruptcy trustee asserted that
22  the preliminary injunction applied to the receiver. The Colorado district court held that the Colorado
   district court had exclusive jurisdiction over the assets and administration of the receivership
23  imposed on IMMI , only the Colorado district court could authorize equitable actions against the
24  receivership estate, and the bankruptcy court's preliminary injunction was not effective against the
   Colorado district court or the IMMI federal receivership.
25       In <u>Eller Industries</u> a bankruptcy trustee was enjoining a third party entity that itself was under
26  federal receivership. Such a pursuit was precluded by the federal receivership district court. Here,
   this Court is enjoining Receiver from dissipating property of Debtor's bankruptcy estate. Debtor is
27  not in receivership. As discussed in detail <u>supra</u>, once Debtor filed its bankruptcy petition, this Court
   obtained exclusive <u>in rem</u> jurisdiction over the Commingled Funds. No such transfer from the
28  bankruptcy estate to the IMMI federal receiver occurred in <u>Eller Industries</u>, and that case is
   distinguishable.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    Supp. 2d 1096, 1104-06 (C.D. Cal. 2001) (where the district court

2    found that the non-party's failure to turn over receivership funds

3    disrupted the district court's power to enforce its injunction and

4    the receiver's right to obtain such funds).  The Florida Action is

5    an enforcement action in which the FTC seeks injunctive relief

6    against Debtor -- among others -- for consumer redress for

7    deceptive and unfair practices for unauthorized billing of charges

8    on phone bills in violation of the Federal Trade Commission Act.

9    The Florida Court appointed Receiver, issued the Preliminary

10   Injunction and ordered Receiver, as the Florida Court's agent, to

11   locate, marshal and preserve receivership property.  Receiver

12   argues that if this Court enjoins Receiver from performing

13   Receiver's duties, this Court will also be enjoining the Florida

14   Court.  Receiver asserts that such a ruling would create an

15   unworkable, unthinkable, and grave conflict between this Court's

16   injunction order and the previously-issued orders of the Florida

17   Court.  However, that is not correct.  Bankruptcy courts enjoin

18   <u>parties</u> from proceeding outside of the bankruptcy court; they do

19   not normally enjoin any other <u>courts</u> from taking any action.  This

20   Court is not enjoining the Florida Court.

21        Receiver also argues that Debtor is merely seeking to re-

22   litigate the parties' disputes over the Commingled Funds as set

23   forth in the Omnibus and Clarification Orders.  Such re-litigation

24   is barred by res judicata.  According to Receiver, a review of the

25   Omnibus Order and the Clarification Order reveals that those orders

26   were not merely an interim measure to preserve the Commingled

27   Funds.  Rather those orders adjudicated <u>ownership</u> of the Commingled

28   Funds.  Moreover, the ownership issue is not predicated on whether

1    the FTC ultimately prevails in the Enforcement Action, and the
2    turnover provisions of the Omnibus Order and Clarification Order
3    are final, appealable orders.  The FTC contends that any issue that
4    Debtor has with those orders should be brought before the Eleventh
5    Circuit.  However, the bankruptcy court has exclusive in rem
6    jurisdiction post-petition over property of the estate, as well as
7    jurisdiction to determine what constitutes property of the estate,
8    so Debtor necessarily should be permitted to assert that position
9    in this Court.

10       Additionally, Receiver is concerned about the dissipation of
11   the Commingled Funds should the Blocked Account be unblocked.  If
12   Debtor were to spend the funds in the Blocked Account, the purpose
13   of the Omnibus Order will be thwarted.  Also, if this Court were to
14   enjoin Receiver and permit Debtor to use the Commingled Funds in
15   the operation of its business, this Court would be exercising
16   control over property under which the Florida Court has exclusive
17   in rem jurisdiction and this Court would effectively be determining
18   the interests in the Commingled Funds without a final order in an
19   adversary proceeding in contravention of Federal Rule of Bankruptcy
20   Procedure 7001(2).

21       Debtor contends that Receiver is adequately protected, even
22   assuming Receiver has a specific interest in the Commingled Funds.
23   Because this Court is not unblocking the Blocked Account at this
24   time, there is no need to address Debtor's argument that Receiver
25   is adequately protected by Debtor's total assets even if at a later
26   time Receiver were to demonstrate an interest in the Commingled
27   Funds and the Court were to consider whether to unblock all or some
28   of the funds in the Blocked Account.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

**4.  Harms to Debtor**

Debtor asserts that it will face irreparable injury if enforcement of the Omnibus Order is not enjoined[28] and if the Blocked Account is not unblocked.  First, Debtor's business will suffer very substantially and irreparably if Debtor is required to turn over $1,762,762.56 to Receiver under the Omnibus Order, particularly at this critical point in Debtor's reorganization efforts.  Debtor's estate will lose the over $1.7 million that appears to be property of the estate.  Those funds will not be available to Debtor or its creditors if they are turned over to Receiver.

Second, Debtor asserts that it needs those funds to maintain adequate cash reserves relating to its post-petition operations. This in part is due to a shift in Debtor's actions with respect to "unremitted" funds.  Specifically, under Debtor's pre-petition settlement process, when Debtor received payments from the LECs, Debtor would settle Debtor's obligations with its customers. Debtor had the right to retain some portion of those proceeds under the service contracts and pay the unremitted portion to the customer at a later time.  When Debtor withheld funds during the pre-petition settlement process, Debtor used those funds for its general operating expenses.  Post-petition, Debtor believes it is prudent for Debtor to retain sufficient cash to cover Debtor's possible administrative obligations to its customers to remit withheld funds to those customers, should Debtor have to remit those funds in the future.  Under its new post-petition policy to retain sufficient cash to cover the unremitted funds, Debtor

---

[28] Debtor asserted this argument prior to obtaining the Stay Order.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   requires additional excess cash to ensure the unremitted funds are

2   available to customers for billing transactions submitted post-

3   petition.

4       Receiver and the FTC both argue that based on Debtor's own

5   budgets, Debtor does not currently need the use of the funds in the

6   Blocked Account, at this time, so there is no basis for this Court

7   to release those funds.  Receiver and the FTC argue that Debtor has

8   made no attempt to supply any foundation for the financial figures.

9   Also, the budgets indicate that Debtor is never left without cash.

10  The total cash balance even during the monthly shortfalls never

11  falls below $3 million.  The question then arises as to whether the

12  claimed monthly shortfall in mid-December results from the

13  unsubstantiated legal costs related to the Enforcement Action, the

14  unexplained one-time drop in revenue in December, and/or the

15  unusual and questionable post-petition pre-payment arrangement.

16      In addition, as Debtor points out, such a turnover by Debtor

17  to Receiver of the funds in the Blocked Account would be a

18  preference of one unsecured creditor -- Receiver -- over all

19  similarly situated unsecured creditors.  The portion of the Omnibus

20  Order that requires Debtor to pay over the Commingled Funds likely

21  represents, at most, an ordinary judgment against Debtor which is

22  an unsecured claim in this bankruptcy estate.  From the issuance of

23  the TRO and Preliminary Injunction in the Florida Court to the

24  filing of Debtor's bankruptcy case, no money was set aside for

25  Receiver's claim.  The Omnibus Order requiring Debtor to pay over

26  to Receiver an amount denominated on Debtor's books as "reserves"

27  cannot create a property interest where none exists.  Debtor has

28  "reserve" amounts for each of Debtor's past and current customers,

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  and none of those customers are being afforded the right to invade

2  Debtor's bank account to retrieve funds that those customers might

3  wish to claim as their own.  Receiver's claim is not superior to

4  that of any other creditor, except that Receiver has obtained the

5  Omnibus Order from the Florida Court, which is currently on appeal

6  to the Eleventh Circuit.

7      In an effort to counter this alleged harm of Debtor, the FTC

8  argues that the Florida Court ruled in the Omnibus Order that the

9  Commingled Funds are property of the receivership estate and not

10  property of Integretel.  Moreover, Debtor's purported inability to

11  turn over the funds is a complete defense to contempt under FTC v.

12  Affordable Media, LLC, 179 F.3d 1228, 1239 (9th Cir. 1999), if that

13  defense can be established.  FTC argues that if Debtor prevails on

14  the inability to pay defense, Debtor will not have to turn over the

15  Commingled Funds and Debtor will not have the irreparable harm

16  Debtor alleges.  Alternatively, if Receiver ultimately prevails,

17  then there is also no cognizable irreparable harm because the

18  property of the receivership estate will have been rightly restored

19  to the receivership at no cost to Debtor's estate.

20      The FTC further argues that Debtor's claim for irreparable

21  harm rings especially hollow given that Debtor only has itself to

22  blame for any predicament in which Debtor now finds itself.  Debtor

23  was served with the TRO in March 2006 and had 18 months to organize

24  its financial affairs in order to comply with the TRO.  Debtor had

25  ample opportunity to seek clarification of the Florida Court TRO

26  and Preliminary Injunction, secure a letter of credit, borrow from

27  one of Debtor's affiliated companies, cut costs, or put money into

28  savings.  Instead, Debtor allegedly chose to ignore the TRO and

1  Preliminary Injunction, and Debtor should not now be heard to

2  complain about a harm that is in essence, self-inflicted.

3       Finally, Debtor will be harmed by incurring legal fees and

4  costs if enforcement of the Omnibus Order is not enjoined, as well

5  as the diversion of Debtor's management from the reorganization

6  process.  Debtor estimates that Debtor will incur an additional

7  $50,000 to $150,000 in fees related to Receiver's request for the

8  turnover of the Commingled Funds.  Receiver argues that the

9  contempt proceedings are largely complete and the orders are self-

10 executing.  However, the Omnibus Order is now on appeal.  If the

11 enforcement of the Omnibus Order is not enjoined, Debtor will have

12 to comply with the order to turn over the funds or show cause why

13 Debtor should not be held in contempt.

14     **5.    Balancing of the Harms and the Public Interest**

15      Even if the contempt proceeding is properly subject to the

16 exemption from the automatic stay under Bankruptcy Code

17 section 362(b)(4), this Court may enjoin the prosecution of the

18 contempt proceeding under Section 105 if the contempt proceeding

19 "threatens" the assets of the bankruptcy estate.  FAMCO, 264 B.R.

20 at 653.  A proceeding "that seeks actual physical control over the

21 assets of the debtor's estate threatens the bankruptcy court's

22 exclusive jurisdiction over the res of the debtor's estate and

23 therefore can be enjoined."  FAMCO, 264 B.R. at 655.[29]

24

25      [29] This Court is not reviewing the Florida Court's decision in the Clarification Order that the
26 contempt proceeding is exempt from the automatic stay under Bankruptcy Code section 362(b)(4);
   that is on appeal to the Eleventh Circuit.  The Florida Court determined that the contempt proceeding
27 was an exercise of the government's police or regulatory power, and therefore exempt from the
   automatic stay pursuant to Bankruptcy Code section 362(b)(4).  However, as this Court understands
28 the situation, neither the FTC nor any other government agency is a party to Receiver's contempt

(continued...)

#### a.  Enjoining Enforcement of the Omnibus Order

Once Debtor filed its bankruptcy petition a bankruptcy estate came into being.  Debtor is a debtor-in-possession and is a fiduciary to all of Debtor's creditors -- inter alia, secured creditors, unsecured creditors, customers, the FTC and Receiver. Receiver certainly does not represent all creditors of Debtor's estate.  At most Receiver represents the receivership estates of the Prior Customers and the FTC.  Receiver does not seek to have the Commingled Funds turned over to him to protect those funds for all creditors of Debtor's bankruptcy estate.  Rather, Receiver seeks possession of those funds for the benefit of the receivership estates of the Prior Customers, to the exclusion of Debtor's other secured and unsecured creditors.

Although the Florida Court issued the Omnibus Order, Receiver -- in the shoes of the Prior Customers -- is no different from nearly all of Debtor's customers.  The typical service contract provides for Debtor to maintain certain reserves for disputes, fees and other adjustments.  These "reserves" on behalf of the Prior Customers were the "reserves" that were the subject of the Omnibus Order.  It is undisputed that the "reserves" were held as bookkeeping entries and not as segregated funds.  Permitting Receiver to implement the Omnibus Order would irreparably harm Debtor's bankruptcy estate by preferring one creditor -- Receiver -- over other similarly situated creditors of Debtor, since most if not all service contracts provide for the same "reserves."

[29](...continued)
proceeding.

MEMORANDUM DECISION RE
  ORDER TO SHOW CAUSE, ETC.          57

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   Moreover, Debtor asserts that it needs the Commingled Funds to
2   operate post-petition.  This Court should not destroy Debtor's
3   business to "protect" a creditor that is likely an unsecured
4   creditor, and in the same position as Debtor's other customer
5   creditors.

6   As far as this Court knows, enforcement of the Omnibus Order
7   is presently stayed under the Stay Order.  This is so because on
8   September 20, 2007, the Florida Court issued an order staying
9   proceedings against Debtor.  The Clarification Order vacated the
10  September 20, 2007 order.  The Stay Order stays the Clarification
11  Order, so the end result is that the Stay Order reinstated the
12  September 20, 2007 order that stays, _inter alia_, enforcement of the
13  Omnibus Order.  At this point, this Court is not inclined to issue
14  a stay that is duplicative of the stay of the Eleventh Circuit.
15  Should there currently be no such stay or should the status of a
16  stay of the enforcement of the Omnibus Order change, any party may
17  request further relief from this Court for good cause based on
18  facts that are not currently before this Court.

19  **b.   Unblocking the Blocked Account**

20  Based on the record before the Court, Debtor's request for
21  authority to unblock the Blocked Account is denied through
22  December 14, 2007.  On December 7, 2007 at 10:00 a.m., the Court
23  will hold a further hearing on whether to unblock the Blocked
24  Account as of December 14, 2007.  Any party may request that the
25  Blocked Account be unblocked prior to that time for good cause
26  based on facts that are not currently before this Court.

27  Debtor concedes that pursuant to Debtor's projected budgets,
28  Debtor does not need to use the funds in the Blocked Account until

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  December 14, 2007.  In reviewing Debtor's budget, Debtor projects
2  incurring litigation expenses related to the Florida Action, in the
3  amount of $333,333 for each week ending November 2, 2007,
4  December 7, 2007, and January 4, 2008.  This Court has stayed the
5  Enforcement Action against FTC through March 14, 2008, and the
6  Eleventh Circuit has stayed the Clarification Order.  The Eleventh
7  Circuit Stay Order effectively reinstates the Florida Court's
8  September 20, 2007 order stating that the automatic stay applies to
9  all aspects of the Florida Action, and so the Stay Order stays all
10  other proceedings against Debtor in the Florida Action.  Thus,
11  unless this Court's order is overturned, the $666,666 that Debtor
12  projects to spend in legal fees for the Florida Action between
13  November 2, 2007 and December 7, 2007 is moot.  Adding those funds
14  back into Debtor's budget means that Debtor should have sufficient
15  cash flow until the week ending December 21, 2007.

16      However, that is not the end of the analysis.  It is this
17  Court's understanding that part of the reason that Debtor's budget
18  indicates that Debtor will have insufficient cash flow as of the
19  week ending December 21, 2007 is based on Debtor's new post-
20  petition practice of holding funds equivalent to post-petition
21  collected and unremitted funds owed to customers.  Adding the
22  projected legal fees back into Debtor's pre-petition settlement
23  cash balance and retaining all other assumptions, Debtor will have
24  a deficit of $167,962 in funds held related to Debtor's obligations
25  to customers for collected and unremitted funds for the week ending
26  December 21, 2007 and a deficit of $185,556 in such funds for the
27  week ending December 28, 2007.  After that time, Debtor's
28  projections indicate that Debtor will have sufficient funds to

1  cover Debtor's new post-petition practice of holding such funds.
2  If this Court's understanding is incorrect or Debtor needs to use
3  those funds, Debtor can always request further relief from this
4  Court for good cause based on facts that are not currently before
5  this Court or if Debtor believes the Court misunderstands the facts
6  before it.

7      The Court acknowledges Debtor's new commitment to addressing
8  an issue that resulted in Debtor's bankruptcy filing, namely
9  Debtor's pre-petition use of funds withheld during the settlement
10 process for Debtor's general operating expenses.  Thus, on the
11 balance sheet it appears that Debtor would have a deficit.
12 However, it appears possible that Debtor would for two weeks have a
13 deficit of less than $200,000 in an account that holds funds to be
14 paid to customers at a later time.  If that were true, would there
15 be a sufficient basis for this Court to unblock the over $1.7
16 million in funds held in the Blocked Account to provide a reserve
17 of less than $200,000 in case Debtor were required to remit
18 unremitted funds to customers?  By December 7, 2007, the Court and
19 all parties will have several more weeks of actual post-petition
20 financial information from Debtor, so a more accurate assessment of
21 Debtor's actual need for the funds in the Blocked Account can be
22 made.  In any event, as noted above, should Debtor need the partial
23 or full use of the funds in the Blocked Account for a period of
24 time, the Court will consider such a request at the December 7,
25 2007 hearing.  Moreover, should Debtor need use of the funds in the
26 Blocked Account prior to the December 7, 2007 hearing, Debtor may
27 request such relief before that hearing.
28

<div style="writing-mode: vertical">UNITED STATES BANKRUPTCY COURT<br>For The Northern District Of California</div>

1

<div align="center">CONCLUSION</div>

2    For the foregoing reasons, the Enforcement Action against

3 Debtor is enjoined through March 14, 2008. On March 7, 2008 at

4 1:00 p.m., the Court will hold a further hearing on whether the

5 preliminary injunction of the Enforcement Action should be

6 continued beyond March 14, 2008. Any supplemental papers in

7 support of continuing the preliminary injunction of the Enforcement

8 Action after March 14, 2008 shall be filed and served by

9 February 22, 2008. Any opposition shall be filed by February 29,

10 2008. Either FTC or Debtor may request that the preliminary

11 injunction be lifted before March 7, 2008 for good cause based on

12 facts that are not currently before this Court.

13    Based on the Stay Order, this Court will deny without

14 prejudice Debtor's request for a preliminary injunction of the

15 enforcement of the Omnibus Order. Should there currently be no

16 such stay or should the status of a stay of the enforcement of the

17 Omnibus Order change, any party may request further relief from

18 this Court for good cause based on facts that are not currently

19 before this Court.

20    Debtor's request for authority to unblock the Blocked Account

21 is denied through December 14, 2007. On December 7, 2007 at

22 10:00 a.m., the Court will hold a further hearing on whether to

23 unblock the Blocked Account as of December 14, 2007. Any

24 supplemental papers in support of unblocking the Blocked Account at

25 that time shall be filed and served by November 27, 2007. Any

26 opposition shall be filed by December 3, 2007. Any party may

27 request that the Blocked Account be unblocked prior to that time

28

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                        61

1  for good cause based on facts that are not currently before this
2  Court.
3      Counsel for Debtor shall submit a form of order consistent
4  with this decision after review by FTC and Receiver as to form.
5
6  Dated:  November 2, 2007
7
8
9                              _____
10                             ARTHUR S. WEISSBRODT
                               UNITED STATES BANKRUPTCY JUDGE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.              62

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  Court Service List

2  The Billing Resource
   5883 Rue Ferrari
3  San Jose, CA 95138

4  Michael Ahrens, Esq.
   Steven B. Sacks, Esq.
5  Jeffrey K. Rehfeld, Esq.
   Sheppard, Mullin, Richter and Hampton
6  4 Embarcadero Center 17th Fl.
   San Francisco, CA 94111
7
   David R Chase
8  c/o Tew Cardenas LLP
   Attention Jeffrey C. Schneider
9  Four Seasons Tower, 15th Floor
   1441 Brickell Avenue
10 Miami, FL 33131-3407

11 Jeffrey Schneider, Esq.
   Tew Cardenas LLP
12 Four Seasons Tower, 15th Floor
   1441 Brickell Avenue
13 Miami, FL 33131-3407

14 Steven J. Schwartz, Esq.
   Danning, Gill, Diamond and Kollitz
15 2029 Century Park E 3rd Fl.
   Los Angeles, CA 90067
16
   Federal Trade Commission
17 c/o Laura Kim
   600 Pennsylvania Ave., N.W.
18 Room H-238
   Washington, DC 20580
19
   Julie A. Mack, Esq.
20 Michael Mora, Esq.
   Collot Guerard, Esq.
21 Richard McKuen, Esq.
   Federal Trade Commission
22 600 Pennsylvania Ave. N.W.
   Washington, DC 20580
23
   Kathryn S. Diemer, Esq.
24 Diemer Whitman & Cardosi, LLP
   75 East Santa Clara Street, Suite 290
25 San Jose, CA 95113-1806

26 Walter K. Oetzell, Esq.
   Danning, Gill, Diamond & Kollitz, Llp
27 2029 Century Park East, Third Floor
   Los Angeles, CA 90067-2904
28

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    63

1  John D. Fiero, Esq.
   Pachulski Stang Ziehl Young & Jones
2  3 Embarcadero Center, Suite 1020
   San Francisco, CA 94111-5994
3
4  Jeff Garfinkle, Esq.
   Buchalter Nemer
5  333 Market Street, 25th Floor
   San Francisco, CA 94105-2130
6  Steven H. Warren, Esq.
   O'Melveny & Myers LLP
7  400 South Hope Street
   Los Angeles, Ca 90071-2899
8
   James Pardo, Jr., Esq.
9  King & Spalding
   1180 Peachtree Street, N.E.
10 Atlanta, GA 30309
11 Felton Parrish, Esq.
   King & Spalding
12 1180 Peachtree Street, N.E.
   Atlanta, GA 30309
13
   Ken Dawson
14 5883 Rue Ferrari
   San Jose, CA 95138
15
   U.S. Trustee
16 Office of the U.S. Trustee
   U.S. Federal Bldg.
17 280 S 1st St. #268
   San Jose, CA 95113-3004
18
   John S. Wesolowski, Esq.
19 Office of the United States Trustee
   280 S 1st St. #268
20 San Jose, CA 95113-0002
21
22
23
24
25
26
27
28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.          64