1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2    Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  STEVEN B. SACKS, Cal. Bar No. 98875
   JEFFREY K. REHFELD, Cal. Bar No. 188128
4  ORI KATZ, Cal. Bar No. 209561
   Four Embarcadero Center, 17th Floor
5  San Francisco, California 94111-4106
   Telephone:    415-434-9100
6  Facsimile:    415-434-3947

7  Proposed Attorneys for The Billing Resource, dba
   Integretel

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

[SAN JOSE DIVISION]

| | |
|---|---|
| In re<br><br>THE BILLING RESOURCE, dba INTEGRETEL, a California corporation,<br><br>            Debtor.<br><br>Tax ID: 33-0289863 | Case No. 07-52890<br><br>Chapter 11 |
| THE BILLING RESOURCE, dba INTEGRETEL, a California corporation,<br><br>            Plaintiff,<br><br>    v.<br><br>FEDERAL TRADE COMMISSION, and DAVID R. CHASE, not individually, but solely in his capacity as receiver for Nationwide Connections, Inc., Access One Communications, Inc., Network One Services, Inc., 411TXT, Inc., CELL-INFO-USA, INC., Enhanced Billing Services, Inc., Toll Free Connect, Inc., Cripple Creek Holdings, LLC, Built to Last, LLC, Not Fade Away, LLC, He's Gone, LLC, The Other One, LLC, Turn on Your Love Light, LLC, China Cat Sunflower, LLC, Lazy River Road Holdings, LLC,<br><br>            Defendants. | Adv. Proc. No. 07-05156<br><br>**DECLARATION OF KEN DAWSON IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Date:    September 26, 2007<br>Time:    2:15 p.m.<br>Place:    United States Bankruptcy Court<br>          280 South First Street<br>          San Jose, California<br>Judge:    Hon. Arthur S. Weissbrodt<br>Courtroom:  3020 |

I, Ken Dawson, declare as follows:

1. I am the President and Secretary of The Billing Resource, dba Integretel, a California corporation (the "Debtor"), the named debtor in this case. I make this declaration in that capacity. I was one of the Debtor's founders in 1988 and I have been with the company ever since. I have personal knowledge of the matters set forth below. If called upon to testify as to those matter I could and would do so competently.

2. This declaration is submitted in support of the Debtor's "Emergency Motion For Temporary Restraining Order And Order To Show Cause Re: Preliminary Injunction And Declaratory Relief" (the "Motion"). Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

3. The Debtor has filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor is operating its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4. The Debtor was formed in 1988 based on a need for aggregators to facilitate billing and collections on behalf of smaller telecommunications companies that provided "alternative operator services" ("AOS") which otherwise could not afford to compete with the larger local exchange carriers ("LECs" or "Telcos") such as AT&T.

5. AOS involves providing long-distance calling on an occasional or as-needed basis in situations where often the consumer uses the service provider's assets or services without the consumer or the service provider knowing each other's identity. For example, a service provider owning the service contract for a hotel chain has no idea as to the identity of the consumer using its phones. If an AOS provider facilitates a collect call it needs a way to bill the consumer for that call.

6. The Debtor addressed a significant industry void by creating a service bureau focused entirely on billing-related services for AOS providers and others needing a means of billing consumers for their services. As the cornerstone to its billing capability, the Debtor maintains a full complement of billing and collection agreements with an estimated 1,400 or more LECs and independent service providers so that it can place calls made

-1-

1 through an AOS on a LEC bill. This infrastructure enables telecommunication service providers to incorporate their charges within the phone bills of more than 90% of business and residential consumers throughout the United States and Canada.

7. The Debtor quickly established itself as a leader in providing LEC billing solutions for diverse and emerging products and services. The Debtor presently offers a complete array of complementary services including internet-delivered management and settlement reporting, direct billing, customer care and collection support. As a strategic back-room business partner, the Debtor frees its clients to focus their efforts on promoting and selling products and services.

8. The Debtor has served thousands of service providers over the years. The vast majority of the processed billings have been in support of smaller sized businesses that otherwise would not have been able to compete. It is the competitive pressure of these smaller companies that has forced down the rates charged to consumers by the larger telecommunication companies.

9. The Debtor has approximately thirty-seven employees. Twenty-two of those employees have been with the company for over five years, and thirteen have been with the Debtor for over ten years. In addition, the Debtor's services support, through outsourced relationships, approximately 20-30 call center personnel in several different call centers who are employed by a third-party vendor.

10. Access One Communications, Inc. ("Access One") and Network One Services, Inc. ("Network One") were two of the Debtor's prior AOS customers (Access One and Network One are collectively referred to as the "Prior Customers").

11. On February 27, 2006, the Federal Trade Commission (the "FTC") commenced a lawsuit (i.e., the Florida Action) against three AOS providers, including the Prior Customers, as well as their principals, alleging deceptive and unfair practices for unauthorized billing of charges on phone bills – referred to as "cramming" – in violation of the Federal Trade Commission Act (the "FTCA"). The Florida Action is captioned <u>Federal Trade Commission v. Nationwide Connections, Inc., et al.</u>, Case No. 06-80180-Civ-

1  Ryskamp, United States District Court for the Southern District of Florida. The Florida
2  Court entered a temporary restraining order and later a preliminary injunction. The Florida
3  Court appointed the Receiver as the receiver for the defendants and certain of their
4  affiliates. An "Amended Preliminary Injunction Order" was filed on September 25, 2006.
5  On or about September 21, 2006, the FTC filed an amended complaint which included
6  claims against the Debtor and another billing aggregator.

7       12.    The FTC alleged in its Amended Complaint that the Debtor caused certain of
8  the Prior Customers' fraudulent charges to be placed on end users' phone bills and that the
9  Debtor was liable under the FTCA in spite of the fact that the LECs, not the Debtor,
10 perform the billing.

11      13.    The FTC has sought injunctive relief against the Debtor as well as monetary
12 redress including restitution for the allegedly defrauded consumers. There has been no
13 finding that the Debtor violated the FTCA.

14      14.    The Debtor voluntarily stopped providing services for the Prior Customers
15 over a year prior to the FTC's filing of its Amended Complaint. At the time that it stopped
16 providing services, the Debtor stopped making payments to the Prior Customers and
17 instead made a determination under the contracts with the Prior Customers that all further
18 amounts received from LECs on account of their billings should be booked as reserves.
19 This was done because of the Debtor's possible exposure to claims for refunds of the Prior
20 Customers' Billing Transactions.

21      15.    Whenever the Debtor allocated an amount to the reserves for the Prior
22 Customers, the Debtor made a bookkeeping entry for that amount. However, the Debtor
23 does not have a corresponding asset, such as a bank account, that contains the monies that
24 were allocated as reserves from the Prior Customers. Moreover, there is no segregated
25 account containing the reserves of any customer, including either of the Prior Customers.
26 The Debtor does not have enough monies to cover the full amount of reserves for all of the
27 Debtor's customers.

28      16.    In contrast to the FTC's allegations, the Debtor asserted that the Prior

-3-

Customers' wrongful conduct caused great injury to the Debtor, including by causing the Debtor to incur fees and expenses to defend the FTC action.

17. The Receiver is seeking to collect all assets of the Prior Customers. Toward that end, the Receiver sought relief in the Florida Action by motion against the Debtor. The Receiver asserted that the Debtor owes the Prior Customers the amount that the Debtor booked as reserves for the Prior Customers, which the Receiver alleged was an asset of the Prior Customers, in an amount in excess of $1.7 million. The Receiver further alleged that the Debtor had violated the Amended Preliminary Injunction Order and should be held in contempt for failing to turn over the sums demanded by the Receiver.

18. The Debtor filed a response opposing such relief on numerous grounds, including that at the most, any rights the Prior Customers—and therefore the Receiver, who stood in their shoes—had with respect to the reserves were simply those rights of a general, unsecured creditor. The Debtor also asserted that it had offsetting claims under the Subject Contracts against the Prior Customers which exceeded the amount of the Prior Customers' alleged reserves. In particular, to the extent the Debtor has any liability in the Florida Action, it arises from the misconduct of the Prior Customers, not the Debtor, and pursuant to the Subject Contracts, the Prior Customers are liable to the Debtor for such liability, as well as the costs and fees incurred in the Florida Action. These costs and fees, and the liability asserted against the Debtor in the Florida Action, far exceed the amount of any sums withheld from the Prior Customers as reserves.

19. The Debtor has expended over $700,000 in legal fees and costs to date in defending the Florida Action. That case is set for trial in February 2008.

20. The Debtor has also had to devote substantial and valuable management and employee time and resources to the Florida Action. Given the schedule in that case, the Debtor's management will need to be diverted even more is issue and would be forced to further incur such items, to the detriment of its reorganization efforts, if this action were not stayed as against the Debtor.

21. The Debtor believes that it will ultimately prevail in the Florida Action, and

-4-

that it will ultimately be held to owe nothing to the Receiver. However, the Debtor could not pay the money sought by the Receiver and still continue its normal operations. The Debtor requested that the Receiver agree to a stay to the implementation and enforcement of the Payment Order. The Receiver refused. The Debtor thereafter filed for bankruptcy protection.

22. The Debtor filed for bankruptcy protection because it could not continue its operations and pay over $1.7 million to the Receiver. Nor can it afford to have the Florida Action continue at the outset of this case, when it will divert its management's attention from the reorganization effort and cost very significant attorneys' fees and costs that the Debtor cannot afford. The Debtor can only proceed with a successful reorganization if the Florida Action, including the Payment Order, is stayed.

23. The Debtor has submitted a budget to this Court in connection with the Debtor's cash collateral motion. The budget shows that the Debtor had $1.9 million in cash at the filing date and expects receivables to be paid in the next three weeks of $3.9 million. If that cash is not used to meet secured creditors' claims on it and to make payments to the Debtor's current customers in exchange for continuing to submit receivables to the Debtor, then they may, as soon as they are able to do so, stop doing business with the Debtor and bring its operations to a halt. The Chapter 11 filing has unsettled the Debtor's customer relationships. For the Debtor to reorganize it needs to retain these customers. It cannot do so if its scarce resources are used for past claims asserted by the Receiver and in connection with litigation with the FTC.

24. Moreover, if the Prior Customers' claims are paid now, they would receive far more than their pro rata share of any funds available to return reserves to customers. The Debtor's current customers have no different entitlement to the Debtor's assets than the Receiver. If the other customers are not afforded similar relief, then the Prior Customers will have been preferred to the detriment of the Debtor's other creditors.

25. Obviously, the FTC claims it is acting in the public interest by proceeding with its claims against the Debtor for its involvement with the Prior Customers some two

1 years ago. But the FTC cannot achieve any proper regulatory goal if continuing the Florida Action merely puts the Debtor out of business, reducing competition in the marketplace from three firms to two. The Debtor plays an important role in helping keep telecommunication prices down, thereby serving the public interest. Unless the Florida Action is stayed, the Debtor is likely to cease operations. A forced liquidation of the Debtor will forfeit the Debtor's going concern value, leaving the Debtor's creditors much worse off. A cessation of the business will also cost the Debtor's employees their livelihoods. This will leave no regulatory purpose to the Florida Action.

26. Putting the Debtor out of business would also prejudice the Debtor's existing customers. Unlike the two Prior Customers who are no longer operating, the Debtor's other customers are still in business and likely would not be able to switch all of their billing and collection needs over from the Debtor to one of the Debtor's competitors fast enough to avoid substantial harm to their business operations.

27. The Debtor believes it will be able to successfully confirm a plan of reorganization. It bases that belief on the fact that on a going forward basis, the Debtor can be cash flow positive if it maintains its existing level of revenue and does not incur extraordinary costs arising from previous operations. The Debtor has a number of avenues open to it to reorganize. It could propose a plan under which it establishes a pot from which unsecured claims would be paid *pro rata*. It could also propose to issue new common stock in exchange for the unsecured debt, thus making its creditors into shareholders, with a stake in outcome of future operations. It could conclude a sale of its business to a competitor or other buyer and the proceeds of that sale would comprise the distributions that unsecured creditors would receive, after payment of secured claims and administrative costs.

28. Given sufficient time the Debtor can formulate a plan and negotiate that plan with its creditors. The Debtor faces no insuperable obstacles to successfully resolving this bankruptcy case.

I declare under penalty of perjury under the laws of the United States of America that the

-6-

-7-

1 | foregoing is true and correct.
2 | September 24, 2007

4 | /s/ Ken Dawson
5 | KEN DAWSON